# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| NEXTERA ENERGY CAPITAL HOLDINGS, INC., NEXTERA ENERGY TRANSMISSION, LLC, NEXTERA ENERGY TRANSMISSION MIDWEST, LLC, LONE STAR TRANSMISSION, LLC, and NEXTERA ENERGY TRANSMISSION SOUTHWEST, LLC, | Civil No. 1:19-cv-00626 |
| Plaintiffs, | |
| v. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| KEN PAXTON, Attorney General of the State of Texas, DEANN T. WALKER, Chairman, Public Utility Commission of Texas ARTHUR C. D'ANDREA, Commissioner, Public Utility Commission of Texas, and SHELLY BOTKIN, Commissioner, Public Utility Commission of Texas, each in his or her official capacity, | |
| Defendants. | |

## INTRODUCTION

1.     The State of Texas passed a law meant to reserve business opportunities and the opportunity to serve Texas customers, which used to be available to all businesses, only to existing electric utilities that currently own facilities in Texas.  Because a virtual *per se* rule of invalidity applies to such protectionist legislation, the law referred to as "Senate Bill 1938" and currently codified at Texas Utilities Code ("Utilities Code") § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154, is unconstitutional and should be enjoined.

2.     "[O]ur economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy," and thus, "the states are not separable economic units." *H. P. Hood*

& *Sons, Inc. v. Du Mond*, 336 U.S. 525, 537–38 (1949). Accordingly, the Supreme Court has "reflected an alertness to the evils of 'economic isolation' and protectionism." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623 (1978). "The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994). Thus, "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *Philadelphia*, 437 U.S. at 624. But even when a law regulates even-handedly it is invalid, if it imposes a burden on interstate commerce that is "excessive in relation to the putative local benefits." *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

3.     This case is about the very type of economic protectionism the Constitution was designed to prevent. The State of Texas has a long and successful history of holding itself out as open for business, including for investment by qualified new entrant transmission owners that did not already own transmission facilities or hold certificates from the Public Utility Commission of Texas ("PUCT") to provide transmission service. Despite this history, after facing competition, several of Texas' traditional transmission and distribution utilities successfully lobbied the Texas Legislature to effectively close the border to further new entrants. The resulting law (Utilities Code §§ 37.051, *et seq.*) is discriminatory on its face, by preserving the opportunity to invest in and provide service over new transmission facilities in the state solely to entities that already own facilities and hold a certificate. This law was intended to benefit local entities—giving electric utilities that already operate in Texas the sole right to build transmission lines with an end point in Texas, even when those transmission lines deliver power in interstate commerce. That is what the Constitution does not allow.

4. Plaintiffs NextEra Energy Capital Holdings, Inc., NextEra Energy Transmission, LLC, NextEra Energy Transmission Midwest, LLC, Lone Star Transmission, LLC, and NextEra Energy Transmission Southwest, LLC (collectively, "Plaintiffs") bring this action for Declaratory and Injunctive relief against Ken Paxton, Attorney General of the State of Texas; DeAnn T. Walker, Chairman, PUCT; Arthur C. D'Andrea, Commissioner, PUCT; and Shelly Botkin, Commissioner, PUCT; each in his or her official capacity, (collectively, "Defendants"), challenging the constitutionality of the amendments to Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154, which, as amended, grant Texas electric transmission owners the exclusive right to construct or acquire electric transmission facilities in the State of Texas.

5. Pursuant to 42 U.S.C. § 1983, Plaintiffs seek declaratory relief to invalidate the amendments to Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154, because these sections, as amended, violate the Commerce Clause and the Contracts Clause of the United States Constitution, and injunctive relief to prevent the unconstitutional enforcement of these laws by Defendants.

**PARTIES**

6. Plaintiff NextEra Energy Capital Holdings, Inc. ("NEECH") is a corporation organized and existing under the laws of Delaware with its principal place of business located at 700 Universe Blvd., Juno Beach, Florida 33408. NEECH is a subsidiary of NextEra Energy, Inc. ("NextEra) that holds direct or indirect ownership interests in, and is a source of funding for, many of NextEra Energy's operating subsidiaries, including NextEra Energy Transmission, LLC ("NEET"). As a result of Senate Bill 1938, NEECH has lost the opportunity for its subsidiaries to compete for, construct, own, or acquire transmission projects in Texas.

7. NEET is a limited liability company organized and existing under the laws of Delaware with a principal place of business in Juno Beach, Florida. It is an indirect subsidiary of

NextEra, and is engaged in the business of building and operating transmission facilities in North America. As a result of Senate Bill 1938, NEET has lost the opportunity to compete for, construct, own, or acquire transmission projects in Texas.

8. NextEra Energy Transmission Midwest, LLC ("NEET Midwest") is a limited liability company organized and existing under the laws of Delaware with a principal place of business in Juno Beach, Florida. It is an indirect subsidiary of NextEra, and is engaged in the business of building and operating transmission facilities in the Midcontinent Independent System Operator, Inc. ("MISO") region of the United States. NEET Midwest is a public utility with rates regulated by the Federal Energy Regulatory Commission ("FERC").[1] In November 2018, as a result of its competitive transmission planning process, MISO designated NEET Midwest to construct, own, and operate new 500 kilovolt ("kV") transmission line and substation facilities in Orange and Newton Counties in East Texas (the "Hartburg-Sabine Junction Transmission Project"). As a result of Senate Bill 1938, NEET Midwest has lost the opportunity to compete for, construct, own, or acquire transmission projects in Texas and further risks losing the Hartburg-Sabine Junction Transmission Project.

9. Lone Star Transmission, LLC ("Lone Star Transmission") is a limited liability company organized and existing under the laws of Delaware with a principal place of business in Austin, Texas. It is an indirect subsidiary of NextEra, and is engaged in the business of building, owning, and operating transmission facilities in the Electric Reliability Council of Texas, Inc. ("ERCOT") region of Texas and, as an investor-owned public utility, is regulated by the PUCT for purposes of rates and reliability. Lone Star Transmission was designated by the PUCT to construct 330 miles of 345 kV transmission lines and five 345 kV substations as part of the state's

---

[1] *NextEra Energy Transmission Midwest, LLC*, 161 FERC ¶ 61,140 (2017).

2005 competitive renewable energy zone ("CREZ") transmission buildout, which facilities were completed in 2013. Lone Star Transmission has thus operated as a transmission-only utility in ERCOT since then. As a result of Senate Bill 1938, Lone Star Transmission's ability to construct, own, or acquire transmission projects in Texas has been curtailed.

