UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NEXTERA ENERGY CAPITAL HOLDINGS, INC., *et al.*, *Plaintiffs*, | § § § § | |
| v. | § § | NO. 1:19-cv-00626-LY |
| DEANN T. WALKER, Chairman of the Public Utility Commission of Texas, *et al.*, *Defendants*. | § § § § | |

---

**TEXAS'S RESPONSE TO STATEMENT OF INTEREST OF THE UNITED STATES**

---

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

PRISCILLA HUBENAK
Chief for Environmental Protection Division

November 12, 2019

JOHN R. HULME
Texas Bar No. 10258400
Assistant Attorney General
john.hulme@oag.texas.gov

H. CARL MYERS
Texas Bar No. 24046502
Assistant Attorney General
carl.myers@oag.texas.gov

JESSICA SOOS
Texas Bar No.  24093183
Assistant Attorney General
jessica.soos@oag.texas.gov

Office of the Attorney General
Environmental Protection Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4229 | FAX: (512) 320-0911

*COUNSEL FOR DEFENDANTS*

The State Official Defendants ("Texas") file this response to the Statement of Interest filed by the Antitrust Division of the United States Department of Justice ("Statement").

## I.      Introduction and summary

Much of the Statement essentially argues that Texas should adopt the competitive process for transmission development under Federal Energy Regulatory Commission ("FERC") Order 1000, a particular policy option that the Antitrust Division favors.  But as explained in Texas's Motion, ECF No. 94 ("Motion"), and supporting reply brief, ECF No. 111 ("Reply"), the challenged legislation (SB 1938) simply codified Texas's longstanding practice of having existing regulated-utility providers (transmission-and-distribution utilities and, outside the ERCOT grid, vertically integrated utilities that generate, sell and deliver electricity to consumers) build out the transmission grid and provide transmission service in the state. SB 1938 does not facially discriminate against out-of-state entities and is not a change from the *status quo*.  The dormant Commerce Clause poses no bar to Texas's regulatory approach to ensuring the reliable delivery of electricity to Texas consumers, exercised pursuant to its undisputed authority over transmission facilities under the Federal Power Act. The United States Constitution allows states to eliminate competition entirely here.

## II.     FERC Order 1000 does not mandate a competitive process for the development of transmission lines in Texas.

The Statement, in its promotion of the Order 1000 process, glosses over a number of important circumstances.

First, as a threshold matter, Order 1000 is irrelevant to most of Texas's electric market. The Electric Reliability Council of Texas ("ERCOT") grid, serving 90% of Texas's electric customers by load, is not generally interconnected with the interstate grids covering the rest of the country that is subject to FERC regulation. Thus, FERC Order 1000 (and the process under it) has no application here.  Motion at 3.  As Texas has explained, the longstanding

process in ERCOT, reflected in its operating rules, is that endpoint owners (primarily transmission-and-distribution utilities) build the new lines that are needed.  Motion at 12.

Second, FERC acknowledged state right-of-first-refusal statutes in adopting Order 1000. And to the extent Order 1000 has any relevance outside ERCOT, transmission service is provided by vertically integrated utilities with significant regulatory obligations to serve end customers. As explained below, this is exactly the type of regulated entity involved in *General Motors v. Tracy*[1], a case in which the United States Supreme Court affirmed the dismissal of a dormant Commerce Clause claim based on differential tax treatment of regulated gas utilities.

Notably, the Statement was filed by the United States Department of Justice, not by FERC—the federal agency charged with overseeing the interstate electric markets that has significant expertise and practical experience with the construction of new transmission facilities outside of Texas. And, indeed, as the Motion explained (and the Statement tellingly admits), in eliminating some federal rights of first refusal FERC expressly acknowledged state right-of-first-refusal statutes such as SB 1938. *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 76 (D.C. Cir. 2014) (FERC "t[ook] great pains to avoid intrusion on the traditional role of the States" as to the siting and construction of transmission facilities.) The federal agency has stated that Order 1000 was not "intended to limit, preempt, or otherwise affect state or local laws" and has even rejected a challenge to a system operator's decision to recognize state-enacted rights of first refusal. *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities,* Order No. 1000, 136 FERC ¶ 61,051 (2011), *order on reh'g,* Order No. 1000-A, 139 FERC ¶ 61,132 (2012), *order on reh'g,* Order No. 1000-B, 141 FERC ¶ 61,044 (2012) (Order 1000); *Midwest Indep. Transmission Sys. Operator, Inc.*, 150 FERC ¶ 61,037 (2015).

