FILED
2020 FEB 26 PM 3:42
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NEXTERA ENERGY CAPITAL HOLDINGS, INC., NEXTERA ENERGY TRANSMISSION, LLC, NEXTERA ENERGY TRANSMISSION MIDWEST, LLC, LONE STAR TRANSMISSION, LLC, AND NEXTERA ENERGY TRANSMISSION SOUTHWEST, LLC, PLAINTIFFS, | § | CAUSE NO. 1:19-CV-626-LY |
| V. | § | |
| DEANN T. WALKER, CHAIRMAN, PUBLIC UTILITY COMMISSION OF TEXAS; ARTHUR C. D'ANDREA, COMMISSIONER, PUBLIC UTILITY COMMISSION OF TEXAS; AND SHELLY BOTKIN, COMMISSIONER, EACH IN HIS OR HER OFFICIAL CAPACITY, DEFENDANTS. | § | |

**ORDER ON MOTION TO DISMISS**

Before the court are Texas's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) filed August 23, 2019 (Doc. #94); Amended Plaintiffs' Opposition to Defendants' Motion to Dismiss filed September 16, 2019 (Doc. #108); Texas's Reply in Support of Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) filed September 27, 2019 (Doc. #111). Also before the court are the Statement of Interest of the United States of America filed September 20, 2019 (Doc. #110) and Texas's Response to Statement of Interest of the United States filed November 12, 2019 (Doc. #122). The court held a hearing on the motion on December 4, 2019, at which the court entertained argument from counsel for the parties.

As a preliminary matter, however, the court will consider numerous motions by third parties to intervene in this case.[1] Intervention in an existing case is governed by Rule 24 of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 24. A movant may intervene of right if "given an unconditional right to intervene by a federal statute" or "claims an interest in relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FED. R. CIV. P. 24(a). No movant satisfies this standard. To the extent that a movant may arguably be impaired or impeded in its ability to protect an alleged interest, the existing parties adequately protect that interest.

Rule 24 also provides for permissive intervention. *See* FED. R. CIV. P. 24(b). "Permissive intervention is wholly discretionary with the [district] court, even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied." *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 471 (5th Cir. 1984). As the existing parties adequately protect all asserted interesst and the presence of additional parties will not be of

[1] The motions are as follows: Motion to Intervene by LSP Transmission Holdings II, LLC (Doc. #33); Motion to Intervene by Oncor Electric Delivery Company LLC (Doc. #49); Motion to Intervene by Entergy Texas, Inc. (Doc. #50); Southwestern Public Service Company's Partially Opposed Motion to Intervene (Doc. #54); Motion for Leave to Intervene and File Answer by Texas Industrial Energy Consumer (Doc. #68); Partially Opposed Motion to Intervene by East Texas Electric Cooperative, Inc. (Doc. #79); Motion for Leave to File Proposed Motion to Dismiss and Proposed Opposition to Motion for a Preliminary Injunction by Southwestern Public Service Company (Doc. #89); Motion for Leave to File Opposition to Plaintiffs' Motion for a Preliminary Injunction by Oncor Electric Delivery Company LLC (Doc. #90); Motion for Leave to File Rule 12(b)(6) Motion to Dismiss (Doc. #91); Motion for Leave to File Motion to Dismiss by Oncor Electric Delivery Company LLC (Doc. #92); and Motion for Leave to File a Response to Plaintiffs' Motion for a Preliminary Injunction by Texas Industrial Energy Consumers (Doc. #93) (collectively, "the motions to intervene").

assistance to the court's determination of the issues presented by the existing parties, the court will deny permissive intervention. **IT IS THEREFORE ORDERED** that the motions to intervene are each **DENIED**.

The court now turns to the motion to dismiss.

## I. BACKGROUND

This case involves regulation of the transmission of electricity and the electric grids serving the State of Texas. Electricity is transmitted throughout a grid on transmission lines with distribution lines that carry the electricity on to individual end customers. There are three essentially separate electric grids in the continental United States—the eastern grid, the western grid, and the Electric Reliability Council of Texas, Inc. ("ERCOT") grid. Texas includes small parts of both the eastern and western grids and the entire ERCOT grid. In much of the country, transmission planning is overseen by an Independent System Operator ("ISO") or a Regional Transmission Organization ("RTO"). In Texas, three ISOs and RTOs are involved—the Southwest Power Pool ("SPP"), the Midcontinent Independent System Operator ("MISO"), and ERCOT. The ERCOT grid covers about 75% of Texas's land area and about 90% of the electricity used by Texas customers. Because it is located only in Texas and interconnected with other grids to only a very limited extent, the ERCOT grid is not deemed to be involved in interstate transmission, and the ERCOT market is not subject to Federal Energy Regulatory Commission ("FERC") rate jurisdiction.

