# *United States Court of Appeals*
**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

December 21, 2022

Mr. Philip Devlin
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

      No. 20-50160   NextEra v. Lake
               USDC No. 1:19-CV-626

Dear Mr. Devlin,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                Sincerely,

                LYLE W. CAYCE, Clerk

                By: _____
                Roeshawn Johnson, Deputy Clerk
                504-310-7998

cc:  Mr. Michael Andrew Boldt
     Mr. Adam Daniel Chandler
     Mr. Paul D. Clement
     Ms. Catherine Garza
     Mr. Larry Edward Gee
     Mr. Jason H. Hilborn
     Mr. John Richard Hulme
     Mr. Thomas S. Leatherbury
     Mr. Matthew C. Mandelberg
     Mr. Michael Andrew McMillin
     Mr. Lino Mendiola III
     Ms. Kasdin M. Mitchell
     Ms. Erin Murphy
     Mr. Ethan James Nutter
     Mr. Pascual Armando Oliu
     Ms. Lanora Christine Pettit
     Mr. Matthew E. Price
     Mr. Stuart H. Singer
     Mr. Jeffrey M. Tillotson
     Mr. Rex D. VanMiddlesworth
     Mr. John C. Wander

**FILED**
December 21, 2022
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____ Jay Vicha _____
DEPUTY

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
August 30, 2022
Lyle W. Cayce
Clerk

————————

No. 20-50160

————————

NextEra Energy Capital Holdings, Incorporated;
NextEra Energy Transmission, L.L.C.; NextEra Energy
Transmission Midwest, L.L.C.; Lone Star Transmission,
L.L.C.; NextEra Energy Transmission Southwest, L.L.C.,

*Plaintiffs—Appellants,*

*versus*

Chairman Peter Lake, Public Utility Commission of
Texas, *in his official capacity*; Commissioner Lois Cobos, Public
Utility Commission of Texas*, in her official capacity*;
Commissioner Jimmy Glotfelty, Public Utility
Commission of Texas*, in his official capacity*; Commissioner
Kathleen Jackson, Public Utility Commission of Texas,
*in her official capacity*; Commissioner Will McAdams, Public
Utility Commission of Texas, *in his official capacity*,

*Defendants—Appellees.*

————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:19-CV-626

————————————————————

Before Dennis, Elrod, and Costa, *Circuit Judges.*

J U D G M E N T

No. 20-50160

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED IN PART and REVERSED IN PART, and the cause is REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

JENNIFER WALKER ELROD, *Circuit Judge*, concurring in part and dissenting in part.

**Certified as a true copy and issued as the mandate on Dec 21, 2022**

**Attest:**

**Clerk, U.S. Court of Appeals, Fifth Circuit**

**FILED**
December 21, 2022
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____ Jay Vicha
DEPUTY

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
August 30, 2022
Lyle W. Cayce
Clerk

No. 20-50160

---

NextEra Energy Capital Holdings, Incorporated; NextEra Energy Transmission, L.L.C.; NextEra Energy Transmission Midwest, L.L.C.; Lone Star Transmission, L.L.C.; NextEra Energy Transmission Southwest, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

Chairman Peter Lake, Public Utility Commission of Texas, *in his official capacity*, Commissioner Lois Cobos, Public Utility Commission of Texas, *in her official capacity*; Commissioner Jimmy Glotfelty, Public Utility Commission of Texas, *in his official capacity*; Commissioner Kathleen Jackson, Public Utility Commission of Texas, *in her official capacity*; and Commissioner Will McAdams, Public Utility Commission of Texas, *in his official capacity*,

*Defendants—Appellees*.

---

Appeal from the United States District Court for the Western District of Texas
USDC No. 1:19-CV-626

---

No. 20-50160

Before Dennis, Elrod, and Costa, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:

Imagine if Texas—a state that prides itself on promoting free enterprise—passed a law saying that only those with existing oil wells in the state could drill new wells. It would be hard to believe. It would also raise significant questions under the dormant Commerce Clause. *Cf. Granholm v. Heald*, 544 U.S. 460, 465–66 (2005) (holding unconstitutional two state laws that allowed only wineries with an in-state physical presence to ship wine to state residents).

Texas recently enacted such a ban on new entrants in a market with a more direct connection to interstate commerce than the drilling of oil wells: the building of transmission lines that are part of multistate electricity grids. A 2019 law says that the ability to build, own, or operate new lines "that directly [connect] with an existing utility facility . . . may be granted only to the owner of that existing facility." Tex. Util. Code § 37.056(e). The law applies not just to transmission lines that are part of Texas's intrastate electricity market, but also to lines that are part of interstate transmission networks. Those lines that carry electricity through multiple states are classic instrumentalities of interstate commerce.

The operator of one such multistate grid awarded Plaintiff NextEra Energy Capital Holdings, Inc. the right to build new transmission lines in an area of east Texas that is part of an interstate grid. The grid operator determined that NextEra's bid offered an "outstanding combination of low cost and high value" and would produce "substantial benefits to ratepayers over time." But before NextEra obtained the necessary construction certificate from the Public Utilities Commission of Texas, the state enacted the law that bars new entrants from building transmission lines.

No. 20-50160

NextEra challenges the new law, as it applies to the interstate electricity networks in Texas (but not the intrastate ERCOT network), on dormant Commerce Clause grounds.  It also argues that the law violates the Contracts Clause by upsetting its contractual expectation that it would be allowed to build the new lines.  Once we wade through the thicket of electricity regulation, the ban's interference with interstate commerce becomes as clear as it is for the oil well hypothetical.  We thus conclude that the dormant Commerce Clause claims should proceed past the pleading stage.  But the Contracts Clause claim fails as a matter of law under the modern, narrow reading of that provision.

## I

### A

Powering the modern world is no easy task.  An energy source must first generate electricity; that electricity must then travel, often for long distances, over high-voltage wires for distribution; and distributors must deliver electricity to consumers over low-voltage wires.  Some providers, known as vertically integrated utilities, perform all of these functions.  *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 49 (D.C. Cir. 2014).  Others—like plaintiff NextEra, a transmission-only company—perform just one.  *Id.* at 50.

In the early 1900s, when the power industry was dominated by vertically integrated utilities, electricity providers were subject to only state and local oversight.  *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 265–66 (2016).  That changed in 1927, when the Supreme Court held that the Commerce Clause prohibited states from regulating "wholesale [electricity] sales (*i.e.*, sales for resale) across state lines."  *Id.* (citing *Pub. Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89–90 (1927)).  While states could continue to oversee local retail markets, only Congress could regulate

3

No. 20-50160

interstate wholesale transactions. *Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 378 (1983).

Congress exercised its new-found authority for the first time as part of the New Deal. In enacting the Federal Power Act of 1935 , Congress declared "that federal regulation of interstate electric energy transmission and its sale at wholesale is 'necessary in the public interest.'" *S.C. Pub. Serv. Auth.*, 762 F.3d at 49 (quoting 16 U.S.C. § 824(a)). Congress also established the Federal Power Commission, the precursor to the Federal Energy Regulatory Commission (FERC), and gave it jurisdiction to regulate "all facilities for such transmission or sale of electric energy." 16 U.S.C. § 824(b)(1); *see also Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1181 (D.C. Cir. 2020) (noting that the Federal Power Act provides FERC with "exclusive authority over" the wholesale transmission market).

