**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| NEXTERA ENERGY CAPITAL HOLDINGS, INC., *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 1:19-cv-00626-DII |
| | § | |
| THOMAS J. GLEESON, in his official capacity as Chairman of the Public Utility Commission of Texas, *et al.*, | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

**PUBLIC UTILITY COMMISSION OF TEXAS COMMISSIONERS' RESPONSE
IN OPPOSITION TO INTERVENOR-PLAINTIFF LSP TRANSMISSION
HOLDINGS II, LLC'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.    Introduction and Summary ................................................................. 1

II.   Factual Background ............................................................................. 4

      A.   The transmission of electricity in Texas ....................................... 4

      B.   The PUCT's key role in overseeing transmission service
           in Texas ...................................................................................... 6

      C.   SB 1938's endpoint practice for development of new
           transmission facilities ................................................................. 7

      D.   Although the FERC has experimented with competitive
           transmission development, it always has allowed states to
           use a different approach and respected state rights of first
           refusal .......................................................................................... 8

      E.   The Fifth Circuit decision and the issues on remand,
           including Texas's need to continue its longstanding
           transmission build-out practice to protect system
           reliability ..................................................................................... 9

III.  LSP is not entitled to a preliminary injunction. ................................. 10

      A.   LSP cannot show a likelihood of success on the merits. ............ 11

      B.   LSP cannot show irreparable harm. ........................................... 14

           1.   LSP seeks to enjoin the wrong party, as it is the
                Southwest Power Pool, not the PUCT
                Commissioners, that may act in the coming
                months ............................................................................. 14

           2.   The PUCT will take no action on any of the new
                SPP projects until at least the middle of next year.
                ........................................................................................ 14

           3.   Under SPP's tariff, SB 1938 could impact only
                one of the SPP Texas projects. ........................................ 16

      C.   The equities and the public interest do not support the
           injunction. ................................................................................. 17

CONCLUSION AND PRAYER ........................................................................ 20

CERTIFICATE OF SERVICE ........................................................................ 22

## TABLE OF AUTHORITIES

**Cases**

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
　　98 F.4th 220 (5th Cir. 2024) ........................................................................ 18

*Direct Biologics, L.L.C. v. McQueen*,
　　63 F.4th 1015 (5th Cir. 2023) ...................................................................... 11

*Emera Me. v. FERC*,
　　854 F.3d 662 (D.C. Cir. 2017) ..................................................................... 19

*Gen. Motors Corp. v. Tracy*,
　　519 U.S. 278 (1997) ..................................................................................... 10

*Gerling Global Reinsurance Corp. of Am. v. Low*,
　　240 F.3d 739 (9th Cir. 2001) ....................................................................... 18

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
　　481 F.3d 60 (2d Cir. 2007) ........................................................................... 18

*Holland Am. Ins. Co. v. Succession of Roy*,
　　777 F.2d 992 (5th Cir. 1985) ....................................................................... 14

*Int'l Franchise Ass'n v. City of Seattle*,
　　803 F.3d 389 (9th Cir. 2015) ....................................................................... 18

*Lake v. NextEra Energy Capital Holdings, Inc.*,
　　144 S. Ct. 485 (2023) ................................................................................... 10

*Maine v. Taylor*,
　　477 U.S. 131 (1986) .......................................................................... 1, 12, 13

*MISO Transmission Owners v. FERC*,
　　819 F.3d 329 (7th Cir. 2016) ................................................................. 18, 19

*New Energy Co. of Ind. v. Limbach*,
　　486 U.S. 269 (1988) ................................................................................ 1, 12

*NextEra Energy Capital Holdings, Inc. v. D'Andrea*,
　　No. 20-50160, 2020 WL 2119791 (5th Cir. Apr. 22, 2020) ......................... 12

*NextEra Energy Capital Holdings, Inc. v. Lake*,
　　48 F.4th 306 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 485 (2023) ........... 1, 9, 19

*Okla. Gas & Elec. Co. v. FERC*,
　　827 F.3d 75 (D.C. Cir. 2016) ....................................................................... 19

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.,*
　　418 F.3d 535 (5th Cir. 2005) ........................................................11

*S.C. Pub. Serv. Auth. v. FERC,*
　　762 F.3d 41 (D.C. Cir. 2014) ......................................................... 9

*TXU Generation Co. v. Pub. Util. Comm'n of Tex.,*
　　165 S.W.3d 821 (Tex. App.—Austin 2005, pet. denied) ................ 5

*Winter v. Nat. Res. Def. Council,*
　　555 U.S. 7 (2008) .....................................................................11, 14

*Wis. Gas Co. v. FERC,*
　　758 F.2d 669 (D.C. Cir. 1985) ..................................................... 14

*Wyoming v. Oklahoma,*
　　502 U.S. 437 (1992) ..................................................................... 12

## Constitutional Provisions & Statutes

17 Okla. Stat. § 292 ............................................................................ 9

Minn Stat. § 216B.246 ........................................................................ 9

N.D. Cent. Code § 49-03-02.2 ............................................................ 9

Neb. Rev. Stat. § 70-1028 ................................................................... 9

S.D. Codified Laws § 49-32-20 .......................................................... 9

Tex. S.B. 1938, 86th Leg., R.S. (2019) ...................................... passim