10.     NextEra Energy Transmission Southwest, LLC ("NEET Southwest") is a limited liability company organized and existing under the laws of Delaware with a principal place of business in Juno Beach, Florida. It is an indirect subsidiary of NextEra, and is engaged in the business of building and operating transmission facilities in the Southwest Power Pool, Inc. ("SPP") region of the United States. NEET Southwest is a public utility with rates regulated by FERC.[2] In 2017, NEET Southwest entered into an asset purchase agreement to acquire 30 miles of 138 kV transmission line facilities from Rayburn Country Electric Cooperative, Inc. (the "Jacksonville-Overton Line") in the SPP region of East Texas for approximately $2.1 million. NEET Southwest filed an application under the then-existing version of Utilities Code § 37.154 for a transfer of the CCN rights associated with the Jacksonville-Overton Line; the application is currently pending before the PUCT.[3] As a result of Senate Bill 1938, NEET Southwest has lost the opportunity to compete for, construct, own, or acquire transmission projects in Texas and further risks losing the Jacksonville-Overton Line.

11.     Defendant Ken Paxton is the Attorney General of the State of Texas, and charged with enforcing the laws of the State of Texas.

---

[2] *NextEra Energy Transmission Southwest, LLC*, 161 FERC ¶ 61,139 (2017), *letter order accepting settlement agreement*, 162 FERC ¶ 61,257 (2018).
[3] *See Joint Application of NextEra Energy Transmission Southwest, LLC and Rayburn Country Electric Cooperative, Inc. to Transfer Certificate Rights to Facilities in Cherokee, Smith, and Rusk Counties*, PUC Docket No. 48071.

12.     Defendants Commissioners of the PUCT, DeAnn T. Walker, Arthur C. D'Andrea, and Shelly Botkin, are charged with the regulation of electric utilities doing business in the State of Texas.  Among other duties, the PUCT is responsible for granting certificates for new transmission facilities throughout the State.  The amendments to § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 of the Utilities Code restrict the PUCT's authority to award certificates to in-state Texas companies.  Thus, the Commissioners are engaged in implementing and enforcing these unconstitutional laws.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331.  Plaintiffs assert claims under 42 U.S.C. § 1983 and the Constitution of the United States.

14.     This Court has personal jurisdiction over Defendants because all Defendants are residents of Texas and regularly conduct business in Texas.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and a substantial part of the events giving rise to this claim have occurred in this district.

## STATEMENT OF FACTS

### A.     History of Electrical Transmission Regulation in Texas

16.     Delivering electricity to customers is a three-step process: *first*, the electricity must be generated, *second*, the electricity must be transmitted from the generation site to where it is needed, and *third*, the electricity must be distributed to end-users.

17.     The transmission step of that process now occurs across a network of interconnected high-voltage transmission wires.  Much of this grid is organized and planned by

independent system operators ("ISOs") or regional transmission organizations ("RTOs"), who coordinate transmission planning, operation, and use on a regional and interregional basis.

18.     As shown in the map below, three ISOs serve Texas:  MISO, which spans much of the Midwestern United States, parts of Canada, and parts of eastern Texas; ERCOT, which covers much of Texas and is wholly within the State of Texas; and SPP, which runs from Canada into parts of eastern Texas and the Texas Panhandle.  In addition, a sliver of West Texas is not covered by any ISO and is instead managed by the Western Electricity Coordinating Council, a Regional Entity given authority by FERC.[4]

**Figure 3. Map of Regional Transmission Organizations in Texas**



19.     Unlike MISO, SPP, and WECC, which manage interstate grids, ERCOT operates wholly within Texas, and as such, is not subject to FERC's jurisdiction over rates for wholesale

---

[4] *See* Public Utility Commission of Texas, Scope of Competition in Electric Markets in Texas, Report to the 86th Legislature, at 9, *available at* https://www.puc.texas.gov/industry/electric/reports/scope/2019/2019scope_elec.pdf

transmission service. Accordingly, whereas FERC and the PUCT share regulatory authority over rates in the portions of Texas covered by MISO, SPP, and WECC, only the PUCT has authority over transmission rates within over ERCOT.

20. Under Texas law, before a new transmission line can be built anywhere in the state (whether inside or outside of ERCOT), a prospective line-owner must receive a Certificate of Convenience and Necessity ("CCN") from the PUCT, which allows the line owners to build, own, and operate the line.

21. Historically, the PUCT has issued CCNs to new entrant transmission utilities, including to entities based out of state. When a new, out-of-state transmission company builds transmission in Texas, that company must submit to regulation by the PUCT for purposes of siting and reliability, and therefore, become a Texas utility. Accordingly, out-of-state utilities are subject to the same rules as their in-state counterparts.

22. For example, in 2005, the Texas Legislature required the PUCT to designate certain areas as Competitive Renewable Energy Zones ("CREZ"). *See* Utilities Code § 39.904(g). The goal of the CREZ program was largely to deliver electricity from Texas' wind farms in the western parts of the state to Texas' electricity consumers primarily located in central and north-central Texas. The PUCT was tasked with developing a plan to construct the transmission capacity necessary to deliver the electric output from the renewable energy generated as part of the CREZ program. In selecting transmission service providers ("TSPs"), the PUCT considered:

> [S]everal factors, including: the interested TSP's current and expected capabilities to finance, license, construct, operate, and maintain the [CREZ Transmission Plan's ("CTP")] facilities in the most beneficial and cost-effective manner; the expertise of the TSP's staff; the TSP's projected capital costs and operating and maintenance costs for each CTP facility, the proposed schedule for development and completion of each CTP facility, financial resources, expected use of historically underutilized businesses (unless the TSP is an electric cooperative or municipally owned utility), and understanding of the specific requirements to implement the CTP facilities; and if applicable, the TSP's previous

transmission experience and historical operating and maintenance costs for existing transmission facilities.[5]

In considering these factors, the PUCT selected Lone Star Transmission, even though it did not already own transmission facilities in Texas, to build needed CREZ transmission lines and substation facilities in the ERCOT region.

23.    Nonetheless, Texas incumbents, including Texas' established transmission and distribution utilities,[6] have periodically attempted to argue that Texas law forbids the PUCT from granting CCNs within the state to transmission-only utilities.  In doing so, these Texas utilities have sought to effectively drive other utilities from the business of building, owning, and operating transmission facilities, by preventing the PUCT from approving anything but a traditional transmission and distribution utility—that is, companies that both transmit high-voltage electricity and deliver low-voltage electricity to end users—from owning facilities.