---

[1] *Gen. Motors Corp. v. Tracy,* 519 U.S. 278 (1997).

Thus, FERC has approved the incorporation of state rights of first refusal into system-operator tariffs, a decision that was upheld by the Seventh Circuit. *MISO Transmission Owners v. FERC*, 819 F.3d 329, 336 (7th Cir. 2016). FERC also has approved multiple tariffs with expansive exemptions to Order 1000 where it might have required a competitive process, effectively continuing federal rights of first refusal for many transmission projects.[2] Given multiple opportunities to oppose state rights of first refusal, or to require rights of first refusal in most projects, FERC has demurred.

Congress has not responded to the FERC's recognition of these state rights-of-first-refusal like SB 1938 by amending the Federal Power Act. The dormant Commerce Clause prohibits "discriminatory state legislation" in the face of congressional silence, but "Congress has not been silent about electricity." *Elec. Power Supply Ass'n, v. Star*, 904 F.3d 518, 525 (7th Cir. 2018). Because state authority over transmission lines has been reserved in the Federal Power Act, there is no conflict preemption here—yet the Statement, like NextEra's briefing, essentially argues that the dormant Commerce Clause may be used to the same end.

Though the Antitrust Division's Statement extolls what it views as the virtues of the Order 1000 approach, FERC itself has taken a different view of late regarding the value of competitive processes in transmission development. The Antitrust Division says it has an interest in this case because of its "interest in preserving and promoting competition in interstate commerce," and contends that S.B. 1938 jeopardizes the benefits from Order 1000's introduction of competition in transmission construction.[3] But the problems with Order 1000's approach, in practice, are common knowledge.  These difficulties are acknowledged

---

[2] The Statement admits there are numerous exemptions to Order 1000's competitive processes.  Statement at 6 n.10.
[3] Statement at 1, 4.

throughout the electric industry, with even FERC Chair Neil Chatterjee recently stating "[e]veryone seems to agree that Order 1000 is not working as intended."[4] There is a view that FERC Order 1000 has incentivized the wrong kind of transmission buildout, has resulted in very few competitively bid projects, and has introduced a costly and time-consuming step into transmission planning that typically results in the incumbent provider being chosen anyway. Instead of encouraging transmission development and creating a robust bidding system for construction of transmission lines, Order 1000 has resulted in regional transmission organizations and utilities working to plan their transmission projects so that they will be exempted from the competitive process.[5]

In practice, Order 1000 has failed to promote competition in transmission construction. In the years since Order 1000 was issued, very few projects have been selected through competitive bidding. The Southwest Power Pool ("SPP") has engaged in just one competitive bidding process for a transmission project, and the Midcontinent Independent System Operator ("MISO") has engaged in only two.[6]  When the competitive process is utilized, it is

---

[4] Herman K. Trabish, *With new transmission urgently needed, FERC Chair hints at a new Order 1000 proceeding,* UTILITY DIVE (May 31, 2019), https://www.utilitydive.com/news/with-new-transmission-urgently-needed-ferc-chair-hints-at-a-new-order-1000/555586/
[5] FERC Commissioner Richard Glick recently explained this when he stated "right now [utilities] are convincing their regional transmission organizations that it's better to invest in the shorter lines to address reliability as opposed to longer lines because they're worried about losing those longer lines to competitive transmission developers." Kelly Andrejasich, *Pointing to 'perverse incentive' under Order 1000, FERC's Glick calls for changes,* S&P GLOBAL, (Oct. 11, 2019) https://www.spglobal.com/platts/en/market-insights/latest-news/electric-power/101119-pointing-to-perverse-incentive-under-order-1000-fercs-glick-calls-for-changes. As a result of these "perverse incentives," the transmission system suffers because projects are chosen for their ability to avoid Order 1000 instead of for cost or efficiency. Commissioner Glick mentioned "getting rid of competition" as one possible solution to the problems created by FERC Order 1000. *Id.*
[6] Tom Tiernan, *SPP selects Mid-Kansas co-op to build Walkemeyer project, lowers reserve margin*, TRANSMISSION HUB (April 27, 2016), https://www.transmissionhub.com/articles/2016/04/spp-selects-mid-kansas-co-op-to-build-walkemeyer-project-lowers-reserve-margin.html; *MISO to Review 12 Proposals for*