The parts of Texas that are outside the ERCOT grid and in the SPP or MISO grids each cover several states and are subject to FERC wholesale-transmission-rate jurisdiction. Thus, their activities within Texas are subject to concurrent federal and state oversight by FERC and the Public Utility Commission of Texas ("PUCT").

In Texas, "[e]lectric utilities are by definition monopolies in many of the services provided and areas they serve. As a result, the normal forces of competition that regulate prices in a free enterprise society do not always operate in Texas. Public agencies regulate electric utility rates, operations, and services . . . ." TEX. UTIL. CODE § 31.001(b) (West 2016). The purpose of the Electric Utilities subtitle of the Texas Utilities Code is "to establish a comprehensive and adequate regulatory system for electric utilities to assure rate, operations, and services that are just and reasonable to the consumers and to the electric utilities." *Id.* at § 31.001(a).

The Texas Legislature has delegated oversight of Texas's electric utilities to PUCT. In ERCOT's region, retail sales and generation have been deregulated, but transmission and distribution is still regulated, with these utilities' rates set by the PUCT and passed through to end customers. Areas outside ERCOT are still served by vertically integrated utilities that provide the generation, transmission and distribution, and retail services at PUCT-set rates that reflect these costs.

All utilities—in all three grids—must obtain a certificate of convenience and necessity ("CCN") from the PUCT to provide transmission service to the public. During the CCN process, the PUCT determines if the line is necessary and weighs a variety of factors, including the cost to consumers and the adequacy of existing service. The PUCT also determines specific line siting and approves technical aspects of facilities.

The utility also must obtain a CCN from the PUCT to build a new line before it may be put into service. The general practice in Texas has been for the existing transmission owners to build new lines. ERCOT's operating rules or "protocols" reflect this longstanding practice. Before 2011, FERC gave incumbent utilities a federal right of first refusal. Under that system, if an ISO such as

MISO or SPP approved construction of a new transmission line, the ISO member that distributed electricity in the area where the facility was to be built had a right of first refusal.

In 2011, however, FERC issued Order 1000, which eliminated the federal right of first refusal. *See Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, 136 FERC ¶ 601051, 2001 WL 2956837 (F.E.R.C. July 21, 2011) ("Order 1000"). Order 1000 is consistent with the effort to manage electric grids on a regional level. *See Reg'l Transmission Orgs.*, 89 FERC ¶ 61285, ¶ 1, 1999 WL 33505505, at *3 (Dec. 20, 1999); *see also* 18 C.F.R. § 35.34 (2006). At the same time, however FERC explained that Order 1000 recognizes that states can continue to regulate electric transmission lines, stating that "nothing in [Order 1000] is intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities, including but not limited to authority over sitting permitting of transmission facilities." Order 1000 ¶ 227.

In accordance with Order 1000, MISO and SPP removed the federal right-of-first-refusal provisions from their tariffs. In May 2019, the Texas Legislature passed its own right-of-first-refusal law in Senate Bill 1938 ("SB 1938"), amending Section 37.056(e) of the Texas Utilities Code to require the PUCT to grant a CCN for new transmission facilities to the endpoint owners of the existing facilities to which the new line will interconnect. SB 1938 § 4.[2] SB 1938 also amends Section 37.056(g) to add a provision allowing the endpoint owner to transfer its rights to build or own or operate a new or existing line to another certificated utility under certain circumstances. Thus, existing owners of transmission facilities in Texas are given a preference to build, own, and

---

[2] In response to Order 1000, several other states enacted their own right-of-first-refusal laws. *See, e.g.*, N.D. CENT CODE § 49-03-02.2; S.D. CODIFIED LAWS § 49-32-20; NEB. REV. STAT. § 70-1028; 17 OKLA. STAT. ANN. § 292; MINN. STAT. § 216B.246.

operate the new lines, and if a new transmission line will connect to lines owned by two different providers, the two "incumbent" transmission providers may each build a portion of the new line.