As the power industry evolved, so did the federal regulatory approach. In the decades following passage of the Federal Power Act, federal regulators policed vertically integrated utilities—most of which were local monopolies—by setting "just and reasonable" wholesale prices. 16 U.S.C. § 824d(a); *Elec. Power*, 577 U.S. at 267. But in the 1970s and 1980s, technological advances encouraged market entrants to challenge vertically integrated utilities. *New York v. FERC*, 535 U.S. 1, 7 (2002). As a result, "[i]ndependent power plants now abound, and almost all electricity flows not through 'the local power networks of the past,' but instead through an interconnected 'grid' of near-nationwide scope." *Elec. Power*, 577 U.S. at 267 (quoting *New York*, 535 U.S. at 7). Adapting to "this new world," FERC shifted away from price setting—the traditional tool "used to prevent monopolistic pricing"—and instead focused on enhancing competition. *Id.*

To that end, FERC encouraged utilities that owned transmission lines to form voluntary associations that would coordinate and "manage wholesale

No. 20-50160

markets on a regional basis." *Id.*; *see also* 16 U.S.C. § 824a(a) ("direct[ing] [FERC] to divide the county into regional districts for the voluntary interconnection and coordination of facilities for the . . . transmission and sale of electric energy"). These associations, called regional transmission organizations (RTOs) and independent system operators (ISOs),[1] now control most of the electrical grid. *Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 769 (7th Cir. 2013). This map shows the various RTOs and ISOs:[2]



---

[1] RTOs and ISOs are similar umbrella entities that "operate the transmission system independently of wholesale market participants and foster competition for electricity generation." Federal Energy Regulatory Commission, Energy Primer: A Handbook of Energy Market Basics 39 (April 2020), https://www.ferc.gov/sites/default/files/2020-06/energy-primer-2020.pdf.

[2] Image from *RTOs and ISOs*, FERC, https://www.ferc.gov/industries-data/electric/power-sales-and-markets/rtos-and-isos (last visited August 28, 2022).

No. 20-50160

For years, RTOs and ISOs included rights of first refusal to build transmission lines in their FERC-sanctioned rate agreements. *MISO Transmission Owners v. FERC*, 819 F.3d 329, 332 (7th Cir. 2016). That meant utilities that already owned transmission lines, called "incumbents," would "have a first crack at constructing a[] . . . transmission project." *Id.* at 331–32. In other words, they would have "the opportunity to build it without having to face competition from other firms that might also like to build it." *Id.* at 331.

In 2011, FERC abolished those provisions. The agency reasoned that federal rights of first refusal might "be leading to rates . . . that are unjust and unreasonable," in large part because "it is not in the economic self-interest of incumbent[s] to permit new entrants to develop transmission facilities," even if those facilities "would result in a more efficient or cost-effective solution." Transmission Planning & Cost Allocation by Transmission Owning & Operating Public Utilities, 136 FERC ¶ 61,051, at ¶ 256 (F.E.R.C. July 21, 2011) (final rule) (Order 1000); *see also id.* at ¶ 253 (explaining that failing to remove federal rights of first refusal might "result in rates . . . that are unjust and unreasonable"). In making its decision, FERC considered— and rejected—the argument "that the reliability of the transmission system is a function of the number of public utility transmission providers of that system." *Id.* at ¶ 266. Historical data suggested the opposite, as "public utility transmission providers have . . . connected to the transmission systems of others" "to enhance reliability." *Id.* (noting that "nonincumbent transmission developers[] that successfully develop a transmission project[] . . . must comply with all applicable reliability standards").

Despite its many reforms, Order 1000 took "great pains to avoid intrusion on the traditional role of the States." *S.C. Pub. Serv. Auth.*, 762 F.3d at 76. So even if the prohibition created "opportunities for nonincumbents, such developers must still comply with state law." *Id.*

No. 20-50160

## B

Order 1000 is consistent with the Federal Power Act in leaving room for state regulation. *Elec. Supply Ass'n*, 136 S. Ct. at 780 (observing that the Act "makes federal and state powers 'complementary' and 'comprehensive'"). States may, for example, oversee "facilities used for the generation of electric[ity,] . . . local distribution or only for the transmission of electric[ity] in intrastate commerce." 16 U.S.C. § 824(b)(1). States also have "authority over the location and construction of electrical transmission lines." *Ill. Com. Comm'n*, 721 F.3d at 773; *see also Piedmont Envt'l Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009) ("The states have traditionally assumed all jurisdiction to approve or deny permits for the siting and construction of electrical transmission facilities."). *But cf. Piedmont*, 558 F.3d at 310 (noting that 16 U.S.C. § 824p "gives FERC the authority in national interest corridors to issue permits for the construction . . . of transmission facilities in certain instances").

In Texas, the Public Utility Commission of Texas (PUCT) regulates electric utilities. TEX. UTIL. CODE § 14.001. To build a new transmission line in the state, a utility must first obtain a certificate of "convenience and necessity" from PUCT. *Id.* § 37.051(a). This process is independent of any approvals that the utility must also obtain from its governing ISO or RTO.

As shown below, an ISO—the Electric Reliability Council of Texas (ERCOT)—covers most of Texas, including the Houston, Dallas-Fort Worth, San Antonio, and Austin areas. Because ERCOT is wholly within Texas, PUCT has exclusive jurisdiction over utilities in its territory. *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001).

Three other RTOs also operate in Texas, but because they also cover areas outside the state, they are subject to concurrent state and federal

No. 20-50160

jurisdiction. Pertinent here, the Midwest Independent System Operator (MISO) and the Southwest Power Pool (SPP) control territory in East



Texas.[3]

In line with Order 1000, SPP and MISO removed federal rights of first refusal from their agreements and established competitive systems to build transmission lines. Texas followed suit, with the PUCT declaring that utilities without any presence in Texas could construct transmission lines in SPP and MISO territory. Joint Petition of Sw. Pub. Serv. Co. & Sw. Power Pool, Inc. for Declaratory Order, 341 P.U.R. 4th 195, 2017 WL 5068379, at

---

[3] Image from *Electric Maps*, Public Utility Commission of Texas, http://www.puc.texas.gov/industry/maps/maps/ERCOT.pdf (last visited August 28, 2022).

No. 20-50160

*15 (Oct. 26, 2017). The declaration clarified that transmission-only companies, and not just vertically integrated monopolies, could engage in that work. *Id.*

This regime allowing open competition in the building of transmission lines did not last long. In May 2019, the Texas Legislature overruled PUCT's decision and barred companies from competing in MISO or SPP territory unless they already owned a transmission facility in Texas.[4] Under the new law, Senate Bill (or SB) 1938, a certificate of convenience and necessity to build, operate, or own transmission lines "that directly [connect] with an existing utility facility . . . may be granted *only to the owner of that existing facility*." TEX. UTIL. CODE § 37.056(e) (emphasis added). If that incumbent chooses not to pursue a project, other owners may step into its shoes. But not just any owner—the incumbent utility may only "designate another electric utility that is currently certificated by [PUCT] within the same electric power region," for example, SPP or MISO, "to build . . . a portion or all of" the new lines. *Id.* § 37.056(g). So the only way a company without a Texas presence can build, operate, or own transmission lines is to buy a utility that already owns a power facility in the state. *See id.* § 37.154(a) (requiring that the buyer also convince PUCT that its purchase "will not diminish the retail rate jurisdiction of this state" and will result in continued "adequate service").

Five other states restored incumbent's rights of first refusals after FERC took them away. *See* MINN. STAT. § 216B.246, subdiv. 3; NEB. REV. STAT. § 70-1028; OKLA. STAT. tit. 17 § 292; S.D. CODIFIED LAWS § 49-32-20; N.D. CENT. CODE § 49-03-02(2). But none of those

---

[4] A similar restriction applies to ERCOT under its statutorily binding Protocols. TEX. UTIL. CODE § 39.151(j); ERCOT Nodal Protocols § 3.11.4.8 (August 1, 2020), http://www.ercot.com/mktrules/nprotocols/current (last visited August 28, 2022).

No. 20-50160

laws is as restrictive as Texas's. Only one other (North Dakota) is like Texas in placing no time limit on the incumbent to exercise its right; the others require incumbents to exercise their right of first refusal within 90 days. And no other state completely bars out-of-state entrants or allows an incumbent to designate its replacement if it declines a project.

## C

Against the changing regulatory landscape in Texas, NextEra and two of its subsidiaries sought to enter the state's market. NextEra is a Florida corporation that, together with its affiliates, owns "approximately 7,300 miles of transmission line[s] . . . in multiple states." It does not, however, have a foothold in Texas. After the removal of the federal rights of first refusal, NextEra tried to build and buy high-voltage transmission lines in Texas.

The project that the parties focus on, the Hartburg-Sabine Line, envisioned the construction of five new high-voltage transmission lines and a substation in East Texas. Although the new lines would be built in Texas, they would form part of MISO's interstate grid and, as a result, be paid for by customers across MISO's 15 states. In November 2018, after a competitive bidding process, MISO selected NextEra to build the line, concluding that the company's proposal offered "an outstanding combination of low cost and high value, with best-in-class cost and design, best-in-class project implementation plans, and top-tier plans for operations and maintenance." MISO also noted that the proposal would reap "substantial benefits to ratepayers over time."