Tex. Util. Code § 14.001 ..................................................................... 6

Tex. Util. Code § 36.001 ..................................................................... 6

Tex. Util. Code § 37.051(a) ................................................................. 6

Tex. Util. Code § 37.056(c) ................................................................. 6

Tex. Util. Code § 37.056(e) ................................................................. 7

Tex. Util. Code. § 37.056(e)–(i) .......................................................... 7

Tex. Util. Code § 37.056(g) ................................................................. 7

Tex. Util. Code § 37.154(a) ................................................................. 7

Tex. Util. Code § 39.051 ..................................................................... 6

Tex. Util. Code § 39.102 ..................................................................... 6

## I.      Introduction and Summary

LSP Transmission Holdings II, LLC ("LSP")'s motion for a preliminary injunction makes no actual attempt to meet its burden for the extraordinary relief of a preliminary injunction, instead assuming the Fifth Circuit has already decided the merits in its favor. Nor does LSP establish the necessary injury without the injunction, failing to explain how the requested injunction against the Public Utility Commission of Texas Commissioners ("Texas," or "PUCT Commissioners")[1] would prevent the potential impending actions of the Southwest Power Pool ("SPP").

The Texas statute, SB 1938, at issue in this Dormant Commerce Clause challenge reflects a longstanding practice critical to the ability of the PUCT Commissioners to ensure reliable electric service in the State. Under SB 1938's "endpoint" rule, the owners of existing transmission lines are tasked with building new lines that are needed, on an increasingly expedited basis, to serve the State's rapidly growing demand for electricity. The Fifth Circuit reversed Judge Lee Yeakel's dismissal of the case and remanded to this Court for Texas to show how an undisputedly legitimate public purpose (ensuring electric system reliability and the speedy development of new transmission that the State urgently needs) justifies SB 1938's regulatory approach to the development of new transmission lines. *NextEra Energy Capital Holdings, Inc. v. Lake*, 48 F.4th 306, 329 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 485 (2023). This inquiry involves consideration of whether that public purpose "cannot be adequately served by reasonable nondiscriminatory alternatives," *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988), or "available nondiscriminatory means," *Maine v. Taylor*, 477 U.S. 131, 138 (1986).

---

[1] PUCT Defendants request that the Court update the style of the case to list the current PUCT Commissioners, Thomas J. Gleeson, Kathleen Jackson, Lori Cobos, Jimmy Glotfelty, and Courtney K. Hjaltman, as defendants in their official capacities. Fed. R. Civ. P. 25(d) (automatic substitution of successors to public officers).

NextEra Energy Capital Holdings, Inc. ("NextEra")'s motion for judgment on the pleadings (ECF 212) remains pending, along with Defendant-Intervenors Southwestern Public Service Company ("SPS") and Entergy Texas, Inc. ("Entergy")'s cross-motion for judgment on the pleadings (ECF 225) urging that LSP lacks prudential standing to bring a Dormant Commerce Clause claim. Plaintiff-Intervenor LSP Transmission Holdings II, LLC ("LSP") has now filed a motion for preliminary injunction. ECF 237. LSP's motion should be denied, as LSP cannot meet any of the requirements for the preliminary injunction it seeks.

***First,*** LSP cannot show a likelihood of success on the merits. Contrary to LSP's contention, the merits have not already been resolved by the Fifth Circuit. LSP Mot. 1. Self-evidently, if that were the case, the Fifth Circuit would not have remanded for this Court to consider whether Texas can meet the applicable Commerce Clause standard in light of its facial-discrimination determination. In urging it is likely to prevail on the merits, LSP offers little more than a bald assertion that SB 1938 is "almost certainly" invalid. LSP Mot. 11. It further claims Texas already has admitted it cannot make the necessary showing, but Texas has made no such admission. The standard may be high, but it can be met: LSP is not entitled to a preliminary injunction solely because a heightened standard applies. And LSP's motion makes no effort to explain why Texas's reliability concerns cannot justify the SB 1938 regulatory structure, summarily noting this interest could "plainly" be addressed through nondiscriminatory alternatives without further explanation. LSP Mot. 13. Its request must be denied for this failure alone. Indeed—as explained below and in the supporting declaration—Texas has no reasonable alternative available to the endpoint rule (and a ROFR) to protect system reliability and resilience in light of the State's particular needs and burgeoning demand for electricity. The issue here is not LSP or NextEra's qualifications to build new transmission lines or Texas's alleged desire to insulate in-state companies from out-of-state

competition. Rather, the issue is how to ensure Texas builds the new transmission lines it must have, when they are urgently needed, and also can successfully manage adverse conditions on the grid such as extreme weather impacts to protect the public health and welfare.