24.    In January 2007, Electric Transmission Texas, LLC ("ETT") sought approval from the PUCT under Utilities Code §§ 37.056 and 37.154 to become an electric utility "whose activities would be limited to acquiring, constructing, owning, and operating transmission facilities" in ERCOT.  *Pub. Util. Comm'n of Texas v. Cities of Harlingen*, 311 S.W.3d 610, 614 (Tex. App.—Austin, no pet. 2010).  The PUCT approved the ETT application.  Nonetheless, the City of Harlingen (and others) argued that the PUCT had no authority to approve a transmission-only utility—effectively claiming that only traditional, integrated transmission and distribution utilities with defined service areas could operate in Texas.  A Texas lower court agreed.  *Cities of Harlingen v. Public Utility Comm'n of Texas*, 2008 WL 8089334 (State District Court, Travis

---

[5] https://interchange.puc.texas.gov/Documents/35665_1324_612713.PDF.
[6] A "transmission and distribution utility" is a person that "owns or operates for compensation in" Texas "equipment or facilities to transmit or distribute electricity."  Tex. Util. Code Ann. § 31.002(19).

County).  This decision was eventually overturned on appeal, with the appellate court concluding that a transmission-only utility was fully consistent with the PUCT's authority under existing Texas law.  *Cities of Harlingen*, 311 S.W.3d at 620-21.  Nonetheless, in the time between the lower court's decision and the eventual reversal, the Texas Legislature intervened, passing laws specifically addressing the ETT transaction and clarifying that a transmission-only utility could operate within ERCOT.  *See* Act of May 31, 2009, 81st Leg., R.S., ch. 1170 (HB 3309), §§ 1-4, 2009 Tex. Gen. Laws 3700 (codified at Tex. Util. Code §§ 37.0541, .051(e)-(g), 053(a), .055, .057, .151).

> **B.**     **For Decades, Federal Policy Has Sought To Foster Competition Among Electric Transmission Providers.**

25.     Recognizing that interstate electric energy transmission and wholesale rates were a matter of federal public interest, Congress enacted the Federal Power Act in 1935, which granted the Federal Power Commission, later renamed the FERC, the exclusive authority to regulate transmission and wholesale sales of electricity in interstate commerce.

26.     As a result of this grant of regulatory authority and Federal regulatory policy implemented pursuant to the Federal Power Act, interconnected-electric systems and long-distance transmission became increasingly prevalent and economical, with competition becoming prevalent in the 1980s.  *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 50 (D.C. Cir. 2014).

27.     The current electric grid is an interconnected hub of transmission facilities crisscrossing the country: "[t]oday, electricity from nearly 5,800 power plants travels over 450,000 miles of high voltage transmission lines in the United States, connecting with nearly 6 million miles of lower voltage distribution cables, to provide power to homes, businesses, and industrial facilities. The U.S. electric grid constitutes an $876 billion asset managed by over 3,000 utilities

serving nearly 300 million customers." Alexandra B. Klass & Jim Rossi, *Revitalizing Dormant Commerce Clause Review for Interstate Coordination*, 100 Minn. L. Rev. 129, 140-41 (2015).

28.     FERC subsequently established a series of reforms to promote the development of competitive wholesale power markets. In 1996, FERC promulgated Order No. 888, which adopted structural reforms to functionally unbundle transmission, paving the way for competitive suppliers to access the wholesale electric grid on nondiscriminatory terms. FERC required that each utility state a separate cost-based rate (or cost) for transmission services, and then charge all parties, including the utility itself (when making off-system sales), the wholesale transmission rate.

29.     In 1999, FERC issued Order No. 2000, which encouraged the owners of electric transmission operating in interstate commerce to transfer operation of their transmission systems to ISOs or RTOs to coordinate transmission planning, operation, and use on a regional and interregional basis.

30.     ISOs and RTOs are FERC-approved nongovernmental corporations that manage portions of the transmission grid and regional markets for wholesale power for much of the country. These entities also plan the expansion of transmission grids within their regional footprints. A key role of an ISO or RTO is to plan for the development of new transmission facilities to ensure the reliability of the system and provide transmission access to wholesale power at reasonable costs.

31.     Until recently, both the MISO and SPP Transmission Owner Agreements and Tariffs, like the agreements or tariffs of many other ISOs, included provisions—referred to as rights of first refusal—through which utilities had a first right to construct any new transmission facilities in their service areas. Accordingly, the majority of the transmission facilities within the MISO- and SPP-administered regions today are owned and operated by transmission companies

that have historically had a footprint in the region. Like MISO and SPP, ERCOT's Nodal Protocols contain a right of first refusal based upon ownership of transmission "end points."[7] However, unlike MISO and SPP, ERCOT has kept its protocol-based right of first refusal, and thus, the vast majority of lines in ERCOT are also owned and operated by transmission companies that have historically had a footprint in the region.

C.    **In Order No. 1000, FERC Further Encouraged Wholesale Transmission Competition By Eliminating Rights of First Refusal and Increasing Transparency in Project and Developer Selection.**

32.    In July 2011, FERC issued Order No. 1000, which, among other things, required the removal from FERC-approved tariffs and agreements of any provision granting a right of first refusal for certain new transmission facilities. Based on their inclusion in agreements or tariffs subject to federal jurisdiction, Order No. 1000 referred to the provisions as "federal" rights of first refusal. Since then, federal courts have rebuffed numerous challenges to Order No. 1000, not only upholding FERC's authority to eliminate rights of first refusal, but also recognizing that rights of first refusal impede competition and harm the public interest. As noted above, MISO and SPP removed their tariff-based rights of first refusal in response to Order No. 1000.

33.    Order No. 1000: (1) seeks to foster competition in the construction of transmission facilities; (2) sets certain standards for regional cost allocation; (3) removes federal rights of first refusal from FERC-approved tariffs; (4) requires identification of the most cost effective projects; (5) requires—with exceptions—competition to select the developer for transmission projects selected for regional cost allocation; and (6) charges ISOs and RTOs with implementation. *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, FERC Stats. & Regs. ¶ 31, 323 (2011) (hereinafter "Order No. 1000"), *order on reh'g*,

---

[7] ERCOT Nodal Protocols § 3.11.4.8.

Order No. 1000-A, 139 FERC ¶ 61.132 (hereinafter, "Order No. 1000-A"), *order on reh'g and clar.*, Order No. 1000-B, 141 FERC ¶ 61.044 (2012). FERC found that these reforms were needed to ensure that Commission-jurisdictional services continued to be offered at "rates, terms and conditions that are just and reasonable and not unduly discriminatory or preferential." Order No. 1000 at ¶ 30.

34.     In particular, FERC found that rights of first refusal discouraged transmission developers seeking to invest in transmission, because a new player in the market would likely not want to risk the significant investment necessary to develop a transmission project if it would simply have to hand over the project to the existing utility exercising its right of first refusal once the benefits of the project became known. *Id.* at ¶ 257.