4

often viewed as both costly and time-consuming.[7] Regional transmission organizations attempting to comply with Order 1000 often have gone through a lengthy and expensive process, only to award the project to the incumbent. The Department of Energy found in its 2018 Transmission Data Review that "[f]or all of the transmission planning regions that had competitive proposal windows, the percentage of selected proposals submitted by nonincumbent transmission developers declined from twenty percent in 2013, to six percent in 2014, to three percent in 2015, and to zero in 2016."[8]

### III. The dormant Commerce Clause does not require Texas to adopt a particular approach to ensuring reliable transmission service.

Regardless of the relative respective merits of the Order 1000 and Texas's approach, the United States Constitution does not mandate the Antitrust Division's preferred policy—and what the Constitution requires is the actual issue this case presents. As Texas explained in prior briefing, the dormant Commerce Clause does not "constitutionalize" any particular form of state utility regulation. Motion at 6; Reply at 1. And as the United States Supreme Court noted in *Tracy*, a state may opt to eliminate competition entirely. *Tracy*, 519 U.S. at 306. That

---

*Hartburg-Sabine Transmission Project*, MISO (August 31, 2018),
https://www.misoenergy.org/about/media-center/miso-to-review-12-proposals-for-hartburg-sabine-transmission-project/.

[7] The SPP reported the internal costs of its sole competitive process to be $522,196. SPP, CTPTF Transmission Owner Selection Process Update, Presented to Strategic Planning Committee, July 7, 2016, p. 33. Available at:
https://www.spp.org/documents/39274/spc%20ed%20session%20materials%2020160707.pdf. It took SPP roughly a year to select the entity to build the line counting from the day SPP published its Request for Proposals. SPP, CTPTF Transmission Owner Selection Process Update, Presented to Strategic Planning Committee, July 7, 2016, p. 29-31. Available at:
https://www.spp.org/documents/39274/spc%20ed%20session%20materials%2020160707.pdf .

[8] US DEPT. OF ENERGY, ANNUAL U.S. TRANSMISSION DATA REVIEW at 77 (March 2018) available at
https://www.energy.gov/sites/prod/files/2018/03/f49/2018%20Transmission%20Data%20Review%20FINAL.pdf

is what Texas has long done with the provision of transmission service by its PUCT-regulated utilities. Texas has enacted a "comprehensive and adequate regulatory system for electric utilities," to protect the public interest in utility rates and services. Tex. Util. Code § 31.001(a). The PUCT authorizes the lines, decides where they are built, and sets the rates that the PUCT-certificated transmission providers (transmission-and-distribution utilities that deliver electricity, and vertically integrated utilities that generate, deliver and sell it) receive for their services.[9] Motion at 3-5; Reply at 1-2. These utilities are subject to mandatory service obligations in their certificated areas under Texas law. SB 1938 simply codified the long-standing general practice in Texas that the existing endpoint owners build out their facilities.

The Statement incorrectly states here that SB 1938 changed the status quo in Texas. It did not. Indeed, there are no transmission-only providers at all in the part of the state outside ERCOT. Within ERCOT, only a handful of transmission-only providers operate a small percentage of the total miles of transmission lines. Motion at 4 n.10. These few transmission-only Competitive Renewable Energy Zone ("CREZ") providers are the result of an extraordinary mandate by the Texas Legislature more than a decade ago to promote the development of the needed infrastructure to bring wind power from West Texas to population centers in the Eastern part of the state. Motion at 12 n.21; Reply at 2 n.1.[10]

---

[9] As explained in Texas's Motion, under the FERC's bundled rate doctrine, the amount paid for transmission services in parts of the state outside ERCOT are set by the Commission as part of the integrated utilities' bundled rates.   Motion at 14.   And as the ERCOT grid itself is not connected to the interstate grid, the PUCT sets transmission rates in ERCOT.   Thus, the Statement's representations about Order 1000 regional cost allocation are a red herring.