This case involves the Hartburg-Sabine Junction Transmission Project ("the Project"), a new 500 kilovolt transmission line and substation facilities proposed to run within Orange and Newton Counties in East Texas. On February 6, 2018, MISO issued a request for proposals for the construction of the Project. In November 2018, MISO selected Plaintiff NextEra Transmission Midwest, LLC ("NextEra Midwest") to build the line. After being selected for the Project, NextEra Midwest and MISO entered into a "Selected Developer Agreement," dated January 25, 2019, allowing NextEra Midwest to recover its costs in building the designated facilities through the MISO Tariff, subject to FERC review and the terms and commitments proposed by NextEra Midwest in its bid. The agreement also allows NextEra Midwest to recover a reasonable return on its investment, subject to various cost cap and cost containment commitments once the transmission line is operational. The agreement requires NextEra Midwest to secure any necessary state-law CCNs to complete the Project.

Plaintiffs assert that as a result of the SB 1938 amendments to Texas Utilities Code, NextEra Midwest will be barred from obtaining a CCN form the PUCT for the Project because NextEra Midwest does not already operate in Texas. On June 17, 2019, Plaintiffs filed this lawsuit challenging the constitutionality of SB1938, currently codified at Sections 37.051, 37.056, 37.057, 37.151, and 37.154 of the Texas Utilities Code. Specifically, Plaintiffs allege that SB 1938 facially discriminates against interstate commerce by giving electric utilities that already operate in Texas the sole right to build transmission lines with an end point in Texas, violating both the Commerce Clause and Contracts Clause of the United States Constitution. U.S. CONST. art. I, § 8, cl. 3; U.S.

CONST. art. I, § 10. Defendants move to dismiss Plaintiffs' complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II. STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal of an action "for failure to state a claim upon which relief can be granted." Although a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, in order to avoid dismissal, the plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). A plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The Supreme Court expounded on the *Twombly* standard, explaining that a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a motion to dismiss, the court must construe the complaint liberally and accept all of the plaintiff's factual allegations in the complaint as true. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2009).

## III. ANALYSIS

Plaintiffs' allegations are based on the premise that the Commerce Clause grants Plaintiffs the right to compete to build transmission lines in Texas. Defendants DeAnn T. Walker, Arthur D'Andrea, and Shelly Botkin are the Commissioners of the PUCT.[3] They argue that the Commerce

[3] Because the PUCT oversees Texas's electric utilities, the individual Commissioners of the PUCT are the proper parties in this case. Therefore, the court will collectively refer to the individually-named Commissioners in this order as "Defendants."

Clause does not preclude Texas's regulatory approach to the construction of new transmission lines. Defendants rely on the United States Supreme Court's opinion in *General Motors Corp. v. Tracy*, which holds that state utility regulation is an important health-and-safety interest supporting regulation that "outright prohibit[s] competition." 519 U.S. 278, 306 (1997). Defendants further assert that SB 1938 does not treat out-of-state transmission providers differently than in-state providers, noting that under the law all existing incumbent transmission owners, regardless of residency, receive the benefits and burdens of the law over nonincumbents. Thus, Defendants contend that the balancing approach of decisions such as *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), which ask whether a state's interest is strong enough to justify an interstate effect, does not apply to Texas's regulation of the right to build new electric-transmission lines. *See Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 525 (7th Cir. 2018), *cert. denied*, ____ U.S. ___ 139 S. Ct. 1547 (2019). Moreover, Defendants assert SB 1938's amendments in the heavily-regulated industry of electric transmission do not disrupt a party's reasonable expectations or extensively impair a contract that would raise a claim under the Contracts Clause.

In response, Plaintiffs and the United States[4] argue that Plaintiffs adequately allege that by restricting the interstate market to develop electric-transmission facility only to owners of interconnecting local facilities or in-state entities the local owners designate, SB 1938 impermissibly discriminates in favor of in-state interest and forecloses entry by nonlocal and out-of-state competitors, imposing a substantial burden on interstate commerce with no local benefits that could not be achieved with reasonable, alternative policies, thereby exceeding the burdens before the

---

[4] The United States filed a Statement of Interest (Doc. #110) in this case in response to Defendants' motion to dismiss. *See* 28 U.S.C. 517 (authorizing United States Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States").

United States Supreme Court in *Pike*. As to Plaintiffs' claim under the Contract Clause, Plaintiffs assert that under the terms of the agreement between NextEra Midwest and MISO, gauged against the nature of existing regulation at the time NextEra Midwest and MISO entered into the agreement, there was no expectation of a risk of change in the law regarding the right of first refusal. Thus, Plaintiffs argue, SB 1938 operated as a substantial impairment of the contractual relationship between NextEra Midwest and MISO. *See Energy Reserves Grp. , Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983).