NextEra and MISO entered into a "Selected Developer Agreement" for the project. But before starting construction, the agreement required NextEra to obtain a certificate of convenience and necessity from PUCT.

No. 20-50160

NextEra "anticipated being able to" get a certificate at the time, but once SB 1938 was enacted it could no longer obtain one.

The Hartburg-Sabine Line was not NextEra's only intended project in Texas. In 2017, NextEra "entered into an asset purchase agreement to acquire 30 miles of . . . transmission line[s] from" a utility located in SPP's jurisdiction, again in East Texas. This project, called the Jacksonville-Overton Line, required the utility to transfer its certificate of convenience and necessity to NextEra, which needed PUCT's approval. *Id.* § 37.154(a). NextEra applied for the transfer, and although PUCT staff recommended approval in October 2018, the application remains pending. SB 1938 requires that it be denied.

Having been shut out of Texas's power market by SB 1938, NextEra sued PUCT Commissioners in federal court a month after the law was enacted. Citing its two stalled projects, NextEra alleged that the Texas ban violates the Commerce and Contracts Clauses. It asked the district court for declaratory and injunctive relief.

The Commissioners moved to dismiss for failure to state a claim. The district court agreed and dismissed NextEra's complaint with prejudice. Starting with the Commerce Clause allegation, the district court concluded that "SB 1938 does not . . . regulate the transmission of electricity in interstate commerce; it regulates only the construction and operation of transmission lines and facilities within Texas." And rejecting NextEra's argument that SB 1938—in its text, through its purpose, and by its effect—unconstitutionally discriminates against out-of-state providers, the district court determined that:

- the law's text establishes a preference for incumbency, not geography;

11

- "legislative history indicates that the Texas Legislature disagreed with . . . PUCT's declaratory order and enacted SB 1938 to eliminate any uncertainty in Texas law"; and

- "most incumbent providers in Texas are owned by out-of-state companies."

The district court also rejected NextEra's argument that, under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), the burden imposed by SB 1938 is "clearly excessive in relation to the putative local benefits." It then held that NextEra failed to state a Contracts Clause claim, as the company did not have reasonable contractual expectations that the law could impair.

NextEra appeals.

## II

We first consider whether there is a jurisdictional impediment to this case even though the Commissioners do not see one. The claims related to the Hartburg-Sabine Line might seem premature because NextEra never applied for a certificate of convenience and necessity. The Constitution's cases-and-controversies requirement prohibits federal courts from resolving "abstract disagreements." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) (explaining that the ripeness doctrine "reflects constitutional considerations that implicate 'Article III limitations on judicial power,' [and] 'prudential reasons for refusing to exercise jurisdiction'" (quoting *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)). So when a "case is abstract or hypothetical," a court must dismiss it for lack of ripeness. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987). In determining whether a case is ripe, we examine "the fitness of the issues for judicial decision" and "the hardship to the parties of

withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

Generally speaking, a case is ripe if it presents questions of law; "conversely, a case is not ripe if further factual development is required." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quoting *New Orleans*, 833 F.2d at 587). This case presents two constitutional questions: whether SB 1938 violates the dormant Commerce Clause or the Contracts Clause. No further factual development or exercise of agency discretion is required for resolution of those legal questions. It would be futile to require NextEra to obtain agency rejection of its application when SB 1938 makes that a foregone conclusion. *See Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974) ("Whe[n] the inevitability of the operation of a statute against certain individuals is patent," a plaintiff need not "await the consummation of threatened injury to obtain preventative relief." (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923))). The Supreme Court recognized as much in another case involving the power industry. Because a state moratorium on the approval of new nuclear power plants left no possibility of agency approval, the utility's suit challenging the law was fit for immediate judicial resolution. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201–02 (1983).

*Pacific Gas* also recognizes that NextEra would suffer hardship if, before filing suit, it had to spend time and money applying for a certificate all agree would be denied. *Pac. Gas*, 461 U.S. at 201 (finding hardship even though the utilities had not yet applied for certification, as postponing resolution of the case would force them to "proceed in hopes that, when the time for certification came, either the required findings would be made or the law would be struck down"); *Cooper v. McBeath*, 11 F.3d 547, 552 n.7 (5th Cir. 1994) ("Substantial hardship—the touchstone for determine when review i[s] appropriate—exists whe[n] the enforcement of a statute is assured and

No. 20-50160

the only obstacle to ripeness is merely a delay before the action or proceedings commence.").

We therefore agree with the parties that the claims are ripe for review.

III

The Constitution extends to Congress the "Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. On its face, this provision says nothing about state authority over interstate commerce. But it is settled that because Congress can regulate interstate commerce, the states cannot erect barriers to the free flow of that commerce. "This 'negative' aspect" of that power, known as the dormant Commerce Clause, "prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)).

A

Although this "negative aspect" of the Commerce Clause (especially a judicially enforceable one) remains controversial, *see, e.g., Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 571–72 (2015) (Scalia, J., dissenting); *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 610 (1997) (Thomas, J., dissenting), it has a deep pedigree. During the tumultuous 1780s, fledgling state governments—beset by a collapsing economy and other crises—"began discriminating against the trade of their neighbors." Michael J. Klarman, The Framers' Coup 23 (2016). Predictably, victims of those "protective laws" retaliated, "rais[ing] costs of importing, shipping, and selling goods." Brannon P. Denning, *Confederation-Era Discrimination Against Interstate Commerce and the Legitimacy of the Dormant Commerce Clause Doctrine*, 94 Ky. L.J. 37, 47 (2005); *see also id.* at 72–73 ("States eager to gain commercial advantage and retain the revenue that

14

No. 20-50160

trade afforded . . . passed laws that palpably affected the commerce of other states."). That harmful patchwork of legislation undermined the Articles of Confederation and helped inspire the Constitutional Convention. *See Tenn. Wine*, 139 S. Ct. at 2460; KLARMAN, *supra*, at 23.

Convention debate about the Commerce Clause Power was limited. Denning, *supra*, at 83. But when the issue came up, it "was uniformly mentioned as a device for preventing obstructive or partial regulations by the states." Albert Abel, *The Commerce Clause in the Constitutional Convention and in Contemporary Comment*, 25 MINN. L. REV. 432, 471 (1941). And although "[t]here was even less commentary at state ratifying conventions," Denning, *supra*, at 83, the Federalist Papers critiqued state protectionism in advocating for national control over interstate commerce, *see* Abel, *supra* at 473 (citing THE FEDERALIST NO. 22 (Alexander Hamilton)). Years later, James Madison remembered that the Commerce Power "grew out of the abuse of the power by the importing States in taxing the non-importing, and was intended as a negative and preventative provision against injustice among the States themselves, rather than as a power to be used for the positive purposes of the General Government." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 n.9 (1994) (quoting 3 MAX FARRAND, RECORDS OF THE FEDERAL CONVENTION OF 1787, 478 (1911)).

One of the early landmark decisions of the Supreme Court recognized "great force" in the argument that, "as the word 'to regulate' implies in its nature, full power over the thing to be regulated, it excludes, necessarily, the action of all others that would perform the same operation on the same thing." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 209 (1824). By the end of the nineteenth century, this notion of a dormant or negative Commerce Clause was "firmly established." *Tenn. Wine*, 139 S. Ct. at 2459–60 (citing *Case of the State Freight Tax*, 82 U.S. (15 Wall.) 232, 279–80 (1873)). And

No. 20-50160

just last year, the Supreme Court "reiterate[d] that the Commerce Clause by its own force restricts state protectionism." *Id.* at 2461.

As is so often the case, Justice Jackson expressed the principle best:

Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

*H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949).

B

Like the farmers and craftsmen of old, NextEra seeks "free access" to the interstate transmission market. *Id.* The company contends that although Texas may restrict competition in its intrastate ERCOT market without Commerce Clause scrutiny, excluding nonincumbents from the interstate transmission market violates the Constitution.