**Second,** LSP cannot show irreparable harm. LSP seeks to enjoin the PUCT from taking any action to enforce SB 1938, claiming it needs this injunction before the October 29 meeting at which the SPP board may vote to approve several new transmission projects in Texas. But the Public Utility Commission of Texas ("PUCT or "Commission") will be taking no action this month regarding any of the identified projects and, indeed, will not be presented with an opportunity to make any determination regarding the certification of these projects (and the enforcement of SB 1938) until next year—after the transmission-line project details have been finalized and the designated provider applies to the PUCT for certification of the line. There is no matter pending at the PUCT relating to these projects in which it will be called upon to apply SB 1938 and will not be for quite some time. Yet LSP (claiming immediate irreparable harm) does not seek an injunction against SPP (the entity that may be acting on the proposed projects in the next six months), only against the PUCT Commissioners (who will not be). And it is very unclear what impact a preliminary injunction against the PUCT Commissioners barring the enforcement of SB 1938 would have on SPP's decision as to the identified projects, given it would not be a final determination on SB 1938's constitutionality.

LSP does not allege that it now plans to compete for any of proposed SPP Texas lines. It concedes it has not yet decided to bid and will not even be in a position to do so until 2025. LSP Mot. 15. And in any event, LSP identifies only *one* project that would potentially be subject to competitive bidding under SPP's tariff. Three of the lines that LSP lists in its motion are reliability-

need driven projects that SPP, pursuant to its tariff, will direct the incumbent providers to build—they will not be competitively bid. LSP cannot compete to build these lines, regardless of SB 1938.

Given all the above, LSP cannot demonstrate its entitlement to an injunction against the PUCT Commissioners now, regardless of the merits. There is no imminent threat of irreparable harm justifying the extraordinary relief of a preliminary injunction. The requested injunction against the PUCT Commissioners should be denied on this basis alone. Indeed, Plaintiff NextEra itself seemingly agrees, as it has responded to LSP's preliminary injunction motion by essentially urging the Court to decline to take up the injunction request and instead decide NextEra's own motion for judgment on the pleadings. ECF 238.

*And third*, LSP cannot meet the other requirements to obtain a preliminary injunction. The equities do not favor its request. LSP barely even acknowledges the State of Texas's strong interest in electric system reliability to protect the health and safety of its citizens. LSP instead focuses on its injury to its constitutional rights (loss of business opportunities, which an injunction against the PUCT Commissioners cannot necessarily remedy) and its assumption that Texas electric consumers would benefit from lower electric rates from a competitive transmission process—while totally ignoring the critical, often life-and-death importance of the rapid build-out and timely maintenance of the State's transmission infrastructure, which is undeniably essential to reliable electric service.

## II.     Factual Background

### A.      The transmission of electricity in Texas

The transmission system at issue in this case is the backbone of Texas's electric grid. Electricity is created by power generators, transmitted throughout a grid on transmission lines, and then distribution lines carry the electricity on to individual end customers. Building and maintaining the necessary transmission infrastructure is critical to ensuring that the State of Texas's

demand for electricity is met on an ongoing basis. This is because electricity must be delivered in real time: it is produced at the same time it is consumed. It cannot be efficiently stored but must be placed on the grid once generated, and consumers must have it on demand. The system must be kept in balance so that the amount of electricity being generated and put on the grid matches the amount being taken off the grid at all times and to maintain proper voltage and frequency. *See TXU Generation Co. v. Pub. Util. Comm'n of Tex.*, 165 S.W.3d 821, 827–28 (Tex. App.—Austin 2005, pet. denied). These unique characteristics make transmission lines critical to the stability of the electric grid. These lines must be available to move the electricity from where it is generated to consumers in real time. Constraints on the transmission system may mean that higher-cost generation (such as older, less efficient generation plants) must be used because transmission lines are not available to bring lower-cost electricity from where it is generated to where customers are demanding it. In the worst-case scenario, the grid operator may be forced to shed load, or initiate rolling blackouts to prevent more serious service outages. Millions of customers could be disconnected. The stakes here for the State of Texas's electric consumers are enormous and involve matters of life and death.

There are three essentially separate electric grids in the continental United States—an eastern grid, a western grid, and a grid operated by the Electric Reliability Council of Texas ("ERCOT"). Texas includes small parts of both the eastern and western grids as well as the entire ERCOT grid. In much of the country, transmission planning is overseen by an Independent System Operator ("ISO") or a Regional Transmission Organization ("RTO"). In Texas, three ISOs/RTOs are involved—the Southwest Power Pool ("SPP"), the Midcontinent Independent System Operator ("MISO"), and ERCOT. The ERCOT grid covers about 75% of Texas's land area and provides about 90% of the electricity used by Texas customers.

**B.      The PUCT's key role in overseeing transmission service in Texas**

The Texas Legislature has delegated oversight of Texas's electric utilities and grid to the
PUCT. Tex. Util. Code § 14.001. In ERCOT's region, retail sales and generation have been
deregulated. *Id.* §§ 39.051, 39.102. But transmission and distribution are still regulated statewide,
with rates set by the PUCT and costs passed through to end customers. *Id.* § 36.001. Areas outside
ERCOT are served by vertically integrated utilities that provide the generation, transmission and
distribution, and retail services at PUCT-set rates that reflect these costs.[2] Utilities—in all three
grids—must obtain a certificate of convenience and necessity ("CCN") from the PUCT to provide
transmission service. *Id.* § 37.051(a). During the CCN process, the PUCT will determine if the line
is necessary, weighing a variety of factors, including the cost to consumers and the adequacy of
existing service. *Id.* § 37.056(c). The PUCT also will determine specific line siting and approve
technical aspects of the new facilities. The PUCT's CCN process is independent of the evaluations
done by the transmission planning entities. The PUCT considers the entities' recommendations but
is not bound to approve any line.[3]

For decades, the practice in Texas has been for existing transmission owners to build the
new transmission lines.[4] ERCOT's operating rules or "protocols" reflect this longstanding

---

[2] A limited number of electric consumers are served by electric distribution cooperatives, and some
electric cooperatives also provide transmission service.