35.     FERC concluded in Order No. 1000 that:

> [L]eaving federal rights of first refusal in place for these facilities would allow practices that have the potential to undermine the identification and evaluation of a more efficient or cost-effective solution to regional transmission needs, which in turn can result in rates for Commission-jurisdictional services that are unjust and unreasonable or otherwise result in undue discrimination by public utility transmission providers.

*Id.* at ¶ 7.

36.     FERC further found that "federal rights of first refusal in favor of incumbent transmission providers deprive customers of the benefits of competition in transmission development, and associated potential savings." *Id.* at ¶ 285.

37.     Order No. 1000 catalogued the numerous comments that supported the removal of federal rights of first refusal. For example:

> 1)     The Federal Trade Commission stated that the existence of a federal right of first refusal reduces capital investment opportunities for potential non-

incumbent developers by increasing their risk, encourages free ridership among incumbent developers, and creates a barrier to entry. *Id.* at ¶ 231.

    2)    Numerous state utility commission and consumer advocate groups agreed that the right of first refusal provisions impede transmission development and removing the provisions would provide a more level playing field for incumbent and non-incumbent transmission developers. *Id.* at ¶ 231.

38.    Conversely, numerous incumbent transmission owners opposed Order No. 1000 and its efforts to benefit ratepayers through transmission planning reform and competition. *Id.* at ¶¶ 239–40.

39.    Order No. 1000 did not, however, preempt states from adopting their own laws, stating "[n]othing in this Final Rule is intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities, including but not limited to authority over siting or permitting of transmission facilities." *Id.* at ¶ 287.

40.    In *S.C. Pub. Serv. Auth. v. FERC*, the D.C. Circuit Court of Appeals affirmed FERC's authority to order removal of federal rights of first refusal from tariff agreements. Under Section 206 of the Federal Power Act, and found:

> [B]asic economic principles make clear that the rights of first refusal are likely to have a direct effect on the costs of transmission facilities because they erect a barrier to entry: namely, non-incumbents are unlikely to participate in the transmission development market because they will rarely be able to enjoy the fruits of their efforts.

762 F.3d at 74.

41.    In Order No. 1000-A, FERC rejected rehearing requests based on transmission owner assertions of a protected contractual right to build all new transmission in an existing footprint, deferring ruling on such assertions to the regional compliance filings. Order No. 1000-A at ¶¶ 388–389. As a result, numerous transmission owners made assertions of a contractually

protected federal right to exclusively build new transmission in a particular region. FERC rejected each of these assertions leading to multiple follow-up appeals challenging FERC's rejection of the asserted protected contractual right.[8] Thus, numerous federal courts have not only upheld FERC's authority to order the removal of federal rights of first refusal in FERC-approved tariffs and agreements, but recognized in no uncertain terms that rights of first refusal impede wholesale transmission competition and harm the public interest.

### D. ISOs' Response to Order No. 1000

42.     In compliance with Order No. 1000-A, MISO and SPP filed revisions to their Transmission Owner Agreements and Open Access Tariffs to remove the federal right of first refusal provisions. MISO and SPP also created a competitive solicitation process to select developers for new transmission projects and created rules governing system-wide cost allocation for new projects.

43.     Following Order No. 1000, MISO developed a competitive system to propose and build transmission facilities. MISO's competitive solicitation process, in compliance with Order No. 1000, allocates the cost of new projects among MISO ratepayers, including for some projects across the entire region. Thus, through these cost allocation mechanisms, costs of even an intra-state project may be allocated across all or a substantial part of the MISO region.

44.     MISO's competitive solicitation process also removed a federal right of first refusal from the tariff. At the same time, MISO added language to its tariff to recognize state-created rights. The MISO Tariff reads:

> **State or Local Rights of First Refusal**. The Transmission Provider shall comply with any Applicable Laws and Regulations granting a right of first refusal to a Transmission Owner. The Transmission

---

[8] *See MISO Transmission Owners v. FERC*, 819 F.3d 329, 333 (7th Cir. 2016); *Oklahoma Gas & Elec. Co. v. Fed. Energy Regulatory Comm'n*, 827 F.3d 75, 76 (D.C. Cir. 2016); *Emera Maine v. FERC*, 854 F.3d 662 (D.C. Cir. 2017).

> Owner will be assigned any transmission project within the scope, and in accordance with such terms, of any Applicable Laws and Regulations granting such a right of first refusal. These Applicable Laws and Regulations include, but are not limited to, those granting a right of first refusal to the incumbent Transmission Owner(s) or governing the use of existing developed and undeveloped right of way held by an incumbent utility.

45. In ruling on MISO's Compliance Filings, after initially rejecting MISO's Tariff addition to recognize state laws, FERC ultimately decided to permit MISO to bind itself by state or local laws or regulations when deciding whether MISO would apply its competitive solicitation process for transmission facilities. *Order on Rehearing and Compliance Filings*, 150 FERC ¶ 61,037, at ¶ 25 (Jan 22, 2015). FERC found that it would be inefficient for MISO to have to consider competitive proposals for projects, if, under state and local laws, the project would be automatically assigned to the existing utility. *Id.* at ¶ 26.

46. However, the then-Chair of FERC, Norman Bay, filed a concurring opinion, in which he questioned the constitutionality of state rights of first refusal:

> I write separately to note that the Constitution limits the ability of states to erect barriers to interstate commerce. State laws that discriminate against interstate commerce—that protect or favor in-state enterprise at the expense of out-of-state competition—may run afoul of the dormant commerce clause. The Commission's order today does not determine the constitutionality of any particular state right-of-first refusal law. That determination, if it is made, lies with a different forum, whether state or federal court.

*Id.* at 61,195.

47. MISO's revised tariff also implemented regional and system-wide cost sharing for critical projects.

48. At the outset, the MISO Tariff categorizes projects based on need, dollar value, and size. For a number of categories of projects, MISO does not require regional cost allocation. These generally small projects are also not subject to competitive bidding and are instead automatically

awarded to the incumbent because, in the view of the MISO members, the cost of holding the bids was not worth any efficiency gains from competition.

49.     Relevant here, two types of projects are subject to system-wide cost sharing and competitive bidding: Multi Value Projects and Market Efficiency Projects.

50.     Multi Value Projects support a range of system wide public policies (*i.e.*, promoting renewable energy).  The costs of Multi Value Projects are allocated system wide.  Thus, a Multi Value Project built in Texas would be paid for by consumers across all MISO States.

51.     Market Efficiency Projects seek to reduce market congestion.  For example, the Hartburg-Sabine Junction Transmission Project, for which NEET Midwest was designated as the selected developer, was a Market Efficiency Project.  At the time the Hartburg-Sabine Junction Transmission Project was approved, MISO's Tariff required that Market Efficiency Project costs were allocated 80% to the zones that would benefit from the project and 20% to the Planning Area in which the project was located.  *See Midcontinent Independent System Operator, Inc.*, 162 FERC ¶ 61,063 (2018).  Because all Planning Areas comprise multiple states, the practical effect of the cost allocation methodology is that the costs of all Market Efficiency Projects are allocated across state lines.