[10] The PUCT declaratory order that the Statement cites as recognizing the certification of transmission-only utilities throughout Texas, Statement at 2, was challenged in court.   But that appeal was dismissed as moot in light of the passage of SB 1938. *See* Motion at 10 n.18.

**IV.     SB 1938 does not facially discriminate against out-of-state entities.**

Like NextEra, the Statement argues that because new providers under SB 1938 must have a physical presence in Texas, the statute purportedly discriminates in favor of these "in-state" entities and against "out-of-state" entities. This overlooks the obvious fact that what is at issue in this case is the construction of transmission lines *in Texas*, that will transmit electricity within Texas. The existing providers with transmission lines in Texas are, necessarily under this definition, "in-state" because their facilities are in the state. So too will all new lines be built by "in-state" companies. Thus, by this logic, these new lines can never be constructed by "out-of-state" companies. Thus, discrimination against out-of-state entities is necessarily impossible.

SB 1938 simply does not preclude out-of-state interests from building and operating transmission facilities in Texas. This is self-evident from the judicially noticeable fact—that neither the Statement nor NextEra itself in its briefing has denied—that most SB 1938 rights-of-first-refusal at issue are actually held by out-of-state controlled interests. Motion at 11-15; Reply at 5-8. (Indeed, NextEra subsidiary Lone Star Transmission itself has a right of first refusal under SB 1938.) The Statement's response here is to assert that what matters for this analysis is the requirement for a physical presence in a state. But these transmission lines *must* be built in Texas, to provide transmission service in Texas.

Finally, and significantly here, SB 1938 does not preclude new out-of-state interests from entering the Texas market for transmission services as the Statement urges. Section 7 of SB 1938 specifically allows the incumbent providers to "sell, assign, or lease a certificate or a right obtained under a certificate" to an entity that has not been previously certificated, with PUCT approval, if the transaction will not diminish the retail rate jurisdiction of the state. Tex. Util.

Code § 37.154(a). Rather than excluding out-of-state interests, Section 7 of SB 1938 expressly provides them a route to enter the Texas market.

V.     *General Motors v. Tracy* **forecloses NextEra's claim, and the existing transmission-and-distribution providers with a right of first refusal under SB 1938 are not similarly situated to the potential new-entrant transmission-only providers.**

In arguing that *General Motors v. Tracy*[11] does not foreclose plaintiffs' claim, the Statement assumes away a core concern underlying *Tracy*—the impacts upon a captive regulated market. This is a key to why SB 1938 does not present a dormant Commerce Clause issue. The same concern is found here. Throughout Texas, transmission service and the construction of new transmission lines is provided by transmission-and-distribution utilities and (outside ERCOT) vertically integrated utilities with significant regulatory obligations and a mandatory obligation to deliver electricity to end customers. Thus, they are akin to the local gas utilities involved in *Tracy;* the Supreme Court's concern about the impacts upon those utilities with service obligations to captive customers was a basis of its determination that the dormant Commerce Clause did not bar the differential tax treatment of these utilities and other types of gas providers. *Tracy*, 519 U.S. at 304-06. Here, the Statement's response to *Tracy* wrongly asserts that a captive market is not involved here. As just explained, this is incorrect.   Thus, *Tracy* does control.

Existing transmission providers and would-be new-entrant transmission-only providers like NextEra are not similarly situated to the existing transmission providers in Texas, as the Statement contends. As in *Tracy*, there are significant differences between potential new transmission-only providers and the incumbent utilities that have the preferential right to build new lines in Texas. Outside ERCOT, investor-owned utilities provide "fully-bundled" service

---

[11] 519 U.S. 278 (1997).