***Commerce Clause***

"The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values." *Maine v. Taylor*, 477 U.S. 131, 151 (1986). *See also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978) (Commerce Clause does not protect "the particular structure or methods of operation" of a market). State laws are subject to scrutiny under the Commerce Clause if they mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald*, 544 U.S. 460, 472 (2005). The validity of a state law, despite its undoubted effect on interstate commerce, requires a two-part analysis. *See C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 389–90 (1994).

First, the court must determine whether the state law discriminates against interstate commerce. *See Philadelphia v. New Jersey,* 437 U.S.617, 624 (1978). If the state law is not overtly discriminatory, the court must determine whether it imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142.

Defendants argue that *General Motors Corp. v. Tracy*[5] controls, barring Plaintiffs' claim of discrimination. Plaintiffs argue that *Tracy* does not exempt regulated utilities from Commerce Clause analysis nor does it require the court to defer to the states' justifications for discrimination. Plaintiffs further assert that unlike *Tracy*, SB 1938 does not treat two different products in separate markets differently, but rather it treats two competitors for the same project differently based on whether one is the in-state incumbent. Thus, Plaintiffs argue that this case is not like *Tracy* but rather like *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,[6] *Granholm*, and *C & A Carbone, Inc.*, in which the Supreme Court struck down facially discriminatory laws.

The court does not find SB 1938 analogous to the cases that Plaintiffs cite, all of which involve the flow of goods in interstate commerce or burdensome requirements as a precondition for allowing the flow of goods in interstate commerce. SB 1938 does not purport to regulate the transmission of electricity in interstate commerce; it regulates only the construction and operation of transmission lines and facilities within Texas, which distinguishes it from the cases upon which Plaintiffs rely.

Moreover, under *Tracy*, the Supreme Court grants controlling weight to the monopoly market, which is also the market in Texas. 519 U.S. at 304. Texas is entitled to consider the effect on the consumers that the utilities serve; its regulations impose upon incumbent utilities the obligation to serve "every consumer in the utility's certificated area" and to "provide continuous and adequate services in that area." TEX. UTIL. CODE § 37.151. Thus, the reasons cited in support of giving greater weight to the monopoly market in *Tracy* apply to SB 1938 as well–to avoid any

---

[5] 519 U.S. 278.

[6] ___ U.S. ___, 139 S. Ct. 2449 (2019).

jeopardy or disruption to the service of electricity to the state electricity consumers and to allow for the provision of a reliable supply of electricity.

Additionally, SB 1938 does not single out Texas transmission-line providers as the sole beneficiaries of the right of first refusal over out-of-state providers such as NextEra Midwest. The existing regulated transmission-line providers with a right of first refusal are not similarly situated with unregulated providers such as NextEra Midwest. *See Tracy*, 510 U.S. at 298–99. Neither does SB 1938 overtly discriminate by granting incumbent transmission-line providers the right of first refusal because that preference does not discriminate against out-of-state providers. Indeed, most incumbent providers in Texas are owned by out-of-state companies, and SB 1938 allows out-of-state providers a means to enter the Texas market for transmission services by buying a Texas utility. Incumbent providers may "sell, assign, or lease a certificate or a right obtained under a certificate" with PUCT approval, if the transaction will not diminish the retail-rate jurisdiction of Texas. TEX. UTIL. CODE § 37.154(a).

Finally the court concludes that SB1938 is without a discriminatory purpose. The court applies a "presumption of good faith" in assessing discriminatory purpose. *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n,* 935 F.3d 362, 373 (5th Cir. 2019). To overcome the presumption, Plaintiffs must allege a pattern of discrimination under a multi-factor analysis. *Id.* at 370.[7] First, the court finds that Plaintiffs have not alleged "a history of hostility toward [Plaintiffs]

[7] The court considers the following non-exhaustive factors: (1) whether the effect of the state action creates a clear pattern of discrimination; (2) the historical background of the action, which may include any history of discrimination by the decision makers; (3) the "specific sequence of events leading up" to the challenged state action, including (4) any "departures from normal procedures[;]" and (5) "the legislative or administrative history of the state action, including contemporary statements by decision makers." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007).