The Commissioners respond that even their regulation of the interstate transmission market enjoys immunity from the Commerce Clause. They rely on *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), which rejected a claim that a law discriminated against interstate commerce by granting a tax exemption to local monopoly distributers of natural gas but not to out-of-state bulk gas sellers.

This much is certain: Utilities, despite their history as monopolies and the vestiges of that tradition even in deregulated markets, are not "immune from [] ordinary Commerce Clause jurisprudence." *Tracy*, 519 U.S. at 291

16

n.8; *see also Wyoming v. Oklahoma*, 502 U.S. 437, 457, 458–59 (1992) (invalidating an Oklahoma law on dormant Commerce Clause grounds because it required in-state "utilities to supply 10% of their needs for fuel from Oklahoma coal"); *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339 (1982) (applying the dormant Commerce Clause to invalidate a New Hampshire agency ruling that prohibited a utility "from selling its hydroelectric energy outside the State"); *Pennsylvania*, 262 U.S. at 596–600 (holding unconstitutional a West Virginia law that required pipeline companies to serve in-state customers first).

Harder to decipher is when *Tracy* cuts into the general principle that utilities are subject to the dormant Commerce Clause. The Ohio local distributors exempt from the state's 5% general tax on goods and services primarily sold natural gas in a "captive market." *Tracy*, 519 U.S. at 282, 303–04, 310. In that market, gas one was one of the "bundled" services over which they enjoyed a monopoly. *Id.* at 297–98. As a regulated monopoly in that local distribution market, the distributors had to serve all customers at restricted rates. *Id.* at 299. But the utilities also competed, "at least at the margins," in a separate market with independent companies that sold "unbundled" gas to bulk industrial customers like General Motors. *Id.* at 297–98, 307. Contending that its out-of-state gas suppliers operated at a disadvantage because they did not enjoy the tax exemption, General Motors sought a refund, on dormant Commerce Clause grounds, of the taxes it paid. *Id.* at 285.

A key to unraveling *Tracy* is the type of claim it considered. As we will discuss further, a dormant Commerce Clause challenge can be based on the text of the law, its effects, or its intent. *Tracy* emphasized that it was just dealing with the first type: a claim that the law discriminated on its face, which if true results in a "virtually *per se* rule of invalidity." *Tracy,* 519 U.S. at 298 (noting that the Court was just considering a challenge to the text of

the Ohio law); *id.* at 310 (holding that the "enterprises should not be considered 'similarly situated' for purposes of a claim of facial discrimination under the Commerce Clause"). The problem with saying that the Ohio tax exemption was discriminatory on its face was that it operated in two different retail markets. There were no legal concerns with giving the tax exemption in the residential market; the utilities had a lawful monopoly there. The problem was that the utilities-only exemption also applied in the competitive gas market for large industrial users. *Id.* at 303–04. The case thus came down to whether the Court should "accord controlling significance to the noncaptive market in which they compete, or to the noncompetitive captive market in which the local utilities alone operate." *Id.*

The Supreme Court determined that the local, captive market was the utilities' "core market." *Id.* at 301. There was only a "possibility of competition" in the noncaptive market for industrial users. *Id.* at 302. The predominance of the monopoly market prevented classifying the statute as discriminatory on its face. Because the law gave the utilities a tax exemption for all retail sales—those occurring in its primary monopoly market as well as in the incidental competitive one—the utilities and out-of-state sellers were not similarly situated for all, or even most applications, of the statute. Accordingly, the text of the statute did not discriminate against interstate commerce, which would trigger the strong medicine of *per se* invalidity.

The dilemma that the Ohio tax exemption posed—how to treat a law that gives in-state businesses a preference in both captive and noncaptive retail markets—does not exist here. The statute limiting who can build transmission lines governs only a competitive market. In the market for transmission of electricity, vertically integrated utilities and transmission-only companies compete and offer the same services: building, operating, and owning transmission lines. Unlike the congressional decision to give states exclusive authority over retail sales, *Tracy*, 519 U.S. at 310, the Federal Power

Act gives general authority over interstate transmission markets to federal regulators. 16 U.S.C. § 824(a). And for the state authority that remains over matters like siting and certification, transmission-only companies face the same regulatory requirements as vertically integrated utilities. *See Pub. Util. Comm'n of Tex. v. Cities of Harlingen*, 311 S.W.3d 610, 617 (Tex. App.—Austin 2010, no pet.).

Consequently, unlike the *Tracy* tax exemption, SB 1938 has no application in a "noncompetitive, captive market in which the local utilities alone operate." 519 U.S. at 303–04. We would have a *Tracy* issue if the challenged law provided vertically integrated utilities with the same benefit in both the monopolistic distribution market and the competitive transmission market. But as a law addressing a single market (transmission)—one that is undoubtedly competitive—SB 1938 is not immune from Commerce Clause scrutiny. *See Camps Newfound*, 520 U.S. at 582 n.16 (observing that the *Tracy* court "premised its holding that the statute at issue was not facially discriminatory on the view that [the marketers and utilities] were principally competing in different markets"); *Tracy*, 519 U.S. at 298–99 (emphasizing that the utilities and marketers "provide different products"). Put another way, when it comes to transmission, a vertically integrated utility and a transmission-only company are similarly situated.

The Commissioners and their supporting amici read *Tracy* more broadly. They essentially contend that it provides Commerce Clause immunity to any law that grants a preference to a company that has at least one foot in a captive market. To be sure, *Tracy* explained Ohio's rationale for giving the utilities the exemption even in the competitive market: it enhanced their economic viability and thus their ability to meet their public obligation of universal service in the captive market. *Id.* at 307 (explaining that doing away with the exemption in the competitive market would reduce

No. 20-50160

the utilities' customer base and thus "increase the unit cost of the [regulated] bundled product"). But if that alone were enough, *Tracy* would not have had to grapple with the Ohio law's application in both captive and noncaptive retail markets and decide which was the utilities' "core" market. *Id*. at 301–02. The Commissioner's broad reading is also irreconcilable with the longstanding principle, reiterated in *Tracy*, that there is no "public utilities exception" to the dormant Commerce Clause. *Tracy*, 519 U.S. at 291 n.8. If a state law's propping up a utility in a noncaptive market to enhance its viability in a captive market created immunity from Commerce Clause scrutiny, then a state could grant in-state utilities the exclusive right to operate coal mines in the state (or, for that matter, the exclusive right to sell ice cream in the state).

Texas has an interest in promoting reliable electricity service, including the power to approve the siting and construction of transmission lines. But as with other police powers a state enjoys, that authority is not immune from Commerce Clause scrutiny when it impacts the interstate market.[5] *Tracy* prevented classifying a law as textually discriminatory only because it applied primarily to grant utilities a tax preference in a market where they were monopolies. SB 1938 operates at "the opposite end of the local-to-interstate spectrum," LSP Transmission Br. at 21–22, in a wholly competitive market, and is an outright ban on new entrants. The state's safety interest may end up justifying that differential treatment, but it does

---

[5] The Supreme Court's most recent dormant Commerce Clause decision involved the state police power over alcohol that the Constitution expressly recognizes. U.S. Const. Amdt. XXI, § 2; *see Tenn. Wine*, 139 S. Ct. at 2449. Even that police power, the Supreme Court held, is not immune from dormant Commerce Clause scrutiny. *Tenn. Wine,* 139 S. Ct. at 2467–2474.

No. 20-50160

not prevent us from answering the threshold dormant Commerce Clause question: whether SB 1938 is discriminatory.

## C

Because *Tracy* does not shield SB 1938 from dormant Commerce Clause scrutiny, we must decide whether the law "discriminates against interstate commerce." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). A law can discriminate against interstate commerce by its text (or "face"),[6] effects, or purpose. *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007). We first address whether the words of the statute discriminate against interstate commerce.

### 1

Supported by the Department of Justice's Antitrust Division, NextEra argues that the reasons the district court cited for rejecting the Commerce Clause challenge are flawed. We agree.

---

[6] Despite the overlapping "facial" labels, whether a statute discriminates on its face for dormant Commerce Clause purposes is a different concept from the general notion of a facial challenge to a statute. NextEra is not bringing the latter type of suit. It recognizes that the part of SB 1938 regulating the intrastate ERCOT market is constitutional. As a result, the remedy it seeks—which is what the general concept of "facial challenges" is about, *see Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (noting that, although the difference between "facial" and "as-applied" challenges "is not so well defined," the distinction "goes to the breadth of the remedy employed by the Court")—is not holding the entire law unconstitutional.

The facial inquiry for dormant Commerce Clause challenges is just one asking whether the statutory language is discriminatory (as opposed to whether the statute has a discriminatory purpose or effect). That question can be asked of laws, like SB 1938, that apply to both intrastate and interstate markets. *See Dean Milk v. City of Madison*, 340 U.S. 349, 354 n.4 (1945) ("It is immaterial that Wisconsin milk from outside the Madison area is subject to the same proscription as that moving in interstate commerce."). As NextEra concedes here, only the enforceability of the law in the interstate market is at issue.

No. 20-50160

One of the district court's rationales was that SB 1938 does not discriminate against interstate commerce because it "regulates only the construction and operation of transmission lines and facilities within Texas." That is wrong for the areas of Texas that are part of interstate electricity networks. SPP and MISO territory in East Texas is part of an "interconnected 'grid' of near-nationwide scope" that has long been subject to FERC oversight. *Elec. Power*, 577 U.S. at 267; *see also North Dakota v. Heydinger*, 825 F.3d 912, 915 (8th Cir. 2016) ("MISO controls over 49,000 miles of transmission lines, a grid that spans fifteen states . . . and parts of Canada."). New lines in these areas thus are instrumentalities of interstate commerce that carry electricity over a broad swath of the country. That certain lines might run entirely within Texas is irrelevant, as "any electricity that enters the grid immediately becomes part of a vast pool of energy that is constantly moving in interstate commerce." *New York*, 535 U.S. at 7; *cf. Buck v. Kuykendall*, 267 U.S. 307, 316 (1925) (holding that an Oregon law limiting what parties could travel on a stretch of highway within the state was "a regulation, not of the use of [Oregon's] highways, but of interstate commerce"). These transmission lines cannot and do not serve Texas consumers alone.

Indeed, transmission lines that are part of an interstate grid are much closer to the heartland of interstate commerce than the wine stores, dairies, or waste processing facilities that have faced dormant Commerce Clause scrutiny. *See Tenn. Wine*, 139 S. Ct. at 2462; *C&A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 391–92 (1994); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 352 (1951). The Supreme Court recognized the interstate character of the electricity market a decade before it recognized that Congress could regulate factories because of their effect on interstate commerce. *Compare Attleboro Steam & Elec. Co.*, 273 U.S. at 90 (1927), *with NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 40–41 (1937). Because the

electricity grid is on its own an interstate market, state protectionist measures regulating its instrumentalities run a much greater risk of harming out-of-state interests—the ability of companies to compete, the prices consumers pay—than regulations on retail wine stores. *Ark. Elec. Co-op Corp.*, 461 U.S. at 377 ("[T]ransmission of energy is an activity particularly likely to affect more than one State, and its effect on interstate commerce is often significant enough that uncontrolled regulated by the States can patently interfere with broader national interests."); *Old Dominion Elec. Coop. v FERC*, 898 F.3d 1254, 1257 (D.C. Cir. 2018) (discussing FERC order that allocated costs for new transmission lines built in Virginia to numerous utilities located throughout the states in the interstate grid). The interstate transmission lines SB 1938 regulates are part of interstate commerce.

Nor does it save SB 1938 that most of the in-state incumbents it protects are incorporated outside Texas. In finding dormant Commerce Clause violations, the Supreme Court did not even mention the place of incorporation for the wineries in New York, coal mines in Oklahoma, or dairies in Madison, Wisconsin that received an unlawful benefit because of their local presence. *Granholm*, 544 U.S. at 475; *Wyoming*, 502 U.S. at 457–59; *Dean Milk*, 340 U.S. at 352 (holding unconstitutional an ordinance that discriminated on the basis of where milk pasteurization occurred, not the facility owner's state of incorporation); *see also Healy*, 512 U.S. at 203–04 (holding that law benefitting dairy farms located in Massachusetts violated Commerce Clause without asking whether those farms were owned by Massachusetts citizens or companies). We also do not know the place of incorporation of the company that operated the solid waste transfer station granted an unlawful monopoly by a small New York town. *C&A Carbone, Inc.*, 511 U.S. at 387 (calling the company a "local private contractor"). The Commissioners cite no Supreme Court case holding that a law is

No. 20-50160

nondiscriminatory for Commerce Clause purposes because the local interests it benefits are incorporated or headquartered in another state.[7]

Most circuits have rejected the idea that a law survives Commerce Clause scrutiny if many of the favored interests are incorporated elsewhere. As the Eleventh Circuit explained, if "place of incorporation alone" were controlling, "then a state['s] dormant Commerce Clause liability would turn on the empty formality of where a company's articles of incorporation were filed, rather than where the company's business takes place or where its political influence lies." *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1259 (11th Cir. 2012); *accord Walgreen Co. v. Rullan*, 405 F.3d 50, 58 (1st Cir. 2005). That reasoning strikes at what the Supreme Court has recognized as a primary concern of the dormant Commerce Clause: "when 'the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected.'" *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007) (quoting

---

[7] A state can discriminate based on business form. *See Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 945 F.3d 206 (5th Cir. 2019) (considering a Texas law "ban[ning] all public corporations from obtaining" a permit to sell alcohol), *cert. denied*, 141 S. Ct. 874 (2020); *Exxon Corp. v. Maryland*, 437 U.S. 117, 125 (1978) (rejecting a facial discrimination claim because the law discriminated based on business form, not an entity's local contacts). The district court did not conclude that SB 38 was such a law, but the Commissioners suggest it is. They argue that because most incumbent transmission facilities are owned by vertically integrated utilities, the law is a permissible protection of companies with that business form.

But SB 1938 does not itself make that business-form distinction. It allows incumbent entities other than vertically integrated utilities, namely electric cooperatives, to compete. *See* TEX. UTIL. CODE § 37.056(f). Indeed, NextEra's Jacksonville-Overton project hinges on its ability to buy high-voltage lines from Rayburn Country Electric Cooperative, Inc. And SB 1938 does not allow vertically integrated utilities without a Texas presence to build lines in the state. SB 1938 conditions a company's ability to compete only on its preexisting operations in Texas, not on its corporate form.

*S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 767–68 (1945)).  For the concern about in-state interests being able to obtain favorable treatment over out-of-state interests, local presence, rather than place of incorporation, should matter.  Which business is more likely to have the clout to enact protectionist measures: a Delaware corporation that employs thousands of workers in a state, or a company that paid a nominal filing fee to be incorporated in state but has its "principal operations" elsewhere?  *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 (1980).  Surely the former, as the swift enactment of SB 1938 after the state regulatory agency rejected rights of first refusal may demonstrate.

One circuit has taken the opposite view that place of incorporation controls.  *See LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1027–29  (8th Cir. 2020), *cert. denied*, No. 20-641, 2021 WL 769770 (Mar. 1, 2021).  The Eighth Circuit case involved a Minnesota law that will sound familiar: it grants incumbent utilities a right-of-first refusal to build new transmission lines, though it does not go nearly as far as the Texas law in banning new entrants outright.  *Compare* MINN. STAT. § 216B.246, subdiv. 3 (providing a right of first refusal that allows any entity — even those without a Minnesota transmission facility — to seek to enter the market if the incumbent does not exercise its rights to compete within 90 days), *with* TEX. UTIL. CODE § 37.056.  The court concluded that the preference for incumbents was not discriminatory because it "applie[d] evenhandedly to all entities, regardless of whether they are Minnesota-based entities or based elsewhere."  *LSP Transmission Holdings, LLC*, 954 F.3d at 1028.[8]  As we have explained,

---

[8] *LSP Transmission* seems to equivocate a bit on this point.  A footnote says that the court is not deciding "whether an entity that has an in-state presence but is headquartered elsewhere is considered an in-state entity for the purpose of dormant Commerce Clause review."   954 F.3d at 1029 n.7.  Yet its rejection of the facial discrimination claim seems to rely on the notion that "incumbents in Minnesota include

No. 20-50160

however, a focus on where a company is "based," which could mean either where it is incorporated or headquartered, is irreconcilable with Supreme Court dormant Commerce Clause jurisprudence addressing physical-presence requirements.  In light of that Supreme Court precedent, the majority view of courts of appeals that where a company is "based" is not controlling, and the underlying concern about local clout leading to protectionist legislation, a law can discriminate against interstate commerce even though most of the incumbent transmission-line providers that benefit from SB 1938 are incorporated or headquartered outside Texas.[9]

What matters instead is that the Texas law prevents those without a presence in the state from ever entering the portions of the interstate transmission market that cross into Texas.  A law that "discriminates among affected business entities according to the extent of their contacts with the local economy" may violate the Commerce Clause.  *Lewis*, 447 U.S. at 42

---

entities headquartered in Iowa, North Dakota, South Dakota, Wisconsin, and Minnesota" and "[m]any of these entities also own and operate facilities in states other than Minnesota." *Id.* at 1028.

[9] The district court also cited SB 1938's allowing a nonincumbent to enter the market by purchasing a Texas incumbent as a reason why the law is not discriminatory. Tex. Util. Code § 37.154(a).  But holding that a law complies with the Commerce Clause because an out-of-state firm can obtain the in-state favoritism by acquiring a firm with the required in-state presence would require wiping away a broad swath of dormant Commerce Clause jurisprudence.  In many cases, the excluded entity would have had the ability to buy the in-state entity and thus obtain the benefit of protectionism.  To take just one example, consider again *Dean Milk*.  340 U.S. at 352.  What would have prevented a dairy operating in Illinois from purchasing a pasteurization facility in Madison and then selling milk from that acquired facility to Madisonians?

There is a more fundamental problem with the view that a law's allowing an out-of-state interest to acquire a protected incumbent precludes a finding of discrimination.  It ignores that the dormant Commerce "Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon*, 437 U.S. at 127–28.  The harm to the market flows from the granting of the exclusive right to in-state interests.  That protectionism lessens thus raises prices in the interstate market.

No. 20-50160

(concluding that a Florida statute was discriminatory, as only financial institutions "with principal operations *outside* Florida [we]re prohibited from operating . . . within the State"). In fact, "in-state presence requirement[s]" have been a fertile ground for recent dormant Commerce Clause challenges. *See Granholm,* 544 U.S. at 475. Consider the New York winery case. *Id.* A New York statute was discriminatory because it required out-of-state wineries to establish "a branch factory, office, or storeroom within the state" to make direct sales to consumers. *Id.* at 470 (quoting N.Y. Alco. Bev. Cont. § 3(37)). The law did not define in-state wineries as those incorporated or headquartered in New York. *Swedenburg v. Kelly*, 358 F.3d 223, 228 (2d Cir. 2004), *rev'd by Granholm*, 544 U.S. at 493. All that was required to be "in-state" was a physical presence in the state. *Id.* at 229. The Court equated that presence requirement—for a brick-and-mortar facility in the state—to a residency requirement. *Granholm*, 544 U.S. at 475.

The Supreme Court's most recent dormant Commerce Clause case, one also involving alcohol, readily concluded that a law requiring two-years of residency to own a liquor store "plainly" favored in-state interests. *Tenn. Wine*, 139 S. Ct. at 2462 (addressing law that required individual owners to be residents of Tennessee for at least two years and required officers and owners of corporation to be Tennessee residents for two years). It took a single sentence to note that such a residency requirement would violate the Commerce Clause for the typical business; the tougher issue was whether the authority the Twenty-First Amendment grants States over alcohol regulation changed that result. *Id.* at 2474. An earlier case also found "plain[]" discrimination when a Madison, Wisconsin ordinance allowed sales of milk only by companies with a pasteurization facility within five miles of the city center. *Dean Milk*, 340 U.S. at 354; *see also Lewis*, 447 U.S. at 38–44 (finding discriminatory a Florida law that prevented banks with their "principal

No. 20-50160

operations" outside the state from owning investment advisory businesses in the state).

What is true for alcohol and milk under the dormant Commerce Clause must be true for electricity transmission.[10] *Cf. Elec. Power Supply Ass'n*, 136 S. Ct. at 767 (discussing the near century long application of the Clause to the power industry).  Requiring boots on the ground discriminates against interstate commerce.  *See also Lewis*, 447 U.S. at 42 n.9 (instructing that "discrimination based on the extent of local operations is itself enough to establish the kind of local protectionism we have [cautioned against]").  And SB 1938's defining feature is a local-presence requirement.  Only companies that already have transmission lines can build new lines that connect to the existing lines.  Only such companies can receive a transfer of rights from another incumbent owner that chooses not to build lines connecting to its existing lines.

The Commissioners and partial dissent contend that a law limiting competition to incumbents is not subject to dormant Commerce Clause review.  But "incumbent" is just another word for an entity that already has a presence.  *Incumbent*, MERRIAM WEBSTER (defining incumbent as "one that occupies a particular position or place").  In fact, an incumbency requirement is a more anticompetitive version of the in-state presence requirements held unconstitutional in cases like *Granholm* or *Dean Milk*.  SB

---

[10] The alcohol and milk cases cannot be distinguished, as the district court thought, on the ground that they involved "the flow of goods in interstate commerce" or "precondition[s] for allowing the flow of goods."  The dormant Commerce Clause has long applied to both "goods and services."  *Tenn. Wine*, 139 S. Ct. at 2459; *C&A Carbone*, 511 U.S. at 391 ("[T]he article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it."); *Camps Newfound/Owatonn*, 520 U.S. at 577 n.10 ("We have long noted the applicability of our dormant Commerce Clause jurisprudence to service industries.").

No. 20-50160

1938 is a local-presence requirement frozen in place.  If a company had not built transmission lines in Texas before 2019, it can never build such lines.  In contrast, a dairy with facilities in Illinois could still sell milk in Madison if it built a pasteurization facility there.  And a winery with California vineyards could sell wine to New Yorkers by establishing a winery in the Empire State.  It is hard to see why the more stringent physical-presence requirement of SB 1938 should escape the fate of the physical-presence laws that still allowed ways for those without a local footprint to establish one and compete.[11]

We fail to see the partial dissent's distinction between the laws in *Granholm* and *Dean Milk*, which "*add* requirements that discriminate against out-of-state entities," and SB 1938, which "merely recognizes a *pre-existing* physical-presence requirement."  Opinion Concurring in Part and Dissenting in Part 3.  *Id*. 4.  SB 1938 was not meaningless; it added a physical-presence requirement to Texas utility law.  Before SB 1938, NextEra had the right to build the new transmission lines.  Indeed, in 2017 the PUCT declared that utilities without any presence in Texas could construct transmission lines in

---

[11] The Commissioners and partial dissent rely on the Fourth Circuit's comment that "incumbency bias . . . is not a surrogate" for the protectionist impulses the dormant Commerce Clause seeks to prevent.  *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 154 (4th Cir. 2016).  But the ellipses hide three critical words: "in this context."  *Id*.  And the context of that case was that it addressed a Virginia law that required all medical service providers—both those with current operations in the commonwealth and those with no history in Virginia—to obtain a certificate of public need before adding operations.  *Id*. at 149.  As the challenged law had no in-state presence requirement, the plaintiffs did not even argue that it was discriminatory on its face.  *Id*.  at 152.  So the court considered only whether the law was discriminatory in its purpose or effects.  *Id*. at 153–60.  The court made the statement about "incumbency bias"—far from an incumbency *requirement*—in explaining why an expert report concluding that incumbent medical providers were more successful in the facially neutral process for obtaining certificates did not require a finding of discriminatory purpose or effects.  *Id*. at 154.  *Colon Health Centers* thus says nothing about a law that restricts economic opportunities to firms that already have a presence in a state.

No. 20-50160

SPP and MISO territory. *Supra* 9–10. In 2018, MISO approved NextEra to build the Hartburg-Sabine Line despite the company's not having a physical presence in Texas. *Supra* 11. And NextEra would be allowed to build new transmission lines for interstate grids in any other state. The vast majority of states would not disfavor NextEra in any way for being a nonincumbent; five states would give incumbents a right-of-first refusal. *Supra* 10–11. Only in Texas do nonincumbents like NextEra face a lifetime ban on building lines for interstate grids that reach into the state. *Id*. Nothing, then, in the natural order of things makes SB 1938 any less of an intrusion on interstate commerce than the (less onerous) physical-presence requirements in cases like *Granholm*, *Dean Milk*, and *C & A Carbone*. *See also United Haulers*, 550 U.S. at 338 (explaining that "discrimination" under the dormant Commerce Clause "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter" (citation omitted)).

The Commissioners justify SB 1938's incumbency requirement as a law that promotes the safety and reliability of the electricity grid by ensuring that only those with a track record of building transmission lines in Texas can build new lines. That may end up justifying the discrimination against out-of-state interests, but it does not avoid the conclusion that the law discriminates. Companies with existing transmission lines in Texas may continue to compete in the transmission line market; companies without any lines in Texas cannot build lines in the state. That is no different than the oil well hypothetical we posed at the beginning. Limiting competition based on the existence or extent of a business's local foothold is the protectionism that the Commerce Clause guards against. *Granholm*, 544 U.S. at 466; *Lewis*, 447 U.S. at 42; *Dean Milk*, 340 U.S. at 352.

We therefore reverse the Rule 12(b)(6) dismissal of the claim that the very terms of SB 1938 discriminate against interstate commerce. On remand,

No. 20-50160

the district court will consider whether the Commissioners can show that Texas has no other means to "advance[] a legitimate local purpose." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 94 (1994).

2

Our conclusion that SB 1938 discriminates on its face may focus the remaining litigation on that aspect of dormant Commerce Clause jurisprudence alone. But NextEra also challenges the dismissal of its claims that SB 1939 has a discriminatory purpose or effect. In addition, it invokes the strand of dormant Commerce Clause caselaw providing that a law having only incidental effects on interstate commerce may nonetheless be unlawful if the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits."[12] *Pike*, 397 U.S. at 142. Apart from what we have said about general Commerce Clause principles, pleadings-stage dismissal of these claims was premature. Claims that turn on intent and effects typically require factual development. *Healy*, 512 U.S. at 201 (recognizing that Commerce Clause decisions require a "sensitive, case-by-case analysis of purposes and effects); *Wal-Mart*, 945 F.3d at 218 (noting that "discriminatory intent is factual matter"); *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) (reversing the Rule 12 dismissal of dormant Commerce Clause purpose and effects claims because of the "fact-intensive quality of the substantive inquiry"); *Cachia v. Islamorada*, 542 F.3d 839, 840–41 (11th Cir. 2008) (reversing the dismissal of a discriminatory-

---

[12] We have previously recognized that the difference is not clear between a "discriminatory effects" claim and a *Pike* balancing claim, which also turns on effects. *Churchill Downs Inc. v. Trout*, 589 F. App'x 233, 235 (5th Cir. 2014) (observing that the Supreme Court "has failed to produce a readily discernable standard for distinguishing between statutes that have discriminatory effects and those that merely create incidental burdens" on interstate commerce). We need not flesh that out at this stage of this litigation when there is no evidence of the law's effect.

effects claim); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 334 (4th Cir. 2001) (denying summary judgment because whether the challenged law discriminated in its effects or purpose were "[q]uite obviously . . . questions of fact"). That is the case here.

Start with the discriminatory-purpose claim. It requires us to consider several factors, including "the specific sequence of events leading up to the challenged decision." *Allstate*, 495 F.3d at 160. NextEra's allegation, though far from proven at this stage, supports a plausible inference of discrimination based on the on the timing of SB 1938. It contends that, at incumbents' prodding, the legislature suddenly enacted the law excluding new entrants after MISO selected NextEra's bid to build the Hartburg-Sabine Line. If proven, such a reaction to the entry of a disfavored group could support a finding of discriminatory purpose. *See Lewis*, 447 U.S. at 32 ("There is evidence that the amendment was a direct response to Banker Trust's pending application, and that it had the strong backing of the local financial community."). Other "purpose" factors are likewise factbound. Indeed, our most recent dormant Commerce Clause "purpose" case had the benefit of a full trial record. *Wal-Mart*, 945 F.3d at 212. Because NextEra has at least raised plausible allegations that SB 1983 had a discriminatory purpose, that claims gets to the discovery stage.

The effects-focused claims are just as, if not more, fact dependent. The *Pike* inquiry requires assessing both the burdens and benefits of the law. In response to the contention that allowing only incumbents to build new lines promotes reliability, NextEra points to FERC's rejection of that notion, MISO's requirements for reliable service, and the successful record of the few out-of-state transmission companies that have run lines in ERCOT before SB 1938. Given that SB 1938 is a complete ban on new entrants and NextEra has at least plausibly alleged that the claimed local benefit of reliability is "insignificant and illusory," this claim warrants the factual

No. 20-50160

development that effects claims typically receive. *See, e.g., Wal-Mart*, 945 F.3d at 221 (reviewing *Pike* claim after bench trial); *United Transp. Union v. Foster*, 205 F.3d 851, 863 (5th Cir. 2000) (reversing summary judgment on the plaintiffs' *Pike* claim because "of an empty record"); *Colon*, 733 F.3d at 546 (reversing the dismissal of the plaintiffs' *Pike* claim because it "present[ed] issues of fact that cannot be properly resolved on a motion to dismiss"); *Cachia*, 542 F.3d at 841 (reversing the dismissal of a discriminatory-effects claim because the complaint alleged that the challenge ordinance did "not simply raise the costs of operating a [chain] restaurant in Islamorada, but entirely prohibit[ed] such restaurants from opening"); *see also Colon*, 813 F.3d at 153–55 (holding, after reversing Rule 12 dismissal of effects claims, that claim did not survive summary judgment based on record that included expert testimony from both sides).

We reverse the Rule 12(b)(6) dismissals of the purpose, effects, and *Pike* claims.

## IV

The district court did not err, however, in dismissing NextEra's claim under the Contracts Clause. One of the original Constitution's only express limitations on state power, it directs that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10. The Contracts Clause was a response to the state laws relieving debtors during the 1780s. James W. Ely, Jr., The Contract Clause: A Constitutional History 1, 8, 15–17 (2016). In the first century or so of the Republic, before the Bill of Rights restricted states, the Contracts Clause was "the primary vehicle for federal review of state legislation." *Id.* at 1. Some of the greatest hits of the antebellum Supreme Court were Contracts Clause cases. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810); *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819);

*Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. (11 Pet.) 420 (1837).

But unlike the dormant Commerce Clause, the Contracts Clause is not what it once was. *See Sveen v. Melin*, 138 S. Ct. 1815, 1827–28 (2018) (Gorsuch, J., dissenting); ELY, *supra*, at 5–6, 220–23, 245–47. The Supreme Court substantially narrowed its scope during the Great Depression. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934) ("[T]he [Clause's] prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula."). Under modern caselaw, states have some leeway to alter parties' contractual relationships "to safeguard the vital interests of [their] people." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (quoting *Blaisdell*, 290 U.S. at 434).

A related principle that has sapped the Contracts Clause of its earlier force applies here. We now recognize that parties contract with an expectation of possible regulation. *See Energy Reserves Grp.,* 459 U.S. at 413. That is especially true in highly regulated industries like power. That history of regulation put NextEra on notice that Texas could enact additional regulations affecting its two projects. *Id.* ("Significant here is the fact that the parties are operating in a heavily regulated industry."); ELY, *supra*, at 246 (explaining that *Energy Reserves* recognized that "parties in regulated industries  must be deemed to enter contracts with the understanding that further regulations might affect their contractual terms"). After Order 1000, there was substantial uncertainty about how state regulators would respond. *See Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 897 (7th Cir. 1998) (highlighting that the plaintiff "should have known . . . that it did not have a solid right to prevent a dealer from changing the location of the dealership"). Despite PUCT's declaration that transmission-only companies could enter the market, Texas courts never weighed in on the issue. Moreover, the emergence of state rights of first refusal signaled that Texas could enact

No. 20-50160

something similar, if not even more restrictive. *Cf. id.* at 895 (concluding that the challenged law "was in the direct path of the plausible . . . evolution of Wisconsin's program for regulating automobile dealership contracts"). Given all that, SB 1938 did not impair NextEra's reasonable expectations.

At a more basic level, SB 1938 did not interfere with an existing contractual right of NextEra's. Both of NextEra's contracts required it "to secure any necessary" certificates of convenience and necessity to build the Hartburg-Sabine Line or purchase the Jacksonville-Overton Line. Yet PUCT never issued them. Consequently, NextEra did not have a concrete, vested right that the law could impair. *See Colon de Meijas v. Lamont*, 963 F.3d 196, 202–03 (2d Cir. 2020) (rejecting a similar challenge because "no contractual right exist[ed]"); *Lazar v. Kroncke*, 862 F.3d 1186, 1200 (9th Cir. 2017) ("Because Lazar never possessed a vested contractual right, she suffered no contractual impairment."); *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1106 (8th Cir. 1986) (affirming the denial of relief because the alleged right was "conditional"). It thus fails at the threshold question for proving a modern Contracts Clause violation. *Energy Reserves Grp.*, 459 U.S. at 413.

***

We AFFIRM the dismissal of the Contracts Clause claim. We REVERSE the dismissal of the Commerce Clause claims and remand those for further proceedings consistent with this opinion. We leave it for the district court to determine whether NextEra is entitled to any preliminary injunctive relief.

No. 20-50160

Jᴇɴɴɪғᴇʀ Wᴀʟᴋᴇʀ Eʟʀᴏᴅ, *Circuit Judge*, concurring in part and dissenting in part:

Today's holding about S.B. 1938 applies only "to the interstate electricity networks in Texas (but not the intrastate ERCOT network)." *Ante* at 2. The territory at issue, which is controlled by MISO and SPP, "is part of an 'interconnected "grid" of near-nationwide scope' that has long been subject to FERC oversight." *Ante* at 22. Because the majority opinion specifically excludes the intrastate ERCOT grid, I concur in much of the majority's opinion. But I dissent from its further conclusion that S.B. 1938 discriminates on its face.*

The "regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Ark. Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). And as the majority opinion recognizes, "Texas has an interest in promoting reliable electricity service, including the power to approve the siting and construction of transmission lines." *Ante* at 20. To ensure "a robust, reliable, and well-regulated electric grid," S.B. 1938 ties construction rights to endpoint ownership to determine who can build, own, and operate new transmission facilities. Tex. H. Comm. on State Affs., Bill Analysis, Tex. H.B. 3995, 86th Leg., C.S.H.B. at 1 (2019). As one of the *amici* stresses, S.B. 1938 "is an exercise of local control over what is inherently a local business. This local character is seen especially in the areas of ERCOT served by public power utilities, which are community-owned or managed, vertically integrated monopoly systems." Brief for The Lower Colorado River Authority, as *Amicus Curiae* Supporting Defendants–Appellees, at 9.

---

* As the majority opinion notes, this facial discrimination claim under the dormant Commerce Clause should not be confused with a facial challenge to S.B. 1938, which this claim is not. *Ante* at 21 n.6.

No. 20-50160

Although the majority opinion does not disturb ERCOT's grid, which is wholly intrastate and makes up most of Texas's electrical system, the right of first refusal so crucial to ERCOT may also be important to the portion of Texas's grid within FERC's jurisdiction.

As the majority opinion states, a law may discriminate against interstate commerce in three ways: on its face (*i.e.*, by its very text), by its purpose, or in its effect. *Ante* at 21 (citing *Allstate Ins. Co v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007)). And a law having only incidental effects on interstate commerce may nonetheless be unlawful if the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). While I agree with the majority that we should reverse the 12(b)(6) dismissals of NextEra's discriminatory-purpose, discriminatory-effect, and *Pike* claims, *ante* at 33, I disagree that "S.B. 1938 discriminates on its face" against interstate commerce, *ante* at 31.

The majority opinion purports to draw a distinction in S.B. 1938 between in-state and out-of-state entities or interests. In reality, it draws a distinction *into* S.B. 1938, because the text does not bear that out. Rather, S.B. 1938 draws a neutral distinction between entities based on *incumbency status*, which does not depend on residency. In *LSP Transmission Holdings, LLC v. Sieben*, the Eighth Circuit considered an incumbency preference nearly identical to this one. 954 F.3d 1018, 1023–24 (8th Cir. 2020). In holding that the law was not facially discriminatory, the court noted that the law's "preference is for electric transmission owners who have existing facilities, and its law applies evenhandedly to all entities, regardless of whether they are Minnesota-based entities or based elsewhere." *Id.* at 1028. True, "laws that restrain both intrastate and interstate commerce may be discriminatory," but "[t]his is not such an instance." *Id.* The incumbency requirement here, as in *Sieben*, is not an illicit residency requirement. *Cf.*

37

No. 20-50160

*Hignell-Stark v. City of New Orleans*, No. 21-30643, 2022 WL 3584037, at *5 (5th Cir. Aug. 22, 2022) (holding that New Orleans's "residency requirement discriminated against interstate commerce").

Similarly, S.B. 1938 draws a neutral distinction based only on incumbency status. Thus, the majority needs a further inferential step to conclude that S.B. 1938 amounts to discrimination against out-of-state entities. Citing three Supreme Court cases, the majority opinion makes that inferential step by saying that "[w]hat is true for alcohol and milk under the dormant Commerce Clause must be true for electricity transmission. Requiring boots on the ground discriminates against interstate commerce." *Ante* at 28 (citations omitted). But this inferential step lands beyond the realm of facial discrimination. If the text does not distinguish between in-state and out-of-state interests—which it does not—S.B. 1938 cannot be facially discriminatory.

To illustrate, S.B. 1938's incumbency requirement is meaningfully different than discriminatory in-state presence requirements. In each of these three cases, the laws *add* requirements that discriminate against out-of-state entities. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2456–59 (2019); *Granholm v. Heald*, 544 U.S. 460, 465–66 (2005); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 350–52 (1951). Without the discriminatory laws in *Granholm* and *Dean Milk*, the goods at issue—wine and milk, respectively—could readily be supplied by providers without any physical presence in the state. Wineries could ship wine directly to consumers in New York and Michigan, and milk producers could send their dairy products into Madison from Chicago. *Granholm*, 544 U.S. at 467–68; *Dean Milk*, 340 U.S. at 352–53. And without the law in *Tennessee Wine & Spirits*, out-of-state entities and individuals could open new liquor stores without residing in Tennessee for any meaningful period of time. 139 S. Ct. at 2458. Under those laws, however, out-of-state producers could no longer

38

ship product into the state or the city, and out-of-state entities could not immediately open liquor stores. Thus, those laws violate the Commerce Clause because they add requirements that discriminate against out-of-state entities.

In contrast, S.B. 1938 does not add any such requirements. By offering a right of first refusal to owners of incumbent utility facilities, S.B. 1938 merely recognizes a *pre-existing* physical-presence requirement: an electric company cannot provide transmission-and-distribution services without some sort of existing physical presence in the state. Thus, unlike the three cases cited by the majority, S.B. 1938 does not add, either explicitly or implicitly, any in-state presence requirements.

Moreover, the nature of the transmission-and-distribution market means that *all* existing market providers must have some sort of physical presence within the state. Thus, the mere fact that an entity had a physical presence in Texas before 2019 says only that the entity was an existing market provider at that time, and nothing more. It says nothing about whether the entity is an in-state or an out-of-state entity, or whether the law favors in-state over out-of-state interests. *See Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 154 (4th Cir. 2016) ("[I]ncumbency bias in this context is not a surrogate for the 'negative[] impact [on] interstate commerce' with which the dormant Commerce Clause is concerned." (alterations in original) (quoting *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 543 (4th Cir. 2013))).

The distinction between incumbents and non-incumbents in S.B. 1938's text, without more, does not constitute facially discriminatory treatment of out-of-state entities. That something more would have to be evidence of discriminatory purpose or discriminatory effect. And as the majority stated, the "pleadings-stage dismissal of [the discriminatory-purpose,

No. 20-50160

discriminatory-effect, and *Pike*] claims was premature.  Claims that turn on intent and effects typically require factual development."  *Ante* at 31.  On remand, I have no doubt that the able district court will carefully analyze these thorny issues.