[3] *See, e.g.*, Tex. Pub. Util. Comm'n, *Application of Brazos Electric Power Cooperative, Inc. to
Amend its Certificate of Convenience and Necessity for a 138-kV Transmission Line in Collin
County*, Docket No. 46429 (Jan. 26, 2018) (denying a CCN for new transmission).

[4] A few of the Competitive Renewable Energy Zone ("CREZ") lines built to deliver wind power
from West Texas to population centers were an exception. But only about 1,500 miles of more than
46,500 miles of transmission lines in ERCOT today were built by "new entrant" CREZ
transmission providers (that is, providers that were not at the time already regulated Texas utilities).
It is a small piece of the ERCOT grid. As the CREZ lines have been completed, SB 1938 repealed
these CREZ provisions in the Texas Utilities Code.

practice.[5] SPP and MISO both had similar rights of first refusal in their tariffs until relatively recently. Although these rights of first refusal were removed from their tariffs, FERC, and SPP and MISO, recognize state rights of first refusal such as that in SB 1938.

### C.      SB 1938's endpoint practice for development of new transmission facilities

In May 2019, the Texas Legislature passed SB 1938, amending the Texas Utilities Code.[6] SB 1938 requires the PUCT to grant a CCN for new transmission facilities to the endpoint owners of the existing facilities to which the new line will interconnect.[7] The bill also added a provision to allow the endpoint owner to transfer its rights to build, own, or operate new or existing lines to another certificated utility under certain circumstances.[8]

SB 1938 amended Utilities Code Section 37.056(e) to state that the Commission may grant the certificate to extend an existing facility to the owner of that line or facility. Texas Utilities Code Section 37.056(g), as amended, further provides the utility that authorized to build and operate the transmission line may, instead of building the line itself, seek to designate another provider currently certificated in the power region to build the line, subject to Commission approval. If a new transmission line will connect to lines owned by two different providers, then those two "incumbent" transmission providers may each build a portion of the new line. SB 1938 applies statewide to all new transmission lines, including those lines that might be eligible for competitive bidding under the FERC-approved MISO and SPP tariffs (as discussed below) as well as those lines for which these federal tariffs do not establish competitive bidding.

---

[5] ERCOT Nodal Protocols § 3.11.4.8, *available at* https://www.ercot.com/files/docs/2024/03/28/April%201,%202024%20Nodal%20Protocols.pdf.
[6] Tex. S.B. 1938, 86th Leg., R.S. (2019).
[7] *Id.*; Tex. Util. Code. § 37.056(e)–(i).
[8] Tex. S.B. 1938, 86th Leg., R.S. (2019); Tex. Util. Code § 37.154(a).

In ERCOT as well as the parts of Texas outside of ERCOT (where the transmission grid is operated by the SPP or MISO), almost all new transmission lines have been built by the incumbent providers. The legislative history for SB 1938 explains why Texas must employ its regulatory approach. Protecting transmission system reliability is the core purpose of the bill:

> Today in Texas, the entity that owns the endpoint of an existing transmission line is the entity that has the right to build any new facility that may be interconnected, an established process embodied in ERCOT protocol.

> Electric utilities in Texas have established geographic footprints, and this bill would ensure the geographic continuity of the system in a way that further facilitates reliability.

> Passage of this bill will protect the integrity of the electric transmission infrastructure and the way it is developed and built today.

Tex. S. Comm. on Bus. & Commerce, Bill Analysis, S.B. 1938, 86th Leg., R.S. (2019). Texas House and Senate Committees heard extensive testimony from a range of interests in favor of the bill, including large industrial customers, electric consumer groups, and utilities who testified as to its critical reliability justification.

> **D.      Although the FERC has experimented with competitive transmission development, it always has allowed states to use a different approach and respected state rights of first refusal.**

LSP devotes much of its motion for preliminary injunction to discussing the Federal Energy Regulatory Commission's efforts to encourage competitive process for the selection of providers to build certain types of transmission facilities. LSP Mot. 3-6. In this context, FERC has directed that ISOs around the country remove the incumbent transmission providers' "rights of first refusal" ("ROFR") from their federal tariffs. MISO and SPP thus amended their tariffs and established competitive bidding for some limited types of transmission projects. But LSP leaves out a critical point essential to this case: in directing this change, FERC also made clear that "nothing" it said was "intended to limit, preempt, or otherwise affect state or local laws or regulations with respect

to construction of transmission facilities," including state incumbent ROFR laws. *Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, 136 FERC ¶ 61,051, at P 227 (2011) ("Order 1000"). FERC thus "provide[d] flexibility" regarding "how best to address" transmission—including "authority over siting or permitting of transmission facilities." *Id.*; *see S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 76 (D.C. Cir. 2014). Thus, while FERC opted in favor of introducing some competition in Order 1000, it recognized that states may need to maintain their regulatory approach to developing new transmission facilities through rights of first refusal. Order 1000 did not, as LSP suggests, mandate a fully competitive transmission market. Indeed, the vast majority of transmission projects that are being built today, including three of the four transmission projects LSP cites in its motion, do not involve such competitive selection processes.

SB 1938 is one of these state ROFR statutes. Other states have similar laws providing a ROFR to incumbent transmission providers. *See, e.g.*, Minn Stat. § 216B.246, subdiv. 2; Neb. Rev. Stat. § 70-1028; N.D. Cent. Code § 49-03-02.2; 17 Okla. Stat. § 292; S.D. Codified Laws § 49-32-20. Texas and these states have reached a different policy judgment than FERC about the competition and reliability in their particular circumstances—a policy judgment that FERC respects and has chosen not to preempt.

### E. The Fifth Circuit decision and the issues on remand, including Texas's need to continue its longstanding transmission build-out practice to protect reliability.

A group of NextEra entities filed this suit challenging SB 1938 under the dormant Commerce Clause and the Contracts Clause of the United States Constitution. Upon the PUCT Commissioners' Rule 12(b) motion to dismiss, ECF 94, this Court dismissed all NextEra's claims. ECF 143. On expedited appeal, the Fifth Circuit affirmed the dismissal of the Contracts Clause claim but reversed the dismissal of the Commerce Clause claims. *NextEra*, 48 F.4th at 310. The

Fifth Circuit found that SB 1938 discriminated on its face against out-of-state transmission providers, *id*. at 321–23. The PUCT Commissioners petitioned for certiorari, which was denied in December 2023. *Lake v. NextEra Energy Capital Holdings, Inc.*, 144 S. Ct. 485 (2023).

But the Fifth Circuit did not decide that Texas statute violated the dormant Commerce Clause. Instead, it remanded to this Court to give Texas an opportunity to show that the State has no other reasonable alternative means other than SB 1938 to advance a legitimate public purpose, noting that Texas explained its incumbency requirement in part based on reliability, and that interest "may end up justifying the discrimination against out-of-state interests." *NextEra*, 48 F.4th at 326. The opinion specifically noted Texas's strong interest in maintaining reliability, which both LSP and NextEra have admitted is a legitimate policy objective that the Texas Legislature could advance through SB 1938. LSP Mot. for Prelim. Inj. 13, ECF 237; NextEra Mot. for J. on Pleadings 9, ECF 212. Thus, the issue remains on remand whether Texas has alternative ways to adequately address system reliability through means other than SB 1938's regulatory approach. In addition, there is another issue: because the transmission market in SPP and MISO is overwhelmingly noncompetitive (as very few projects are developed through competitive processes), the *General Motors v. Tracy*[9] exception to the Dormant Clause Clause applies. *See* PUCT's Resp. in Opp'n to NextEra's Mot. for J. on Pleadings 15, ECF 226.

## III.   LSP is not entitled to a preliminary injunction.

NextEra's motion for judgment on the pleadings (ECF 212), supported by LSP (ECF 220), remains pending. Nonetheless, Plaintiff-Intervenor LSP, another transmission provider, has now filed a motion for preliminary injunction, arguing that the PUCT Commissioners must be enjoined

---

[9] *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 310 (1997).

from enforcing SB 1938 before grid operator SPP's October 29 board meeting at which it may approve several new transmission projects in Texas.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Plaintiff has the burden of persuasion on all requirements. *E.g., PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). A preliminary injunction is an "extraordinary" remedy, *Direct Biologics, L.L.C. v. McQueen*, 63 F.4th 1015, 1020 (5th Cir. 2023), and unavailable here. LSP cannot establish any of the required elements.

### A.    LSP cannot show a likelihood of success on the merits.

LSP's argument that it will succeed on the merits is based entirely on two erroneous contentions: first, that the Fifth Circuit has already decided the merits (it self-evidently has not, as it remanded to this Court for application of the applicable standard), and second, that Texas has admitted it cannot make the necessary showing to support SB 1938. As for the latter, Texas has made no such admission. Here, LSP mischaracterizes Texas's certiorari briefing in the Supreme Court. LSP Mot. 2, 14. The referenced statements were made in urging the Supreme Court to review the Fifth Circuit's reversal of the dismissal of NextEra's dormant Commerce Clause claims on a Rule 12(b) motion. This briefing simply describes the applicable standard, given the Fifth Circuit's facial-discrimination determination, and is not an admission that Texas cannot meet it. It is a *standard*, and thus it can be met. It has been met in other circumstances, as discussed extensively in the PUCT Commissioners' response to NextEra's motion for judgment on the pleadings. ECF 226. Indeed, before the Fifth Circuit, Texas explained that even if SB 1938 were deemed to be facially discriminatory, Texas could meet the standard. Brief for Appellees at 42,

*NextEra Energy Capital Holdings, Inc. v. D'Andrea*, No. 20-50160, 2020 WL 2119791 (5th Cir. Apr. 22, 2020) (noting that "SB 1938 would survive even strict scrutiny" based on system reliability objectives as it is "demonstrably justified by a valid factor unrelated to economic protectionism" (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992))). The Fifth Circuit remanded to give Texas the opportunity to make that showing.

Beyond these erroneous contentions, LSP's motion makes no real effort to explain why Texas's specific reliability needs do not justify SB 1938's regulatory transmission-development framework. The motion summarily dismisses the State's critical reliability concerns and its need to speedily develop transmission lines in the face of rapidly increasing demand for electricity, merely noting (without further explanation) that reliability needs "plainly could be achieved through other nondiscriminatory alternatives." LSP Mot. 13. LSP's supporting declaration does not even mention this issue. As LSP has not even tried to meet its burden on the merits, its requested injunction must denied for this reason alone.

Indeed, LSP mischaracterizes the applicable standard that Texas must meet in light of the Fifth Circuit's facial-discrimination determination. Like NextEra in its motion for judgment on the pleadings, LSP essentially asserts that the standard is impossible to meet, and thus there is nothing left for this Court to do because SB 1938 is necessarily not the least restrictive means to achieve any legitimate local interests. *See* LSP Mot. for Prelim. Inj. 13, ECF 237; NextEra Mot. for J. on Pleadings 7, ECF 212. But a facially discriminatory law can still pass muster. *NextEra*, F.4th at 326. LSP and NextEra both inaccurately state the test that the Court is charged with applying on remand. The test is whether "legitimate local purpose . . . cannot be ***adequately served by reasonable nondiscriminatory alternatives***," *New Energy Co. of Ind. v. Limbach*, 486 U.S. at 278 (emphasis added), or **"*available nondiscriminatory means*,"** *Maine v. Taylor*, 477 U.S. at 138

(emphasis added).[10] Texas's response to the motion for judgment on the pleadings further discusses this test. ECF 226 at 16–20.

Indeed, given the State's particular circumstances, Texas has no reasonable and adequate alternative to the endpoint rule's incumbency preference available to it to protect reliability. Texas's rapid growth requires expedited planning and construction of new transmission lines, a critical need that is inconsistent with the delays inherent with competitive selection processes for the development of new transmission. *See*, *e.g.*, Ex. A, Decl. of Warren Lasher ("Lasher Declaration") at ¶ 19-22. Competitive processes have historically resulted in months and years of delays unacceptable in the face of increasing demand. *Id*. at ¶ 21-22.  The increase in electric demand is fueled by a growing population, economic growth, and the industrialization of existing industrial processes. *Id*. at ¶ 8, 23. A new wave of industrial demand growth (including automotive and computer chip manufacturing, liquified natural gas exports, and computer data centers) is significantly increasing the burden on the transmission system. *Id.* at ¶ 23. And during emergency conditions such as adverse weather events, the clear lines of authority and accountability with incumbent build-out are essential to effectively responding to extreme events and restoring electric service as quickly as possible. *Id.* at ¶ 18.

---

[10] *Maine*, for example, involved a statute that, like SB 1938, had been found to be facially discriminatory. The Supreme Court analyzed the standard for determining whether it should still be upheld and held that "[a] State must make reasonable efforts to avoid restraining the free flow of commerce across its borders, but it is not required to develop new and unproven means of protection at an uncertain cost." 477 U.S. at 147. The statute's opponents contended that there were other means to protect public interest. The Court evaluated the evidence supporting those contentions and found it flawed, holding that since "there is no assurance as to their effectiveness," they did not equate to "available nondiscriminatory alternative[s]." *Id*. In short, the Commerce Clause does not require states to blindly accept unproven or uncertain methods. *Id*. *Maine* also makes clear that whether those other methods of protection are proven or certain depends on the specific facts, and any decision regarding the existence of nondiscriminatory alternatives must be based upon the circumstances and cannot be based on "abstract possibility." *Id*.

**B.      LSP cannot show irreparable harm.**

To obtain the relief it asks for, LSP must also show it will suffer irreparable injury if the injunction is not granted. *Winter*, 555 U.S. at 20; *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018). Speculative injury is not sufficient; the movant must offer more than that. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (injury must be certain and great, actual and not theoretical). LSP has not made the necessary showing of immediate irreparable harm.

> **1.      *LSP seeks to enjoin the wrong party, as it is the Southwest Power Pool, not the PUCT Commissioners, that may act in the coming months.***

The actions LSP describes that would cause the irreparable harm in the foreseeable future are those of SPP, not the PUCT Commissioners. LSP claims it needs this injunction before SPP's October 29 board meeting at which SPP may approve a number of transmission projects, including several in Texas. But LSP seeks only to enjoin the PUCT Commissioners from taking any action to enforce SB 1938. The PUCT will be taking no action this October and, indeed, will have no opportunity to take any action whatsoever with regard to the line(s) at issue for some time. Ex. B, Declaration of Shawnee Claiborn-Pinto ("Claiborn-Pinto Decl.") at ¶ 3-4. Yet LSP does not seek an injunction against grid operator *SPP*, only the PUCT Commissioners. SPP is not a party to this proceeding.

> **2.      *The PUCT will take no action on any of the new SPP projects until at least the middle of next year.***

Although LSP seeks an injunction only against the PUCT Commissioners, there is no matter pending at the agency in which the PUCT Commissioners would apply SB 1938, and there will not be one for some time. As LSP concedes, there is work left finalizing the specifics of these transmission-line projects. And only after that designation, or after a competitive process completed, could the PUCT be called upon to certificate the line in a proceeding initiated by the

designated provider. Under current Texas law, the agency has 180 days to rule upon such certification requests in a proceeding involving potentially affected landowners that includes a PUCT determination as to the routing of the line as well as the need for it. Tex. Util. Code § 37.0537; *see also* Claiborn-Pinto Decl. at ¶ 4.

To the extent LSP claims that it may miss out on competitive opportunities due to SB 1938, it is (again) SPP's potential action—not the PUCT Commissioners'—that would need to be enjoined. This is readily apparent from LSP's own motion. *E.g.*, LSP Mot. 1 ("*SPP will in all likelihood* deem itself bound to apply that facially discriminatory law, foreclosing qualified transmission developers like LSP from any opportunity to compete for those new Texas projects, as *SPP* will not hold a competitive solicitation at all.") (emphasis added).

Indeed, it is unclear whether a *preliminary* injunction restraining PUCT action until the case can be finally decided would benefit LSP in any meaningful way. An injunction against the PUCT Commissioners preventing enforcement of SB 1938 will not compel SPP to put any project out for competitive bidding. And preventing SPP from foregoing competitive bidding and awarding the line to an incumbent provider would require an injunction against SPP. Moreover, LSP seeks only a preliminary determination that it *may* ultimately succeed and to prevent the PUCT Commissioners from taking any action to enforce SB 1938 during the pendency of the litigation until the merits of its Commerce Clause claim can be finally decided. That would not be a final judgment that SB 1938 violates the Commerce Clause. SPP would have to interpret the language of its own tariff to determine whether or not a project could be put out for competitive bid if a preliminary injunction enjoining the PUCT Commissioners from enforcing SB 1938 were issued. What SPP would conclude in this event is unclear, and LSP's motion sheds no light on the uncertainty.   And, again, there is no need for any restraint on the PUCT Commissioners now; they

are not about to take *any* action on the SPP projects and will not be doing so for some time. By LSP's own admission—the details for the four projects it identifies "have not yet been finalized." LSP Mot. at 15 & Ex. A (Segner Declaration) at ¶ 9.

Even Plaintiff NextEra itself seems to recognize that a preliminary injunction is not available. NextEra has filed a response to LSP's motion, essentially urging the Court to decline to rule on LSP's request for a preliminary injunction, arguing instead for a decision on NextEra's pending motion for judgment on pleadings. *See* NextEra's Statement Regarding LSP's Mot. for Prelim. Inj. 1, ECF 238 (ruling on NextEra's motion the "better path forward" than taking up injunction, as it avoids another round of briefing and "*other aspects of resolving a preliminary injunction motion*") (emphasis added). As Texas explained in its response to NextEra's motion, that motion should be denied as well.

Given all of this, LSP cannot demonstrate its entitlement to an injunction against the PUCT now, even if it had shown it was likely to prevail on the merits. The requested injunction against the PUCT Commissioners should be denied on this basis alone.

### 3.    Under SPP's tariff, SB 1938 could impact only one of the SPP Texas projects.

LSP vastly overstates the business opportunities it might lose if the injunction is not issued. It seeks that injunction based on four projects that SPP may approve in its upcoming board meeting. LSP Mot. 14–15 & Ex. A (Segner Declaration) at 3–4. But in fact, only *one* of these projects would potentially be open to competitive bidding. Three of the projects in Texas are priority reliability projects that SPP (pursuant to the requirements of its tariff) will direct the incumbent provider to build; thus, they will not be open to competitive bidding. *See* Claiborn-Pinto Decl. at ¶ 5-6. Thus, LSP will not in any event have the opportunity to compete for these projects, regardless of SB1938's endpoint rule. *See id.* Only one of the projects LSP cites in its request for a preliminary

injunction may actually be subject to competitive bidding. *Id.* at ¶ 7. Beyond this, it is unclear whether LSP will even bid on the projects at all. *See* LSP Mot. at 15; *see also* Segner Decl. at ¶ 9 (LSP's eligible subsidiary "has not yet made a final decision on whether it will bid on any of these specific projects").

> **C.    The equities and the public interest do not support the injunction.**

LSP cannot dispute that Texas, and its electric consumers, have a strong interest in grid reliability. LSP's claim that no "meaningful" equities support Texas's position, LSP Mot. 17, only underscores that it has not engaged at all on the core issue before this Court on remand: can Texas justify SB 1938's regulatory approach to transmission development in light of its specific circumstances (particularly, the State's rapid load growth necessitating quick transmission development) based on its legitimate policy interest in ensuring reliable electric service for its citizens? LSP barely acknowledges this critical reliability concern at all (and the public health and safety impacts), ignoring it entirely in its "equitable balancing." It considers only interference with its constitutional rights through the loss of business opportunities and *the assumption* that the construction of transmission lines by incumbents, rather than by new-entrant providers, would be much more expensive. *See* LSP Mot. 17 (public "has no interest in paying artificially high rates for electricity" and "government suffers no injury when a court prevents it from enforcing an unlawful law"). Here, it is public health and safety that would suffer. LSP only considers assumed ratepayers' savings and its own alleged lost profits, totally ignoring Texas's reliability interest in protecting the health and safety of its citizens.

As for the business opportunities LSP contends it may lose due to SB 1938, LSP's motion touts some past successes, but these say nothing about the likelihood of it winning the one listed Texas project likely to be competitively bid (the Chisolm-Potter line). By contrast, in the cases LSP cites (LSP Mot. 16) irreparable harm was not challenged or established through the evidence.

*See, e.g., Gerling Global Reinsurance Corp. of Am. v. Low*, 240 F.3d 739, 754 (9th Cir. 2001) (irreparable harm of loss of right to do business in state unchallenged); *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 237-38 (5th Cir. 2024) (evidence irreparable harm not "speculative or remote"); *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015) (record support allegations not conclusory); *see also Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007) (stating only loss of market share *may* constitute irreparable harm).

And once again, LSP looks to the FERC's promotion of competitive transmission processes (particularly, through Order No. 1000) as its equitable justification. But Order No. 1000 does not support LSP's equitable argument for two reasons. First, "Order No. 1000 terminated only *federal* rights of first refusal; it did not 'limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities.'" *MISO Transmission Owners v. FERC*, 819 F.3d 329, 336 (7th Cir. 2016) (quoting Order No. 1000, 136 FERC ¶ 61,051, at P 227). Thus, the provisions LSP cites refer to *federal* and not state rights of first refusal. *See* Order No. 1000, 136 FERC ¶ 61,051, at PP 7, 231, 285. Reliance on Order No. 1000 is misplaced because "FERC wanted 'to avoid intrusion on . . . the States' in regulating the siting and construction of transmission facilities." *MISO Transmission Owners*, 819 F.3d at 336 (quoting *S.C. Pub. Serv. Auth.*, 762 F.3d at 76).

Respect for states' particular needs aside, LSP's reliance upon Order No. 1000 also ignores that FERC itself is questioning the benefits of Order No. 1000. In recognizing recent investment trends, FERC stated that the "nonincumbent transmission developer reforms" provided by Order No. 1000 "may in fact be inadvertently *discouraging* investment in and development of regional transmission facilities to some extent." *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 179 FERC ¶ 61,028,

at P 350 (Apr. 21, 2022) (emphasis added). FERC has proposed to revisit Order No. 1000's prohibition of federal rights of first refusal—a policy decision that remains pending. *Id*; *see also Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, 187 FERC ¶ 61,068, at PP 9, 1563 (May 13, 2024).

Nor do LSP's cited court decisions support its position. The quoted passage from the Fifth Circuit's opinion in *NextEra* addresses the costs for entities to obtain in-state presence rather than any cost to the consumer. *NextEra*, 48 F.4th at 324 n.9. *Emera* does not specifically address the effects of Order No. 1000 but rather the propriety of FERC relying upon "economic and competition *theory* to justify its decision in the absence of empirical data." *Emera Me. v. FERC*, 854 F.3d 662, 671 (D.C. Cir. 2017) (emphasis added). Instead of determining that there was no benefit from a right of first refusal, the court in *MISO Transmission Owners* merely noted that no party made an effort to demonstrate benefits in its briefing or oral arguments. *MISO Transmission Owners*, 819 F.3d at 333; *see also id.* at 334 ("But if there are indeed good things to be said about . . . rights of first refusal . . ., they are not said in any of the voluminous filings in this case."). And *Oklahoma Gas & Electric*'s description of "anti-competitive rights of first refusal" rests on the supposed benefits of Order No. 1000—benefits that have been cast into doubt by FERC itself. *Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 77 (D.C. Cir. 2016).

And LSP does not identify harm that outweighs the public interest behind a right of first refusal. "Granting a right of first refusal to build a project makes sense when the grantee clearly is best suited to build it, so that it would be a waste of time to invite and conduct competitive bidding." *MISO Transmission Owners*, 819 F.3d at 332. But as discussed above, SB 1938 is much more than this. It was crafted with *reliability* in mind—it is "a law that promotes the safety and reliability of the electricity grid." *NextEra*, 48 F.4th at 326; *see also* PUCT's Resp. in Opp'n to

NextEra's Mot. for J. on Pleadings 8, ECF 226 (detailing how "[p]rotecting transmission system reliability is the core purpose of" SB 1938); Lasher Declaration ¶ 25-29.

## CONCLUSION AND PRAYER

For the foregoing reasons, Texas respectfully requests that Plaintiff-Intervenor LSP's motion for preliminary injunction be denied.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

*/s/ John R. Hulme*
JOHN R. HULME
Assistant Attorney General
State Bar No. 10258400
John.Hulme@oag.texas.gov

H. CARL MYERS
Assistant Attorney General
State Bar No. 24046502
Carl.Myers@oag.texas.gov

WESLEY S. WILLIAMS
Assistant Attorney General
State Bar No. 24108009
Wesley.Williams@oag.texas.gov

IAN LANCASTER
Assistant Attorney General
State Bar No.  24097964
Ian.Lancaster@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911

***Counsel for Thomas J. Gleeson, Kathleen Jackson, Lori Cobos, Jimmy Glotfelty, and Courtney K. Hjaltman, in their official capacities as Commissioners of the Public Utility Commission of Texas***

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 11, 2024, and that all counsel of record were served by CM/ECF or by electronic mail.

*/s/ John R. Hulme*
JOHN R. HULME