52.     This 80%-20% allocation formula governs costs incurred on the Hartburg-Sabine Junction Transmission Project, and as such, the Hartburg-Sabine Junction Transmission Project will be funded in part by non-Texas customers.

53.     SPP similarly revised its Tariff.   Like MISO, SPP developed a system of competitive bidding and regional cost allocation.  Also like MISO, SPP eliminated the federally-sanctioned right of first refusal from its Tariff.  At the same time, the SPP Tariff—like the MISO Tariff—recognized the effect of state laws that provided for rights of first refusal.

54.     In FERC's order approving SPP's competitive process, Chairman Bay again filed a concurring opinion, questioning the constitutionality of the state rights of first refusal, stating:

> I again write separately to note that the Constitution limits the ability of states to erect barriers to interstate commerce. State laws that discriminate against interstate commerce — that protect or favor in-state enterprise at the expense of out-of-state competition — may run afoul of the dormant commerce clause. The Commission's order today does not determine the constitutionality of any particular state right-of-first-refusal law. That determination, if it is made, lies with a different forum, whether state or federal court.

*Sw. Power Pool, Inc.*, 151 FERC ¶ 61,045 at 61,390 (Apr. 16, 2015).

### E.     Texas' Response to Order No. 1000

55.     Following Order No. 1000's implementation in SPP and MISO, Texas transmission and distribution owners outside of ERCOT tried to argue that, despite the decision on *Cities of Harlingen*, Texas law granted them an absolute right to build transmission facilities in their service areas.

56.     These arguments first came to a head in the SPP. In late 2016, SPP began to identify the transmission projects it would need to build from 2017 to 2027. One of the projects recommended was a 90-mile transmission line from a substation in Potter County, Texas to Southwestern Public Service Company's ("SPS") Tolk Generating Plant. In conformity with its competitive bidding plan after Order No. 1000, SPP prepared to solicit bids to construct and run the line. SPS, however, argued it had the exclusive right to build transmission lines within its service area under Texas law and, therefore, claimed that no competitive process should take place.

57.     Although this first dispute occurred in SPP, the question of whether Texas law granted current Texas utilities the exclusive right to build transmission facilities impacted all of the power regions in Texas. As Brian Pedersen, the Manager of Competitive Transmission for

MISO explained, the outcome of the SPS-SPP dispute would affect MISO's transmission selection as well.[9]

58.     On February 28, 2017, SPS and SPP filed a joint request for a declaratory ruling from the PUCT.  The parties asked the PUCT whether "SPS ha[d] the exclusive right to construct and operate new, regionally-funded transmission facilities in areas of Texas that lie within SPS's certificated service area."  *Joint Petition of Sw. Pub. Serv. Co. & Sw. Power Pool, Inc. for Declaratory Order*, 341 P.U.R.4th 195 (Oct. 26, 2017).

59.     The PUCT found that SPS did not have such exclusive rights, because "[n]owhere does [Texas utility law] explicitly grant [incumbent transmission and distribution] utilities an exclusive right to provide transmission service—including the right to construct transmission facilities—within their certificated service areas."  *Id.* at *16.  The PUCT cited the *Cities of Harlingen* decision in reaching this determination.

60.     The PUCT's decision was appealed by SPS and Entergy Texas, Inc. ("Entergy"), two entities that already owned and operated lines in Texas, and the Texas Industrial Energy Consumers.  The state district court affirmed,[10] and the case is currently pending with the Third Court of Appeals in Austin.[11]

**F.     Texas Enacted New Subsections to the Texas Utilities Code that Unconstitutionally Favor In-State Utilities.**

61.     After the PUCT determined that Texas' existing law did not insulate Texas transmission and distribution line owners from competition and after MISO had selected NEET Midwest to construct the Hartburg-Sabine Junction Transmission Project through a competitive

---

[9] https://www.rtoinsider.com/miso-market-efficiency-project-43345/.

[10] *Sw. Pub. Serv. Co. v. Pub. Util. Comm'n of Texas*, No. D-1-GN-18-000208 (459th Dist. Ct., Travis County, Tex. Sept. 27, 2018).

[11] *Entergy Texas, Inc. et al. v. Pub. Util. Comm'n of Texas*, No. 03-18-00666-CV (Tex. App.—Austin).

process, those same Texas utilities turned to the Legislature to gain that very protection, which the PUCT and the Texas courts had not given them.

62.     In March 2019, lawmakers in the Texas House and Senate introduced Senate Bill 1938 and the companion House Bill 3995, which sought to grant transmission and distribution utilities that already owned and operated lines in Texas the exclusive right to build lines that interconnected to their current lines, effectively seeking to replace the MISO and SPP Tariff-based rights of first refusal eliminated by Order No. 1000 with even stronger protections for the existing Texas utilities.

63.     On April 2, 2019, the Texas Senate Committee on Business & Commerce heard testimony on Senate Bill 1938.  A number of large Texas public utilities spoke in favor of the bill. The Texas public utilities were clear about why they supported the bill, as a representative for Oncor Electric, CenterPoint Energy, AEP Texas, and Texas New Mexico Power explained, the bill did not determine whether a project went forward, but was about determining who built the projects.  To the representative, Senate Bill 1938 was clear on this point, "[t]he end point owners of an existing facility", "will build any extensions that come off that facility, that's what this bill does."[12]  Companies that included transmission-only utilities and those seeking to become new entrants in Texas made the flip side of the same point.  A NextEra representative made clear that Senate Bill 1938 "limits the PUC's ability to license new transmission projects to entities just like NextEra and this takes potential options off the table that could save Texans millions of dollars as well as deny innovative solutions and expedited timelines at the same reliability."[13]  As the NextEra representative explained, under Texas law as it existed before the challenged bill, Texas

---

[12] http://tlcsenate.granicus.com/MediaPlayer.php?view_id=45&clip_id=14109 at 28:49-29:00.
[13] http://tlcsenate.granicus.com/MediaPlayer.php?view_id=45&clip_id=14109 at 9:19-9:35.

utilities were free to bid on and win new transmission lines as long as they are the most competitive bidder.[14]

64.     The House Report was also clear about what the bill would do, plainly stating that: "[t]he bill *limits* the persons to whom the Public Utility Commission of Texas (PUC) may grant a certificate to build, own, or operate a new electric transmission facility that directly interconnects with an existing electric utility facility or municipally owned utility facility *to the owner of that existing facility* and requires, for a new transmission facility that will directly interconnect with facilities owned by different electric utilities or municipally owned utilities, each entity to be certificated to build, own, or operate the new facility in separate and discrete equal parts unless they agree otherwise."[15]   Representative Phelan, the sponsor of the House bill was even clearer about the protectionist purposes of the bill, explaining that "transmission operations are best managed by accountable companies *with boots on the ground in our communities*."[16]

65.     Despite being introduced late in the legislative session, the Bill was sped through the process, being sent to the Governor on May 8, 2019.

66.     On May 16, 2019, Senate Bill 1938 was signed by Texas Governor Gregory Abbott.

67.     The enacted statute begins by requiring that before any utility provides any service in Texas, it must receive a certificate from the PUCT.  Utilities Code § 37.051.

68.     New subsections codified in Utilities Code § 37.056 give current transmission line owners the exclusive right to build new transmission lines that interconnect with their existing projects by limiting who the PUCT can issue certificates to, providing:

---

[14] *Id.* at 10:26.
[15] https://capitol.texas.gov/tlodocs/86R/analysis/pdf/HB03995H.pdf#navpanes=0
[16] http://tlchouse.granicus.com/MediaPlayer.php?view_id=44&clip_id=16845 at 7:50:21 – 7:50:27.

(e) A certificate to build, own, or operate a new transmission facility that directly interconnects with an existing electric utility facility or municipally owned utility facility may be granted only to the owner of that existing facility. If a new transmission facility will directly interconnect with facilities owned by different electric utilities or municipally owned utilities, each entity shall be certificated to build, own, or operate the new facility in separate and discrete equal parts unless they agree otherwise.

(f) Notwithstanding Subsection (e), if a new transmission line, whether single or double circuit, will create the first interconnection between a load-serving station and an existing transmission facility, the entity with a load-serving responsibility or an electric cooperative that has a member with a load-serving responsibility at the load-serving station shall be certificated to build, own, or operate the new transmission line and the load-serving station. The owner of the existing transmission facility shall be certificated to build, own, or operate the station or tap at the existing transmission facility to provide the interconnection, unless after a reasonable period of time the owner of the existing transmission facility is unwilling to build, and then the entity with the load-serving responsibility or an electric cooperative that has a member with a load-serving responsibility may be certificated to build the interconnection facility.

69.     The statute goes on to grant current Texas utilities the right to choose—but only among the pool of existing utilities that are already certified within a power region—which entity will operate a new line in the event the line's owner chooses to pass up the project, stating:

(g) Notwithstanding any other provision of this section, an electric utility or municipally owned utility that is authorized to build, own, or operate a new transmission facility under Subsection (e) or (f) may designate another electric utility that is currently certificated by the commission within the same electric power region, coordinating council, independent system operator, or power pool or a municipally owned utility to build, own, or operate a portion or all of such new transmission facility, subject to any requirements adopted by the commission by rule.

70.     Next, the statute provides that a CCN holder "shall serve every consumer in the utility's certificated area." Utilities Code § 37.151.

71.     Finally, the statute limits who an electric utility that holds a CCN can transfer their CCN to, providing in Utilities Code § 37.154(a) that:

> An electric utility or municipally owned utility may sell, assign, or lease a certificate or a right obtained under a certificate if the purchaser, assignee, or lessee is already certificated by the commission to provide electric service within the same electric power region, coordinating council, independent system operator, or power pool, or if the purchaser, assignee, or lessee is an electric cooperative or municipally owned utility.

72.     The statute, therefore, limits the right to build and operate approved transmission lines in Texas to those entities that already have a Texas transmission and distribution footprint, and excludes any out-of-state entities from building these lines, regardless of whether the lines cross Texas' state boundaries, whether costs for the lines are allocated to ratepayers outside of Texas, or whether the lines were approved by an interstate organization such as MISO, SPP, or WECC.

73.     Moreover, because the statute prevents transfer of CCN rights to an entity that does not already have a certificate in the "same electric power region, coordinating council, independent system operator, or power pool" even in the rare cases when a facility owner decides not to build a given facility or wishes to transfer an existing facility, the statute still prevents out-of-state entities from entering the Texas market by requiring the facility owner to transfer their rights to another entity that is already operating in Texas.

74.     Texas' exclusive-right-to-build law effectively ousts NextEra and its subsidiaries, NEET Midwest and NEET Southwest, which previously could have become regulated public utilities under Texas law, from acquiring further business or developing and constructing new transmission projects in Texas.  It does so for the benefit of a defined few utilities that already own transmission and distribution facilities in Texas, and blocks other entities, including new entrants,

and out-of-state developers that otherwise could qualify as public utilities under Texas law, from developing or acquiring transmission facilities, including those approved through a federally-mandated planning processes.

75.     The justifications the Texas legislators gave for the bill were unwarranted and pretextual.

76.     For example, some legislators argued that the bill was needed to protect the PUCT's rate jurisdiction. But the week before the Committee hearings on the Bill, the PUCT took the exact opposite position, arguing in a brief filed in Texas appellate court that allowing new, transmission-only companies in Texas does nothing to divest the PUCT of jurisdiction. As the PUCT explained: "If a transmission-only electric utility provides service in the non-ERCOT areas of Texas, FERC will still have jurisdiction over the wholesale transmission rates and the Commission will continue to set retail rates for these areas; there will be no relinquishment of jurisdiction."[17]

77.     Legislators also worried that out-of-state transmission companies might be less reliable than in-state companies. But there is no basis for the concern. As noted, the small number of out-of-state companies brought into ERCOT to run CREZ lines have successfully shown that out-of-state new entrant transmission service providers are just as reliable as in-state traditional transmission and distribution utilities. Moreover, for an out-of-state company to run transmission lines in Texas, even without the Bill, the out-of-state company would need to demonstrate that it could provide reliable service in order to obtain a CCN from the PUCT and to win a competitive bid from MISO or SPP. Additionally, transmission facilities are uniformly required to comply

---

[17] Br. of the Public Utility Commission of Texas, *Entergy Texas, Inc. v. Public Utility Commission of Texas*, No. 03-18-0666-CV, at 27-28 (Mar. 28, 2019).

with the North American Electric Reliability Corporation's standards, ensuring that all lines are operated reliably.

G.  **As a Result of Texas Law, NextEra and its Subsidiaries Are Foreclosed from the Right to Pursue New Business in Texas.**

78.  NextEra and its subsidiaries have a long history of active development of new electric transmission solutions. NextEra and its subsidiaries have been pioneers in the transmission business; NextEra subsidiaries were among the first non-incumbents to be awarded transmission projects by system operators and utility commissions in Texas, California, New York, and Ontario, Canada.

79.  Currently, NextEra and its affiliates own approximately 7,300 miles of transmission line between 69 kilovolts and 500 kilovolts operating in multiple states and have participated in numerous transmission planning and development processes across the country. NextEra and its subsidiaries have been able to secure such a robust portfolio of projects because of a proven construction track record; since 2003, NextEra companies have built over $43 billion in major projects, and have on an overall basis completed those projects on-time and under budget. Once construction is complete, NextEra and its subsidiaries operate one of the most reliable networks in the country, boasting a 99.98% reliability rate.

80.  Indeed, the PUCT has previously recognized NextEra's superior service by selecting Lone Star to build, own, and operate lines as part of the CREZ program. Lone Star completed its transmission facilities in 2013, and has reliably operated those facilities since then.

81. Since Order No. 1000 became effective,[18] NextEra subsidiaries have been selected as the more efficient or cost-effective transmission developer for needed transmission additions in five different competitive solicitations by different ISOs/RTOs.

82. For example, on February 6, 2018, MISO issued a request for proposals for the construction of a 500 kV competitive transmission project known as the Hartburg-Sabine Junction Transmission Project, which will be constructed in the Entergy service territory in East Texas. As mentioned, the Hartburg-Sabine Junction Transmission Project was designated as a Market Efficiency Project, and accordingly, the MISO tariff did not automatically award it to the incumbent, but rather required a competitive solicitation.

83. The solicitation was highly competitive, with MISO receiving 12 bids from nine qualified developers to build the line. A number of the same Texas transmission and distribution utilities supporting the legislation themselves created stand-alone affiliates to bid on the MISO project. In November 2018, MISO selected NEET Midwest to build the line, concluding that NEET Midwest's proposal offered "an outstanding combination of low cost and high value, with best-in class cost and design, best-in-class project implementation plans, and top-tier plans for operations and maintenance." Additionally, MISO indicated that NEET Midwest's bid conveyed "substantial benefits to ratepayers over time." Notably, NEET Midwest's selected bid included: a construction cost cap of $114.8 million, or $7.6 million below MISO's initial scoping-level cost estimate for the project; caps of 9.8 percent on the return on equity and 45 percent equity that NEET Midwest would recover over the life of the project; a cap on the revenues that NEET

---

[18] Although Order No. 1000 established a date for the submission of required compliance filings, each planning region proposed its own effective date for those Order No. 1000 compliant provisions. As a result, a limited number of competitive solicitations have been held under the Order No. 1000 compliant competitive processes.

Midwest would recover for the project over the first ten years of the project's life; and agreements to forgo certain revenues during construction of the project.

84. After being selected to build the Hartburg-Sabine Junction Transmission Project, NEET Midwest and MISO entered into a "Selected Developer Agreement," dated January 25, 2019. The contract allows NEET Midwest to recover its costs in building the designated facilities through the MISO Tariff, subject to FERC review and the terms and commitments proposed by NEET Midwest in its bid. The contract also allows NEET Midwest to recover a reasonable return on its investment, subject to various cost cap and cost containment commitments once the transmission line is operational. The Selected Developer Agreement required NEET Midwest to secure any necessary state-law CCNs to build the Hartburg-Sabine Junction Transmission Project. In its selection report, MISO found that "NextEra identified and provided experience for routing and siting staff, as well as third-party contractors engaged to provide permitting support. NextEra also furnished a clear summary and timeline for the Certificate of Convenience and Necessity ("CCN") process." But as a result of the amendments to Utilities Code § 37.051, § 37.056, § 37.057, and § 37.151, NEET Midwest will be barred from obtaining a CCN for the Hartburg-Sabine Junction Transmission Project because NEET Midwest does not already operate in Texas.

85. Thus, NextEra and its affiliates have shown that under applicable federal and state law they are willing, capable, and competitive players in the transmission development field and that they consistently deliver significant benefits to ratepayers when given the opportunity to participate.

86. Given this history, NextEra and its affiliates are positioned to provide high-quality, low-cost transmission lines in the State of Texas. However, NextEra and its subsidiaries NEET Midwest and NEET Southwest are effectively shut out of the Texas market by the amendments to

the Utilities Code. Thus, even though NextEra wishes to pursue regulated transmission projects in Texas, has the means to effectively win bids for those projects, and has clearly demonstrated its ability to reliably construct, own, and operate transmission facilities in the state through Lone Star Transmission, NextEra and its affiliates are further shut out of the areas of the state outside of ERCOT because they do not currently have a Texas footprint, and therefore, do not have the exclusive right to build new transmission facilities.

87.     Specifically, following an evaluation that included highly competitive bids from multiple entities, including an affiliate of Entergy, NEET Midwest has been awarded the rights to build the Hartburg-Sabine Junction Transmission Project by MISO. However, because of the amendments to § 37.051, § 37.056, § 37.057, and § 37.151, the incumbent transmission utility, Entergy will now appear to have the exclusive right to build the facilities under Texas law because the project as designed will interconnect with two existing Entergy lines and an Entergy substation. Thus, even though MISO selected NEET Midwest to construct, own, and operate the facilities, and even though NEET Midwest's proposal was selected as the best value both technically and financially for Texas (and the MISO region's) electric customers to the proposals of affiliates of a number of Texas transmission and distribution utilities (including Entergy), Texas law would appear to give its preferred in-state entities the exclusive right to build the facilities. Accordingly, as a result of the amendments to the statute, NEET Midwest's ability to construct this hundred-million dollar project will be impaired and NEET Midwest will suffer immediate harm. Senate Bill 1938 also creates uncertainty as to whether NEET Midwest will recover costs it has spent to date in developing the Hartburg-Sabine Junction Transmission Project.

88.     Similarly, NextEra subsidiary NEET Southwest will be immediately harmed by the new provisions of Utilities Code, which will prevent NEET Southwest from closing its currently

pending transaction to acquire the Jacksonville-Overton Line in the SPP region because the law requires the line to be transferred to a Texas incumbent. Accordingly, as a result of the statute, NEET Southwest will immediately lose out on an investment worth over $2 million.

89. Even NextEra subsidiary Lone Star Transmission is harmed by § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154. As explained, Lone Star was granted a CCN to build transmission facilities in ERCOT under the CREZ program. However, because new subsection (e) of § 37.056 mandates that a new transmission facility connecting to an existing facility may "only" be built by the owner of the existing facility, Lone Star's ability to expand its existing business is diminished by § 37.056.

## COUNT I
## TEXAS'S LAW VIOLATES THE
## COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983 and 42 U.S.C. § 1988
**(Brought by All Plaintiffs against All Defendants)**

90. Plaintiffs reallege paragraphs 1 through 89 of this Complaint as though fully set forth herein.

91. The United States Constitution provides that Congress shall have the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.

92. The Commerce Clause includes a "dormant" limitation on the authority of the States to enact legislation affecting interstate commerce.

93. The doctrine "is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Department of Revenue v. Davis*, 553 U.S. 328, 337–38 (2008) (internal quotation marks and citations omitted).

94. A state statute that discriminates against interstate commerce in favor of in-state commerce is unconstitutional. That is true whether the discrimination is found on the face of the statute, in its effect or its purpose.

95. The State of Texas is regulating activities in the interstate market, because it is applying its exclusive right to build law to projects approved through a federally mandated-planning process in MISO and SPP, even to lines that run across state lines. In addition, projects in these ISOs are eligible for regional (*i.e.*, multi-state) cost allocation, even though the footprint of the project does not cross state lines.

96. Texas also is regulating the provision of services in the nation-wide market to provide transmission services.

97. Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 facially discriminate against Plaintiffs by effectively prohibiting Plaintiffs, as well as other out-of-state, new entrant market participants, from building transmission lines in the State of Texas, including those lines approved through a federally-mandated planning process.

98. Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 also discriminate in purpose and effect by imbuing transmission developers with a Texas footprint with rights well beyond a right of first refusal. They unequivocally grant a select few utilities with the absolute right to construct all transmission projects within their geographic footprint, to the exclusion of out-of-state developers, including those approved through a federally-mandated planning process, who otherwise could qualify as public utilities under Texas law.

99. The legislative history shows that the law was not enacted for a legitimate, non-protectionist purpose.

100.     Many other methods would allay any concerns regarding cost and reliability of service, such as requiring new entrants to become public utilities and imposing other permit obligations on the new entrants to ensure reliability of service.  *See Cities of Harlingen*, 311 S.W.3d at 617 (noting that under Texas law an entity must become a utility to provide transmission services).

101.     Thus, the burden on interstate commerce caused by Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 is not justified by valid public welfare, consumer protection, or other legitimate public purpose unrelated to economic protectionism.

102.     In addition, Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 unduly burden interstate commerce by restricting entry to the transmission market in Texas, thus walling off the state from new market participants.  *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

103.     The purported local benefits of the Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 are insignificant and illusory, and are a mere pretext for discrimination against out-of-state transmission developers.  As numerous courts have found, basic economic theory leads to the conclusion that wholesale transmission competition benefits the markets and consumers.  Accordingly, the burden on interstate commerce is clearly excessive in relation to any purported local benefits.

104.     The statute has injured Plaintiffs by preventing their entry to the Texas transmission-development marketplace as regulated utilities, and interfering with their ability to plan, invest in, and conduct their business operations as MISO, SPP, ERCOT, and WECC-qualified entities.

105. This unconstitutional legislation, as enacted and as applied, should be stricken as unconstitutional and/or its enforcement should be enjoined as it threatens Plaintiffs with irreparable injury for which there is no adequate remedy at law. Plaintiffs also seeks attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT II**
**TEXAS'S LAW VIOLATES THE**
**CONTRACTS CLAUSE OF THE UNITED STATES CONSTITUTION**
**42 U.S.C. § 1983 and 42 U.S.C. § 1988**
**(Brought by NEET Midwest and NEET Southwest against All Defendants)**

106. Plaintiffs reallege paragraphs 1 through 89 of this Complaint as though fully set forth herein.

107. Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 substantially impair NEET Midwest's contractual right with MISO to build and operate the Hartburg-Sabine Junction Transmission Project and NEET Southwest's contractual right with Rayburn County to buy the Jacksonville-Overton Line.

108. Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 do not advance any goals that are important and of legitimate public concern under the police power.

109. Alternatively, if Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 do advance such a goal, its impairment of rights under the NEET Midwest-MISO and NEET Southwest-Rayburn contracts are neither reasonable nor necessary to serve any important and legitimate public concern.

110. Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 do not advance any goals that are important and of legitimate public concern under the police power.

111.     As such, Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 violate the "Contracts Clause" of the federal constitution, art. I, § 10 and 42 U.S.C. § 1983 and is void and unenforceable.

**COUNT III**
**DECLARATORY RELIEF**
**28 U.S.C. § 2201**
**(Brought by All Plaintiffs Against All Defendants)**

112.     Plaintiffs reallege paragraphs 1 through 89 of this Complaint as though fully set forth herein.

113.     "In a case of actual controversy . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

114.     Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 violate the Dormant Commerce Clause because they discriminate on their face and in purpose and effect against interstate commerce in order to benefit in-state competitors.

115.     The statute was enacted for purely protectionist purposes, and there are no local benefits that justify the continued enforcement of the statute.

116.     Enforcement of these laws create a genuine, credible, and immediate threat of harm to Plaintiffs' business and interstate commerce, by preventing new transmission development entities from entering the Texas market.

117.     Plaintiffs seeks a declaration that Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 are void under the Dormant Commerce Clause of the United States Constitution.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs hereby respectfully request the Court grant the following relief:

118.    An order declaring pursuant to 28 U.S.C. § 2201 that Utilities Code § 37.051, § 37.056, § 37.057, § 37.151, and § 37.154 are unconstitutional because they violate the Dormant Commerce Clause and the Contracts Clause and are therefore invalid and unenforceable, to the extent they grant in-state transmission owners the exclusive right to build or acquire transmission lines in the state of Texas and impair Plaintiffs' contracts.

119.    An order enjoining Defendants from enforcing the unconstitutional provisions of Utilities Code § 37.051, § 37.056, § 37.057, § 37.151 and § 37.154.

120.    An order awarding Plaintiffs the costs and expenses incurred in the instant litigation, including its reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b).

121.    An order for such other relief, including preliminary injunctive relief, and further relief as may be just and appropriate under the circumstances.

Dated:  June 17, 2019

Respectfully submitted,

**TILLOTSON LAW**

**Of Counsel:**

By: _/s/ Jeffrey M. Tillotson_____
    Jeffrey M. Tillotson

**BOIES SCHILLER FLEXNER LLP**

    (Texas Bar No. 20039200)
    1807 Ross Ave., Suite 325

    Stuart H. Singer
    Dallas, Texas 75201
    (Florida Bar No. 377325) (*pro hac vice application to be submitted*)
    Telephone: (214) 382-3040
    Facsimile: (214) 292-6564
    jtillotson@tillotsonlaw.com
    Carlos M. Sires
    (Florida Bar No. 319333) (*pro hac vice application to be submitted*)
    Evan Ezray
    (Florida Bar No. 1008228) (*pro hac vice application to be submitted*)
    401 East Las Olas Boulevard, Suite 1200
    Fort Lauderdale, Florida 33301
    Telephone: (954) 356-0011
    Facsimile: (954) 356-0022
    ssinger@bsfllp.com
    csires@bsfllp.com
    eezray@bsfllp.com

*Counsel for Plaintiffs*