to captive end-use customers, just like the favored local gas distribution companies involved in *Tracy*. Transmission-only providers would not sell or deliver electricity to end consumers, and/or have mandatory distribution service obligations. *See* Compl. ¶¶ 28, 41, 103. By contrast, the incumbent vertically integrated utilities in Texas, like the local gas utilities involved in *Tracy*, are subject to pervasive state regulation over their retail rates and services, Tex. Util. Code §§ 11.001, 36.051, & 38.002, and have an obligation to serve "every consumer in the utility's certificated area" and "provide continuous and adequate service in that area." Tex. Util. Code § 37.151. The situation is effectively the same within ERCOT, where most transmission lines are owned and operated by regulated transmission-and-distribution utilities that have significant regulatory obligations. Any differential treatment of these different types of entities is not discrimination, as the existing providers and the potential transmission-only new entrants are not substantially similar. *See Tracy*, 519 U.S. at 298 ("any notion of discrimination assumes a comparison of substantially similar entities"). The distinction that SB 1938 draws is based upon business form, one that the Fifth Circuit has long held does not violate the dormant Commerce Clause. Motion at 11; Reply at 2.

On this issue, the Statement says that "[l]ocal and nonlocal transmission development companies are similarly situated," Statement at 9, but offers little actual explanation other than the simple assertion that "nonlocal" companies could build the lines. It includes no discussion of the significant differences between transmission-and-distribution providers now serving Texas and would-be new transmission-only providers.

## VI.   Other cases the Statement cites do not show that plaintiffs have pleaded a dormant Commerce Clause claim.

SB 1938 is not analogous to the legislative enactments at issue in the "flow-control" dormant Commerce Clause cases that the Statement cites. Statement at 12-13. Unlike SB 1938, the laws at issue in the cited cases imposed restrictions on the flow of goods in interstate

commerce or burdensome requirements as a precondition for allowing the flow of goods in interstate commerce. As Texas's prior briefing has discussed, SB 1938 does neither of these. Reply at 7-8. It only regulates the construction and operation of new transmission facilities that will be located wholly within Texas. This is not a matter of economic protectionism but necessity and physical reality. This simple fact distinguishes SB 1938 from these cases.

Finally, a plaintiff's burden under the *Pike* test—that the law's burden on interstate commerce is "clearly excessive" relative to the putative local benefits—is seldom met. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Courts routinely dismiss *Pike* claims once they have found, as is the case here, that there is no discrimination. *See, e.g., Elec. Power Supply*, 904 F.3d at 524-25; *Allco Fin., Ltd. v. Klee*, 861 F.3d 82, 103-08 (2d Cir. 2017). As Texas explained in its prior briefing, SB 1938 does not discriminate against out-of-state providers on its face. Motion at 10-11; Reply at 5-8. And the State's interest in assuring reliable electric service is overwhelming. In this context, the Statement asserts that statutes requiring business operations be performed in the home state that could more efficiently be performed elsewhere are viewed with suspicion. Statement at 14. But that is exactly the point—these transmission lines must be built in Texas, to provide transmission service in Texas.

**VII. Conclusion**

The Statement does not demonstrate that the NextEra plaintiffs have pleaded a dormant Commerce Clause claim regarding SB 1938. NextEra's Complaint should be dismissed.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

10

PRISCILLA HUBENAK
Chief for Environmental Protection Division

/s/ *John R. Hulme*
JOHN R. HULME
Texas Bar No. 10258400
Attorney-in-Charge
Assistant Attorney General
john.hulme@oag.texas.gov

H. CARL MYERS
Texas Bar No. 24046502
Assistant Attorney General
carl.myers@oag.texas.gov

JESSICA SOOS
Texas Bar No. 24093183
Assistant Attorney General
jessica.soos@oag.texas.gov

Office of the Attorney General
Environmental Protection Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4229 | FAX: (512) 320-0911

*COUNSEL FOR DEFENDANTS*

11

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2019, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record and via email to the following individuals who have provided their written consent in accordance with FRCP 5(b)(2)(E) to receive service by electronic means:

Mark A. Walker
XCEL ENERGY SERVICES, INC.
816 Congress Avenue, Suite 1650
Austin, Texas 78701
mark.a.walker@xcelenergy.com

Winston Patrick Michael Skinner
VINSON & ELKINS, LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
wskinner@velaw.com

Jacob Lawler
HOLLAND & KNIGHT
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
jacob.lawler@hklaw.com


<u>/s/ *John R. Hulme*</u>
JOHN R. HULME
Assistant Attorney General

12