singularly or towards out-of-state companies in general." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007). Second, the court finds no evidence of a sudden or dramatic change in state law, as SB 1938 continues the long-term practice in Texas of allowing existing providers to build needed new transmission lines. Third, the court finds SB 1938 followed a standard path from filing to passage, and Plaintiffs do not allege any facts indicating that SB 1938 resulted from a legislative process that departed from "normal procedures." *Allstate*, 495 F.3d at 160–61. Fourth, the court finds no indication in the legislative history of any discriminatory purpose, as the SB 1938 debate was "devoid of discriminatory remarks directed toward out-of-state competition." *Wal-Mart Stores, Inc.*, 935 F.3d at 372. Although Plaintiffs allege that SB 1938 was a reaction to an ISO's designation of NextEra Midwest for the Hartburg-Sabine transmission line, the legislative history reflects to the contrary. The legislative history indicates instead that the Texas Legislature disagreed with the statutory analysis reflected in a 2017 PUCT declaratory order and enacted SB 1938 to eliminate any uncertainty in Texas law. Therefore, the court concludes that Plaintiffs have failed to demonstrate that SB 1938 discriminates against out-of-state transmission-line providers or has a discriminatory purpose or effect..

***Pike***

Having determined that SB 1938 does not discriminate and is without a discriminatory purpose against out-of-state transmission-line providers in part because it was enacted to avoid jeopardy or disruption to the service of electricity to Texas electricity consumers and to allow for the provision of a reliable supply of electricity to those consumers, along with the additional reasons discussed above, the court concludes that the burden imposed by SB 1938 is also not "clearly excessive in relation to the putative local benefits," and therefore passes the more permissive *Pike*

test. *Pike*, 397 U.S. at 142; *see also United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007) (holding under *Tracy* state law did not discriminate against interstate commerce and law therefore was "properly analyzed under the test set forth in *Pike*").

As the Supreme Court states in *Tracy*,

> We have consistently recognized the legitimate state pursuit of such interests as compatible with the Commerce Clause, which was "never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens,'" even if that "legislation might indirectly affect the commerce of the country."

519 U.S. at 306–07 (quoting *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443–44(1960)). Having also determined that under the *Pike* test any burden on interstate commerce is outweighed by the benefits of SB1938, the court concludes that SB 1938 does not violate the Commerce Clause.

***Contracts Clause***

In its evaluation of whether Plaintiffs have properly pleaded a violation of the Contracts Clause, this court must determine: (1) whether a contract exists as to the specific terms at issue; (2) whether the law has "operated as a substantial impairment of a contractual relationship"; (3) "whether the state law at issue has a legitimate and important public purpose"; and (4) whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose. *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186–87 (1992); *see also Powers v. United States,* 783 F.3d 570, 577–78 (5th Cir. 2015). An "important consideration in [the] substantial impairment analysis is the extent to which the law upsets the reasonable expectation the parties had at the time of contracting, regarding the specific contractual rights the state's action allegedly impairs." *United Healthcare v. Davis*, 602 F.3d 618, 627 (5th Cir. 2010). "Courts look to

the terms of the contract to determine the parties' reasonable expectations, including whether the risk of a change in the law was contemplated at the time of contracting." *Id.* at 628.

In *Energy Reserves Group, Inc.*, the Supreme Court upheld a Kansas statute imposing price controls on natural gas after considering that not only was the natural-gas market heavily regulated at the time the parties entered the contract, but that the contract itself included terms that adjusted for changes in gas-price regulation so the parties must have known that their "contractual rights were subject to alteration by state price regulation." 459 U.S. at 415–16. Under the terms of the Agreement between MISO and NextEra Midwest, NextEra Midwest's contractual right to build the Hartburg-Sabine line was subject to obtaining the necessary regulatory approvals, including from PUCT.

Further, Texas's regulation of the electric transmission has a long and extensive history. Every aspect of the production, transmission, distribution, and retail sale of electricity is regulated and supervised by the state. *See* TEX. UTIL. CODE §§ 31.001–43.152. As the Supreme Court has observed, "[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908). The court finds that to the extent, if any, SB 1938 impairs NextEra Midwest's contractual interests, SB 1938 rests on, and is prompted by, significant and legitimate state interests. *Energy Reserves Group, Inc.*, 459 U.S. at 416–17. Thus, the court concludes that Plaintiffs have failed to plead a claim under the Contracts Clause.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Texas's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) filed August 23, 2019 (Doc. #94) is **GRANTED**. Plaintiffs' complaint is **DISMISSED WITH PREJUDICE**.

Having dismissed Plaintiffs' complaint,

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for a Preliminary Injunction filed June 17, 2019 (Doc. #7) and Plaintiffs' Motion for a Status Conference filed February 13, 2020 (Doc.. #140) are **DISMISSED**.

A Final Judgment shall be filed subsequently.

SIGNED this 26th day of February, 2020.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE