IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NEXTERA ENERGY CAPITAL HOLDINGS, INC., et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:19-CV-626-DII |
| KATHLEEN JACKSON, *in her official capacity as Commissioner of the Public Utility Commission of Texas*, et al., | § § § § | |
| Defendants. | § § | |

## ORDER

Before the Court are cross-motions for judgment on the pleadings—one motion filed by NextEra,[1] (Dkt. 212), and a second motion filed by Defendant-Intervenors Southwestern Public Service Company ("SPS") and Entergy Texas, Inc. ("Entergy"), (Dkt. 225)—and responsive briefing. Also before the Court is Plaintiff-Intervenor LSP Transmission Holdings II, LLC's ("LSP") motion for a preliminary injunction, (Dkt. 237), and responsive briefing. Having reviewed the briefing, the record, and the relevant law, the Court will deny SPS and Entergy's motion for judgment on the pleadings, grant NextEra's motion for judgment on the pleadings, and moot LSP's motion for a preliminary injunction.

## I. BACKGROUND

In this action, NextEra, and Plaintiff-Intervenors LSP and East Texas Electric Cooperative, Inc. ("ETEC") challenge Texas's Senate Bill 1938 ("SB 1938"), Tex. Util. Code § 37.056(e), which limits the ability to build, own, or operate new transmission lines to owners of an existing

---

[1] Plaintiffs NextEra Energy Capital Holdings, Inc., NextEra Energy Transmission, LLC, NextEra Energy Transmission Midwest, LLC, Lone Star Transmission, LLC, and NextEra Transmission Southwest, LLC (collectively, "NextEra").

transmission facility in Texas. In their original complaint, NextEra sued commissioners of the Public

Utility Commission of Texas (the "PUCT Defendants").[2] Defendants SPS, Entergy, and Oncor

Electric Delivery Company LLC ("Oncor") also intervened in this action to defend SB 1938. Below

the Court provides a brief background on the regulatory scheme affecting the transmission market,

SB 1938, the parties to this suit, and the procedural history of this case. A more extensive

background to this action can be found in the Fifth Circuit's opinion on appeal in *NextEra Energy*

*Cap. Holdings, Inc. v. Lake*, 48 F.4th 306 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 485, (2023).

### A. Federal Regulatory Background of the Transmission Market

In the early 20th Century, "state or local utilities controlled their own power plants,

transmission lines, and delivery systems, operating as vertically integrated monopolies in confined

geographic areas." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016). Although states

possessed broad power to regulate all levels of these systems, in 1927, the Supreme Court held that a

state's attempt to regulate the rates of electricity sold across state lines violated the Commerce

Clause. *Pub. Utils. Comm'n of R.I. v. Attelboro Steam & Elec. Co.*, 273 U.S. 83, 89 (1927). The Court

reasoned that the regulation imposed a "direct burden upon interstate commerce," and accordingly,

only Congress had the power to regulate the interstate transactions. *Id.*

Congress responded by enacting the Federal Power Act ("FPA"). *New York v. FERC*, 535

U.S. 1, 6 (2002); *see also* 16 U.S.C. §§ 791 *et seq*. The FPA charges the Federal Energy Regulatory

Commission ("FERC") with providing "effective federal regulation of the expanding business of

transmitting and selling electric power in interstate commerce." *New York*, 535 U.S. at 6. The FPA

gave FERC jurisdiction to regulate "all facilities for such transmission or sale of electric energy." 16

---

[2] The original PUCT Defendants in this action were DeAnn Walker, Arthur D'Andrea, and Shelly Botkin. (Compl., Dkt. 1). Because these individuals have resigned as PUCT Commissioners, the current PUCT Commissioners—Thomas J. Gleeson, Kathleen Jackson, Lori Cobos, and Jimmy Glotfelty—have been automatically substituted in as defendants. *See* Fed. R. Civ. P 25(d). These defendants are sued in their official capacities.

U.S.C. § 824(b)(1); *see also Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1181 (D.C. Cir. 2020) (noting that the FPA provides FERC with "exclusive authority over" the wholesale transmission market).

In the last few decades, FERC has used its authority to encourage competition for electric infrastructure. *See Elec. Power*, 577 U.S. at 267. To that end, FERC encouraged utilities that owned transmission lines to form voluntary associations that would coordinate and "manage wholesale markets on a regional basis." *Id.*; *see also* 16 U.S.C. § 824a(a) ("direct[ing] [FERC] to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the . . . transmission and sale of electric energy"). These associations, called regional transmission organizations ("RTOs") and independent system operators ("ISOs"), are non-governmental bodies, created under FERC's authority, that are charged with operating and planning the transmission grid on a regional basis. Order No. 2000, 65 Fed. Reg. 810 (2000). RTOs and ISOs now control most of the electrical grid. *Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 769 (7th Cir. 2013).

For years, RTOs and ISOs included rights of first refusal ("ROFRs") to build transmission lines in their FERC-sanctioned rate agreements. *MISO Transmission Owners v. FERC*, 819 F.3d 329, 332 (7th Cir. 2016). Under that arrangement, utilities that already owned transmission lines, called "incumbents," would "have a first crack at constructing a[ ] . . . transmission project." *Id.* at 331–32. In other words, incumbents would have "the opportunity to build it without having to face competition from other firms that might also like to build it." *Id.* at 331.

In 2011, FERC abolished those provisions and adopted Order No. 1000, which required RTOs and ISOs to eliminate ROFR provisions for regional transmission facilities from their FERC-approved tariffs and agreements. *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 48–53 (D.C. Cir. 2014). The agency reasoned that federal ROFRs might "be leading to rates . . . that are unjust and unreasonable," in large part because "it is not in the economic self-interest of incumbent[s] to

permit new entrants to develop transmission facilities," even if those facilities "would result in a more efficient or cost-effective solution." *Transmission Planning & Cost Allocation by Transmission Owning & Operating Public Utilities*, 136 FERC ¶ 61,051, at ¶ 256 (2011) ("Order No. 1000"); *see also id.* at ¶ 253 (explaining that failing to remove federal ROFRs might "result in rates . . . that are unjust and unreasonable"). FERC found that failing to remove ROFRs "would leave in place practices that have the potential to undermine the identification and evaluation of more efficient or cost-effective solutions to regional transmission needs." *Id.* at ¶ 253. In making its decision, FERC considered— and rejected—the argument "that the reliability of the transmission system is a function of the number of public utility transmission providers of that system." *Id.* at ¶ 266. This was because historical data suggested the opposite, as "public utility transmission providers have . . . connected to the transmission systems of others" "to enhance reliability." *Id.* (noting that "nonincumbent transmission developers[ ] that successfully develop a transmission project[ ] . . . must comply with all applicable reliability standards"). However, FERC also stated that "nothing" it said in Order No. 1000 "is intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities," including state ROFR laws. *Id.* at ¶ 227.

### B. Regulation of the Transmission Market in Texas and SB 1938

Despite the many reforms in Order 1000, Order 1000 is consistent with the FPA in that it leaves room for state regulation. *Elec. Power*, 577 U.S. at 289 (observing that the FPA "makes federal and state powers complementary and comprehensive") (cleaned up). For example, states may oversee "facilities used for the generation of electric[ity,] . . . [for] local distribution or only for the transmission of electric[ity] in intrastate commerce." 16 U.S.C. § 824(b)(1). States also have "authority over the location and construction of electrical transmission lines." *Ill. Com. Comm'n*, 721 F.3d at 773; *see also Piedmont Env't Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009) ("The states

have traditionally assumed all jurisdiction to approve or deny permits for the siting and construction of electrical transmission facilities.").

In Texas, the Public Utility Commission of Texas ("PUCT") regulates electric utilities. Tex. Util. Code § 14.001. To build a new transmission line in the state, a utility must first obtain a certificate of "convenience and necessity" ("CCN") from PUCT. *Id.* § 37.051(a). This process is independent of any approvals that the utility must also obtain from its governing ISO or RTO.

In Texas, three ISOs have responsibility for different portions of the state. The Electric Reliability Council of Texas ("ERCOT") covers most of Texas, including the Houston, Dallas-Fort Worth, San Antonio, and Austin areas. Because ERCOT is wholly within Texas, PUCT has exclusive jurisdiction over utilities in its territory. *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001). By contrast, the other two organizations—the Midwest Independent System Operator ("MISO") and the Southwest Power Pool ("SPP")—cover areas inside and outside of Texas. Thus, these organizations are subject to both FERC and PUCT oversight.

In line with Order 1000, SPP and MISO amended their tariffs to remove federal ROFRs from their agreements and established competitive systems to build certain categories of transmission lines. The tariffs also provided that no competitive processes would occur where state law established a state ROFR. Texas followed suit, with PUCT declaring that utilities without any presence in Texas could construct transmission lines in SPP and MISO territory. *NextEra*, 48 F.4th at 314.

This regime that allowed open competition in the building of transmission lines did not last long. In May 2019, the Texas Legislature overruled PUCT's decision and barred companies from competing in MISO or SPP territory unless they already owned a transmission facility in Texas. Under SB 1938, a CCN to build, operate, or own transmission lines "that directly [connect] with an

existing utility facility . . . may be granted only to the owner of that existing facility." Tex. Util. Code § 37.056(e). If that incumbent chooses not to pursue a project, other owners may step into its shoes. But the incumbent utility may only "designate another electric utility that is currently certificated by [PUCT] within the same electric power region," for example, SPP or MISO, "to build . . . a portion or all of" the new lines. *Id.* § 37.056(g). Similarly, Texas law prohibits an electric utility from selling, assigning, or leasing its certificate or rights obtained under a certificate unless "the purchaser, assignee, or lessee is already certificated by the commission to provide electric service within the same electric power region . . . ." *Id.* § 37.154(a).

Five other states also restored incumbent's ROFRs after FERC took them away.[3] However, as the Fifth Circuit noted, "none of those laws is as restrictive as Texas's." *NextEra*, 48 F.4th at 314. Four of these five states require incumbents to exercise their ROFR within 90 days. Only one state, North Dakota, is like Texas in placing no time limit on the incumbent to exercise its right. No other state completely bars out-of-state entrants or allows an incumbent to designate its replacement if it declines a project. *Id.*

### C. NextEra's Attempts to Enter the Texas Transmission Market

Plaintiffs are corporations that are subsidiaries of NextEra Energy, Inc. NextEra Energy Capital Holdings, Inc. is a Florida corporation that holds direct or indirect ownership interests in, and is a source of funding for, many of NextEra Energy's operating subsidiaries, including NextEra Energy Transmission, LLC ("NEET"). (Am. Compl., Dkt. 175, ¶ 6). NEET is a Florida corporation engaged in the business of building and operating transmission facilities throughout North America. (*Id.* ¶ 7). NextEra Energy Transmission Midwest, LLC ("NEET Midwest") is also a Florida corporation, engaged in building and operating transmission lines in MISO territory. (*Id.* ¶ 8). Lone

---

[3] *See* Minn. Stat. § 216B.246, subdiv. 3; Neb. Rev. Stat. § 70-1028; Okla. Stat. tit. 17 § 292; S.D. Codified Laws § 49-32-20; N.D. Cent. Code § 49-03-02(2).

Star Transmission, LLC is a Texas corporation, engaged in the transmission line business in the ERCOT region of Texas. (*Id.* ¶ 9). Last, NextEra Energy Transmission Southwest, LLC ("NEET Southwest") is a Florida corporation, engaged in the transmission line business in the SPP region. (*Id.* ¶ 10). Collectively, NextEra and its affiliates own 12,800 miles of transmission line between 69 kilovolts and 500 kilovolts operating in multiple states and have participated in numerous transmission planning and development processes across the country. (*Id.* ¶ 78).

After the removal of the federal ROFRs, NextEra tried to build and buy high-voltage transmission lines in Texas. In 2018, MISO issued a request for proposals for the construction of a 500 kV competitive transmission project known as the Hartburg-Sabine Junction Transmission Project, which was to be constructed in the Entergy service territory in East Texas. (*Id.* ¶ 81). After receiving 12 bids, MISO ultimately selected NEET Midwest to build the line, concluding that NEET Midwest's proposal offered "an outstanding combination of low cost and high value, with best-in class cost and design, best-in-class project implementation plans, and top-tier plans for operations and maintenance." (*Id.* ¶ 82). MISO also noted that the proposal would reap "substantial benefits to ratepayers over time." (*Id.*). NEET Midwest and MISO entered into a "Selected Developer Agreement" for the project, which required NEET Midwest to secure any necessary state-law CCNs to build the Hartburg-Sabine Junction Transmission Project. However, once SB 1938 was enacted, NEET Midwest could no longer obtain a CCN from PUCT because NEET Midwest did not already operate in Texas. (*Id.* ¶ 83).

In 2022, while this litigation was ongoing, MISO informed NEET Midwest that it intended to cancel the Hartburg-Sabine Project because SB 1938 made it impossible for NEET Midwest to obtain a CCN and because the instant lawsuit had not yet been resolved. (*Id.* ¶ 84). NEET Midwest challenged that decision, and an appeal remains pending. *NextEra Energy Transmission Midwest, LLC v. FERC*, No. 23-1180 (D.C. Cir.). That appeal is currently held in abeyance pending final resolution of

whether SB 1938 is lawful. NEET Midwest asserts that if it is successful in this lawsuit and it is no longer barred by SB 1938, it would continue to pursue the Hartburg-Sabine Project. (Am. Compl., Dkt. 175, ¶ 84).

The Hartburg-Sabine Line was not NextEra's only intended project in Texas. In 2017, NEET Southwest entered into an asset purchase agreement to acquire 30 miles of transmission lines from a utility located in SPP's jurisdiction, again in East Texas. (*Id.* ¶ 10). This project, called the Jacksonville-Overton Line, required the utility to transfer its CCN to NEET Southwest, which needed PUCT's approval. *See* Tex. Util. Code § 37.154(a). NextEra applied for the transfer, but SB 1938 prevented NEET Southwest from closing the transaction because the law requires the line to be transferred to a Texas incumbent. As a result, NEET Southwest lost out on an investment worth over $2 million. (Am. Compl., Dkt. 175, ¶ 88).

### D. Procedural History of This Suit

On June 17, 2019, shortly after SB 1938 was enacted into law, NextEra filed its original complaint in this action against the PUCT Defendants. (Compl., Dkt. 1). NextEra alleged that SB 1938 was unconstitutional under the Commerce Clause because it discriminates against interstate commerce on its face, in effect, and in purpose, and alternatively because it unduly burdens interstate commerce under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). (*Id.* ¶¶ 90–105). NextEra also alleged that SB 1938 violated the Contract Clause. (*Id.* ¶¶ 106–111). NextEra requested both injunctive and declaratory relief. (*Id.* ¶¶ 118, 119).

Before the PUCT Defendants filed responsive pleadings, several third parties moved to intervene in the case. (*See* Dkts. 33, 49, 50, 54, 79).[4] Three entities sought to intervene to defend SB 1938. Entergy, Oncor, and SPS are all entities owning transmission lines in Texas who hold the

---

[4] A sixth entity, Texas Industrial Energy Consumers ("TIEC") also filed a motion to intervene, (Dkt. 68). TIEC, however, did not appeal the denial of its motion to intervene. Accordingly, TIEC has not been involved in this case since it was remanded to this Court.

ROFRs granted by SB 1938. Two entities sought to intervene to challenge the constitutionality of SB 1938: LSP and ETEC. LSP is a transmission utility whose subsidiaries or affiliates have been awarded competitive projects across the country, including in the ERCOT portions of Texas. (LSP Compl., Dkt. 182, ¶¶ 48, 54, 55, 84–86). However, LSP is precluded from competing in interstate-transmission development in Texas under SB 1938. (*Id.* ¶¶ 89–90). ETEC is a non-profit rural electric cooperative that owns power-generating plants and power transmission lines in the part of Texas within Entergy's transmission area. ETEC is largely dependent on Entergy's transmission lines, and SB 1938 prevents ETEC and other entities who might compete with Entergy from building new lines from lines owned by Entergy. (ETEC Compl., Dkt. 183, ¶¶ 6, 12, 16, 44).

On February 26, 2020, the Court issued an order granting the PUCT Defendants' motion to dismiss and dismissing NextEra's complaint with prejudice. (Order, Dkt. 143). The Court found that NextEra had failed to plead a claim under the Contract Clause and had failed to plead that SB 1938 violates the dormant Commerce Clause under each of their asserted theories. (*Id.*). In the same order, the Court also denied the motions to intervene. (*Id.*). On the same day, the Court entered final judgment in this case. (Dkt. 144).

On appeal, the Fifth Circuit issued two opinions: one on the merits and one on the issue of intervention. On August 30, 2022, the Fifth Circuit issued an opinion affirming in part and reversing in part this Court's order granting the PUCT Defendants' motion to dismiss. *NextEra*, 48 F.4th 306. The Fifth Circuit affirmed the Court's Contract Clause holding, finding that NextEra had not stated a viable claim under the Contract Clause. *Id.* at 328–29. However, the Fifth Circuit reversed the dismissal of all the Commerce Clause claims—facial discrimination, discriminatory purpose, discriminatory effect, and undue burden. *Id.* at 329. As for the facial discrimination claim, the Fifth Circuit held that "the very terms of SB 1938 discriminate against interstate commerce." *Id.* at 326. The Fifth Circuit stated that on remand, "the district court will consider whether the Commissioners

can show that Texas has no other means to "advance[] a legitimate local purpose." *Id.* As for the

other Commerce Clause claims, the Fifth Circuit found that the discriminatory purpose,

discriminatory effect, and undue burden claims are plausible and should proceed. *Id.* at 326–28. The

Fifth Circuit remanded the case for further proceedings consistent with its opinion. *Id.* at 329. In a

separate opinion, on December 7, 2022, the Fifth Circuit also reversed the Court's denial of LSP,

ETEC, SPS, Entergy, and Oncor's motions to intervene, finding that all the intervenors had met the

standard to intervene as of right. *NextEra Energy Capital Holdings, Inc. v. D'Andrea*, No. 20-50168,

2022 WL 17492273, at *1 (5th Cir. Dec. 7, 2022). On December 11, 2023, the Supreme Court

denied a petition for a writ of certiorari as to the Fifth Circuit's merits opinion. *See Lake v. NextEra*

*Energy Capital Holdings, Inc.*, 144 S. Ct. 485 (2023).

Accordingly, on remand, this Court vacated the previous final judgment, granted the

intervenors' motions to intervene, and ordered the parties to file amended pleadings. (*See* Dkts. 172,

174, 189). NextEra filed an amended complaint, (Dkt. 175), and the Court filed LSP and ETEC's

intervenor complaints, (Dkts. 182, 183). The PUCT Defendants and the Defendant-Intervenors

then filed answers. (*See* Dkts. 196, 198–205, 207–209).

On March 15, 2024, NextEra filed the instant motion for judgment on the pleadings, (Dkt.

212). LSP and ETEC joined NextEra's motion. (*See* Dkt. 220, at 3). The PUCT Defendants and

Defendant-Intervenors filed responses in opposition, (Dkts. 224, 226, 227), and NextEra filed a

reply, (Dkt. 228). A month later, SPS and Entergy filed a cross-motion for judgment on the

pleadings. (Dkt. 225). NextEra and LSP filed responses in opposition, (Dkts. 230, 231), and LSP and

Entergy filed a reply, (Dkt. 231). On September 27, 2024, LSP filed a motion for preliminary

injunction, (Dkt. 237), which is also fully briefed, (*see* Dkts. 238, 240–243).

## II. LEGAL STANDARD

"After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "A motion brought pursuant to Rule 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). "Pleadings should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of fact and only questions of law remain." *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001). The Fifth Circuit applies the same standard to a motion under Rule 12(c) as it does for a motion under Rule 12(b)(6). *Id.*, at 313 n.8; *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999). In ruling on a Rule 12(c) motion, the Court is confined to the pleadings and must accept all allegations contained therein as true. *St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.,* 937 F.2d 274, 279 (5th Cir. 1991).

## III. DISCUSSION

NextEra asserts that on remand from the Fifth Circuit, it is entitled to judgment on the pleadings on its claim that SB 1938 is unconstitutional under the Commerce Clause because it facially discriminates against interstate commerce. (Dkt. 212, at 1). Because the Fifth Circuit found SB 1938 to be facially discriminatory, NextEra argues that all that is left for this Court to decide is whether SB 1938 satisfies strict scrutiny. NextEra contends that the PUCT Defendants cannot satisfy strict scrutiny, and that no further factual development is necessary for the Court to come to that conclusion. Accordingly, NextEra argues that its motion for judgment on the pleadings is an appropriate vehicle for entry of final judgment. (*Id.*).

The PUCT Defendants and Defendant-Intervenors oppose NextEra's motion on several fronts. First, SPS and Entergy move for judgment on the pleadings in their own right. (Dkt. 225).

They argue that a Dormant Commerce Clause claim is unavailable to NextEra, LSP, and ETEC because they pleaded in-state presences, which bring them outside the dormant Commerce Clause's zone of interests. (*Id.*). Second, Defendants argue that discovery is needed to determine questions of justiciability—namely, whether NextEra has standing to bring its Commerce Clause claims and whether its claims are ripe and not moot. (*See* Dkts. 224, at 7–12; 226, at 11–14). Last, they argue that discovery is needed to determine whether SB 1938 survives strict scrutiny. (*See* Dkt. 224, at 15–20; Dkt. 226, at 15–20; Dkt. 227, at 1–3). The Court first addresses SPS and Entergy's motion, before turning to the justiciability and merits questions pertinent to NextEra's motion.

### A. SPS and Entergy's Cross-Motion for Judgment on the Pleadings

SPS and Entergy move for judgment on the pleadings because they argue that NextEra, LSP, and ETEC's in-state presence in Texas precludes them from seeking relief under the dormant Commerce Clause. (Dkt. 225). SPS and Entergy argue that the dormant Commerce Clause only "safeguards out-of-state entities from local protectionism." (*Id.* at 1). They further argue that because NextEra, LSP, and ETEC all pleaded that they own transmission facilities within Texas, all Plaintiffs' injuries thus are "traceable not to any protectionism against out-of-state entrants, but rather to Texas's choice regarding how to regulate various in-state entities." (*Id.*). SPS and Entergy assert that Plaintiffs' "complaints take issue with the differential impact [SB 1938] has among in-state entities," which is a grievance that falls outside the zone of interests of the dormant Commerce Clause. (*Id.* at 1–2). In other words, SPS and Entergy argue that Plaintiffs lack prudential standing. The Court disagrees.

Prudential standing is a "judicially self-imposed limit[] on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). But because federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given to them, *Mata v. Lynch*, 576 U.S. 143, 150 (2015) (quotation omitted), prudential standing is narrow. It bars relief only when "the

plaintiff's interests are so marginally related" to the right at issue that it cannot be assumed that she is protected. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). The zone-of-interest test is "not meant to be especially demanding," *id.*, and gives "the benefit of any doubt . . . to the plaintiff." *Texas v. United States*, 50 F.4th 498, 521 (5th Cir. 2022).

The Court finds SPS and Entergy's prudential standing argument unpersuasive. To begin, the Court notes that during the five years of this litigation, no party has raised an argument regarding prudential standing. The PUCT Defendants did not reference this argument in their prior motion to dismiss, (*see* Dkt. 94), nor did the Defendant-Intervenors raise this defense in the proposed motions to dismiss they sought leave to file before their intervention was denied, (*see* Dkts. 89-1, 91-1, 92-1). On appeal, the Fifth Circuit *sua sponte* considered whether there were justiciability issues that precluded their review over the case and ultimately found that the case was ripe for resolution. *NextEra*, 48 F.4th at 315–16. The Fifth Circuit did not, however, find that NextEra failed to state a claim under the dormant Commerce Clause because one of its subsidiaries had an in-state presence in the intra-state, ERCOT region of Texas. This Court is skeptical that a prudential standing issue could exist in this case that no party nor the Fifth Circuit would notice in the last five years, especially because the Fifth Circuit considered its jurisdiction before remanding the case to this Court.

More importantly, the Court finds that SPS and Entergy's argument that "the dormant Commerce Clause does not protect entities with an in-state presence," (Dkt. 225, at 10) (emphasis omitted), is not supported by precedent. "[C]ourts have reached the merits of numerous dormant Commerce Clause cases involving in-state parties, and an entire body of dormant Commerce Clause jurisprudence reflects the disposition of such cases on the merits." *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1256 (11th Cir. 2012). Indeed, the Supreme Court has repeatedly recognized that in-state plaintiffs may have valid dormant Commerce Clause cases. *See, e.g., Or. Waste*

*Sys., Inc. v. Dep't of Env't Quality of the State of Oregon*, 511 U.S. 93, 97 (1994) (finding facial discrimination in a case where the plaintiffs were two Oregon companies and an Oregon county); *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 387 (1994) (invalidating town waste processing ordinance in suit by local waste processor against town); *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 567 (1997) (invalidating a Maine property tax exemption as violative of the dormant Commerce Clause where plaintiff was a "Maine nonprofit corporation," that operated a summer camp in "the town of Harrison"). These cases demonstrate that there is no rule barring in-state plaintiffs from pursuing Commerce Clause claims. Indeed, another Judge on this Court has recently rejected the exact argument that SPS and Entergy pursue here. *See Anding v. City of Austin*, No. 1:22-CV-01039, 2023 WL 4921530, at *5 (W.D. Tex. Aug. 1, 2023) ("Contrary to the City's urging, there is no requirement that a plaintiff must be an out-of-state resident in order to contest a law as discriminating against interstate commerce.").

In their motion, SPS and Entergy rely heavily on *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491 (5th Cir. 2004). In *Pine Belt*, waste management companies sued a regional waste management authority alleging that municipal ordinances restricting disposal of waste violated the Commerce Clause. *Id.* at 493. The Fifth Circuit dismissed the companies' claims, finding that the plaintiffs' injuries did not fall within the zone of interests to be protected by the dormant Commerce Clause. *Id.* at 499. The Fifth Circuit reasoned that the companies did not ship any waste out-of-state and therefore their injury was "not related to any out-of-state characteristic of their business." *Id.* at 500. As such, these plaintiffs did not have standing to challenge the municipal ordinances on the basis that they were facially discriminatory against out-of-state interests. *Id.*

SPS and Entergy's reliance on *Pine Belt* is misplaced because *Pine Belt* did not "impose an out-of-state residency requirement for raising a dormant Commerce Clause claim." *Anding*, 2023 WL

4921530, at *4. Rather, the case stands for the principle that an entity who wants to bring a facial discrimination claim must either engage in interstate commerce or have "plans to do so." *Pine Belt*, 389 F.3d at 499–500; *see also Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 476 (5th Cir. 2013) ("[T]he only parties that have standing to bring a dormant Commerce Clause challenge are those who both engage in interstate commerce and can show that the ordinance at issue has adversely affected their commerce."). Standing to bring a Commerce Clause claim thus turns on interactions with the interstate market, not out-of-state residency. *E.g.*, *Huish Detergents, Inc. v. Warren Cnty.*, 214 F.3d 707, 711–12 (6th Cir. 2000) ("[W]aste generators participate directly in commerce, and the Commerce Clause guarantees to them access to the interstate market for waste-related services.").

That test is easily met here. NextEra and Plaintiff-Intervenors plead that their ability to engage in the interstate transmission market in Texas has been curtailed by SB 1938. (*See* Dkt. 175, ¶¶ 9, 86; Dkt. 181, ¶¶ 89–90, 98; Dkt. 182, ¶ 71). This is a classic Commerce Clause issue, as the Fifth Circuit recognized on appeal. *NextEra*, 48 F.4th at 324 ("Texas law prevents those without a presence in the state from ever entering the portions of the interstate transmission market that cross into Texas."). Because Plaintiffs want to "engage in interstate commerce and can show that [SB 1938] has adversely affected [their] commerce," they have standing to pursue their dormant Commerce Clause claims. *See Cibolo Waste*, 718 F.3d at 476. Accordingly, the Court denies SPS and Entergy's cross-motion for judgment on the pleadings.

## B. NextEra's Motion for Judgment on the Pleadings

### 1. Justiciability

The Court next turns to NextEra's motion for judgment on the pleadings. Before analyzing the merits of the motion, the Court first considers several justiciability issues that the PUCT Defendants and Defendant-Intervenors raise in their responses. Defendants argue that this Court should not grant NextEra's motion because discovery is needed to determine whether NextEra has

standing, whether NextEra's claims are ripe, and whether NextEra's claims are not moot. (*See* Dkts. 224, at 7–12; 226, at 11–14).[5]

a. Standing

The Court first considers standing. NextEra argues that SB 1938's discriminatory effect alone constitutes injury, and that as a party that has suffered unequal treatment, it has standing to challenge a discriminatory action. (Dkt. 212, at 16). NextEra asserts that all that is needed to demonstrate standing is that it wants the denied government benefit, which it argues it has done by demonstrating the ways in which it has sought to enter the interstate transmission market in Texas. (*Id.* at 17). In response, Defendants argue that there are insufficient facts to determine whether each of the NextEra entities lost opportunities to compete in Texas because of SB 1938 and whether there even would be projects for them to compete for if SB 1938 were set aside. (Dkt. 224, at 10–12; 226, at 12).

The Court agrees with NextEra. It has "long" been "recognized" that discrimination at the government's hand inflicts a "cognizable" injury. *Heckler v. Mathews*, 465 U.S. 728, 738 (1984). For that reason, discrimination by the government alone establishes injury. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). "A plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception that favors others." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 634–35 (2020). Thus, in discrimination cases "no further showing of suffering based on that unequal positioning is required for purposes of standing." *Tex. Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 218 (5th Cir. 2008); *see also Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636–37 (5th Cir. 2012). This principle applies to dormant Commerce Clause cases where the constitutional injury is a defendant's impingement of the "right to compete on an equal footing in interstate commerce." *All. for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir.

---

[5] Oncor takes no position on the justiciability of NextEra's claims. (Dkt. 227, at 12–13).

1995); *see also Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 292–93 (5th Cir. 2018) (recognizing that loss of a non-illusory opportunity to pursue a benefit constitutes injury in fact outside of only equal protection claims). Here, there can be no dispute that NextEra is subject to a statute, SB 1938, that is discriminatory against entities—such as itself—that do not already own a transmission facility in the non-ERCOT regions of Texas. This regime limits NextEra's ability to access the Texas interstate transmission market—an interest that the Fifth Circuit has recognized is sufficient to maintain this suit. *See NextEra*, 2022 WL 17492273, at *3 (finding that LSP, who never won an ISO bid in Texas, has a "protectable interest related to . . .  this case" because SB 1938 "prospectively interferes" with LSP's "business opportunities").

In instances where a plaintiff has been injured due to discrimination, a plaintiff need not identify the specific benefit that they applied for and lost. *See Ne. Florida Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 668. That makes sense because a "consistently enforced discriminatory policy can surely deter . . . applications from those who are aware of it and are unwilling to subject themselves to . . . certain rejection." *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 365 (1977). Therefore, it is sufficient for a plaintiff to show that he "regularly" sought the benefit or "would" seek the benefit if he could. *Ne. Florida Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 668; *see also Gratz v. Bollinger*, 539 U.S. 244, 262 (2003). NextEra has met this requirement. NextEra has built transmission lines in the ERCOT region. (Am. Compl., Dkt. 175, ¶ 9). It has tried to buy a line in SPP and bid on and won the right to build a line in MISO. (*Id.* ¶¶ 10, 82, 83). And NextEra has pleaded that it is ready to participate in further projects in the Texas market if given the opportunity again. (*Id.* ¶ 87). Thus, NextEra has demonstrated that SB 1938 infringes upon its right to compete in interstate commerce on equal footing.

SPS and Entergy attempt to differentiate the above caselaw on the ground that they involve "ongoing unequal treatment [] occurring that could give rise to an ongoing injury." (Dkt. 224, at 11).

They argue that this case is different because "MISO and SPP have no current [requests for proposals] that would be eligible for competition absent the [ROFR]" and "[w]hether or when they will ever do so again it is wholly speculative." (*Id.*). This argument is flawed, however, because given the long-time horizon to plan and bid on a transmission line, it is not surprising that there is not a readily identifiable project, especially because laws like SB 1938 impede the development of new lines. *See* Order No. 1000, at ¶ 256 ("[A]n incumbent transmission provider's ability to use a right of first refusal . . . may discourage new entrants from proposing new transmission projects in the regional transmission planning process."). An ISO will not institute a competitive process and issue requests for proposals on projects in Texas if it knows that SB 1938 will prohibit a non-incumbent from obtaining CCNs necessary to build the project. Where, as here, discrimination against interstate commerce "occurs at [a] very early stage" of what would otherwise be a competitive process, "it is unreasonable to expect [NextEra] to point to specific" projects lost. *See Miller*, 44 F.3d at 594. In other words, because SB 1938 itself creates the lack of opportunities, it cannot be the case that a lack of identifiable opportunities precludes a challenge to SB 1938. In any event, SB 1938 not only prevents NextEra, and others, from successfully competing for ISO bids, it also prevents non-incumbents from buying a transmission line—as NextEra attempted to do with the Jackson-Overton Line. *See* Tex. Util. Code § 37.154(a); (Am. Compl., Dkt. 175, ¶ 10, 88). This type of discrimination also constitutes an ongoing injury sufficient for standing.

In sum, Defendants' standing arguments are unconvincing. As the Fifth Circuit has already found, SB 1938 is a statute that facially discriminates against interstate commerce. Because NextEra has previously attempted to enter the interstate transmission market and still seeks that opportunity, SB 1938 infringes upon its right to compete in interstate commerce on equal footing. That injury is sufficient for standing, and this Court need not look further to determine if specific projects would become available to NextEra absent SB 1938. Thus, factual development of Defendants' standing

arguments is unnecessary. NextEra has sufficiently demonstrated that it has standing to pursue its dormant Commerce Clause claims.

### b. Mootness

Next, the Court considers whether this case may be moot because MISO has cancelled the Hartburg-Sabine Transmission Project—NextEra's primary (but not only) example of how SB 1938 has injured its interests in Texas. NextEra argues that despite the cancellation, the Hartburg-Sabine Project is "not dead." (Dkt. 212, at 18). It argues that even though MISO cancelled the project, NextEra has appealed the cancellation, and the D.C. Circuit stayed the appeal pending the outcome of this litigation. (Am. Compl., Dkt. 175, ¶ 84). NextEra argues that this litigation will impact the D.C. Circuit case, which in turn, may reverse the cancellation of the project. This is because, as FERC has acknowledged, "SB 1938 contributed to [MISO's] decision to terminate its agreement with NextEra." Mot. to Hold Appeal in Abeyance, *NextEra Energy Transmission Midwest, LLC v. FERC*, No. 23-1180 (D.C. Cir. Aug. 7, 2023). Thus, according to NextEra, an order from this Court enjoining SB 1938 may lead to a decision reversing the termination of the project. Defendants, on the other hand, point to statements made by MISO and FERC stating that the Hartburg-Sabine Project is no longer needed. Accordingly, Defendants argue that NextEra's success in this case will not revive the project. Defendants ask the Court to allow expert discovery on the issue of whether the evolution of the MISO grid has made the reinstatement of the Hartburg-Sabine Project an impossibility. (*See* Dkts. 224, at 7–10; 226, at 13–14).

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.,* 568 U.S. 85, 91 (2013) (internal quotation omitted). Here, the cancellation of the Hartburg-Sabine Project does not make this case moot because, as explained above, NextEra's standing in this case is not premised solely on the ways in

which SB 1938 inhibited NextEra's pursuit of this particular project. Rather, NextEra is injured by Texas's ongoing discriminatory regime that prevents NextEra from competing for new projects or otherwise entering the interstate transmission market in Texas. NextEra thus has a live challenge to the discriminatory regime that bars it from competing in Texas, and this court has a "virtually unflagging obligation" to exercise jurisdiction and resolve that dispute. *Mata*, 576 U.S. at 150.

Because the issues in this case do not hinge upon the Hartburg-Sabine Project, this Court can determine that this case is not moot without turning to expert testimony about whether the project can and will be revived as a result of this litigation. Accordingly, discovery on this issue is not required, and this Court can proceed in its analysis satisfied that this case is not moot.

c. Ripeness

Defendants also raise concerns about whether this case is ripe because it is unclear whether the ISOs will offer future competitive projects in the MISO or SPP regions of Texas. (*See* Dkts. 224, at 10–12; 226, at 14). The Constitution's cases-and-controversies requirement prohibits federal courts from resolving "abstract disagreements." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). So, when a "case is abstract or hypothetical," a court must dismiss it for lack of ripeness. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987). In determining whether a case is ripe, we examine "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Generally speaking, a case is ripe if it presents questions of law; "conversely, a case is not ripe if further factual development is required." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quoting *New Orleans*, 833 F.2d at 587).

In this case, Defendants' ripeness arguments have been addressed by the Fifth Circuit's opinion on appeal. In *NextEra*, the Fifth Circuit *sua sponte* considered whether NextEra's claims, as

related to the Hartburg-Sabine project, were ripe because NextEra had never applied for a CCN. 48

F.4th at 315–16. The Fifth Circuit found that "[n]o further factual development or exercise of

agency discretion is required for resolution" of NextEra's dormant Commerce Clause or Contract

Clause claims because "[i]t would be futile to require NextEra to obtain agency rejection of its

application when SB 1938 makes that a foregone conclusion." *Id.* at 316.

The same is true now. As explained above, SB 1938 prevents all future projects from even

coming up for a competitive bid. Because laws like SB 1938 "create[] disincentives for non–

incumbents to identify . . . cost-effective solutions to transmission needs," they slow the

identification of new lines entirely. *Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 80 (D.C. Cir. 2016).

In other words, SB 1938 does not just prevent bids, it prevents the identification of lines that could

be subject to those bids. Likewise, SB 1938 prevents NextEra from buying an existing transmission

line because no one would spend the time to identify and negotiate new purchases that are doomed

to fail. Because lost chances to compete form NextEra's injury, this injury is ongoing and imminent.

*See Baughcum v. Jackson*, 92 F.4th 1024, 1036 (11th Cir. 2024) ("In cases involving pre-enforcement

review, like this one, the standing and ripeness analysis tend to converge.").

The Supreme Court's decision in *Pacific Gas & Electric Co. v. State Energy Resources Conservation*

*& Development Commission* also provides support for the ripeness of NextEra's claims. *See* 461 U.S.

190 (1983). In *PG&E*, utilities challenged a California law that prohibited the certification of new

nuclear plants until federal regulators certified that a demonstrated disposal technology existed. *Id.* at

198. The Supreme Court held the challenge ripe, *id.* at 200–02, even though, as the lower court had

found, one of the utilities alleged only that it "had abandoned general plans to build two nuclear

plants at some future time" and the utilities conceded "that their proposed plants are many years

from being eligible for certification." *Pac. Legal Found. v. State Energy Res. Conservation & Dev. Comm'n*,

659 F.2d 903, 910 (9th Cir. 1981). *PG&E* is instructive here because the Supreme Court permitted

the utilities to challenge the California moratorium even though they did not identify specific future projects that would be impacted. Instead, the *PG&E* court focused on whether the legal dispute is sufficiently concrete and whether delayed adjudication would harm the plaintiff. 461 U.S. at 200–02. Here, both elements are satisfied. The MISO tariff, for example, is clear that MISO will not hold a bid if state law makes the bid useless. *See MISO Transmission Owners*, 819 F.3d at 336.

Because SB 1938 itself prevents future competitive bids, the case remains in the same ripeness posture as it was before the Fifth Circuit. Yet again, "[n]o further factual development or exercise of agency discretion is required for resolution of th[ese] legal questions," because requiring additional administrative proceedings would be "futile." *NextEra*, 48 F.4th at 316. And again, "NextEra would suffer hardship" if it had to spend time and money identifying and developing futile bids just to open the courthouse doors. *Id.* "Where the application of a law is inevitable and consequences attach to it, the Court will find the matter ripe before the actual proceedings occur." *Cooper v. McBeath*, 11 F.3d 537, 552 n.7 (5th Cir 1994). SB 1938 makes it inevitable that if NextEra were to try to enter the Texas market, it would fail. Accordingly, NextEra's claims continue to be ripe for review.

### 2. Dormant Commerce Clause Claim

Having found that no justiciability concerns bar consideration of NextEra's motion for judgment on the pleadings, the Court now turns to the merits of NextEra's dormant Commerce Clause claim.

The Constitution extends to Congress the "Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. It is settled that because Congress can regulate interstate commerce, the states cannot erect barriers to the free flow of that commerce. "This negative aspect of that power, known as the dormant Commerce Clause, prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *NextEra*, F.4th

at 317 (quoting *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019)). The first

step in the dormant Commerce Clause analysis is deciding whether a challenged law discriminates

against interstate commerce. *Id.* at 321–22 (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338

(2008)). "A law can discriminate against interstate commerce by its text (or 'face'), effects, or

purpose." *Id.* at 322. In addition, a law that only has incidental effects on interstate commerce may

nonetheless be unlawful if the "burden imposed on such commerce is clearly excessive in relation to

the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

In its complaint, NextEra raised all four of the above theories for how SB 1938 could violate

the dormant Commerce Clause, but NextEra's present motion focuses solely on its facial

discrimination claim. In that regard, the Fifth Circuit has already held that SB 1938 is facially

discriminatory. *NextEra*, 48 F.4th at 326. Thus, the only remaining question is whether SB 1938

survives strict scrutiny.[6]

---

[6] Defendants raise an additional argument for why NextEra's motion should be denied on the merits. Defendants argue that NextEra's motion is precluded because factual development is needed to show whether "the Texas transmission market is fully competitive," which Defendants argue is important to decide whether *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), bars NextEra's claim. (Dkt. 226, at 15; *see also* Dkt. 224, at 12–15). *Tracy* prevented classifying a law as textually discriminatory because it applied primarily to grant utilities a tax preference in a market where they were monopolies. Before the Fifth Circuit, Defendants argued that *Tracy* similarly barred NextEra's claim because Texas's transmission market has significant non-competitive elements. However, the Fifth Circuit rejected that argument, finding that SB 1938 has no application in a "noncompetitive, captive market in which the local utilities alone operate." *NextEra*, 48 F.4th at 319 (quoting *Tracy*, 519 U.S. at 303–04). Rather, because SB 1938 addresses a "single market (transmission)" that is "undoubtedly competitive," "*Tracy* does not shield SB 1938 from dormant Commerce Clause scrutiny." *Id.* at 320. On remand, Defendants now argue that the Fifth Circuit's holding was based on NextEra's allegation that the Texas transmission market is fully competitive, an allegation that the Fifth Circuit had to assume was true in reviewing a Rule 12(b) dismissal. (*See* Dkt. 224, at 15; Dkt. 226, at 13). However, this Court does not read the Fifth Circuit's opinion to be premised on such an assumption. Nowhere in the opinion does the Fifth Circuit state that its holding hinges on the procedural posture of the case. To the contrary, the Fifth Circuit could not have been clearer in stating that Texas's transmission market is "undoubtedly competitive" and that "*Tracy* does not shield SB 1938 from dormant Commerce Clause scrutiny." *NextEra*, 48 F.4th at 320. Defendants' request for factual development on the competitiveness of Texas's transmission market, thus, amounts to nothing more than an attempt to relitigate an issue that the Fifth Circuit has already conclusively decided.

When a state law facially discriminates against interstate commerce, it is subject to the "strictest scrutiny." *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979). Under that "extremely difficult burden," *Camps Newfound*, 520 U.S. at 582, the state must show that its discriminatory law "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of the State of Oregon*, 511 U.S. 93, 101 (1994); *see also NextEra*, 48 F.4th at 326. Even then, "[t]he State's burden of justification is so heavy that facial discrimination by itself may be a fatal defect." *Or. Waste Sys.*, 511 U.S. at 101 (quotation omitted). Thus, once a state law is found to discriminate against interstate commerce, "it is typically struck down without further inquiry." *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 342 (1992). Indeed, this Court is aware of only one case where a facially discriminatory law was found to be justified by the Supreme Court. *See* Donald L. R. Goodson, *Toward A Unitary Commerce Clause: What the Negative Commerce Clause Reveals About the Commerce Power*, 61 Clev. St. L. Rev. 745, 766 (2013) ("*Maine v. Taylor*[, 477 U.S. 131(1986),] is the only instance in which such a discriminatory measure survived judicial challenge.").

In deciding whether SB 1938 advances a legitimate purpose, Texas is limited to the legislature's stated purposes at the time of adoption; post-hoc rationalizations are not permitted. *See Hughes*, 441 U.S. at 338 n.20 (rejecting a justification because it had "the flavor of a post hoc rationalization"); *see also United States v. Virginia*, 518 U.S. 515, 533 (1996) (noting that post-hoc rationalization cannot satisfy heightened scrutiny). The legislature offered four justifications for SB 1938:

- To "codify the existing process in Texas" that the "entity that owns the endpoint of an existing transmission line is the entity that has the right to build any new facility that may be interconnected";
- To "clean-up statutory remnants of the Competitive Energy Zone" buildout and resolve "ambiguity because of statutory exceptions that were included in the Utilities Code to allow outside utilities to construct transmission" as part of that buildout in "areas of West Texas that were not certificated" by the PUCT;

- To "ensure the geographic continuity of the system in a way that further facilitates reliability"; and
- To "ensure[] that," in the "non-ERCOT areas of the state served by utilities engaged in interstate commerce," the PUCT "maintains its current jurisdiction over transmission rates borne by Texas consumers rather than having a federal rate."

Br. of Appellees, *NextEra v. Lake*, 2020 WL 2119791, at *32–33 (5th Cir. Apr. 22, 2020). Three of the four justifications offered in defense of SB 1938 are not legitimate local purposes. And the fourth justification, reliability, while proper, is achievable without discrimination.

First, Texas' claim that SB 1938 is justified as a codification of existing processes is both factually untrue and not a compelling state interest. It is not the case that Texas historically required the end-point owner to build transmission lines. As the Texas Attorney General, PUCT, and the Texas courts have all explained, before SB 1938 Texas law was clear that end-point owners did not have ROFRs. *E.g.*, Br. of Appellee Public Utility Commission of Texas, *Entergy Tex. Inc. v. Pub. Util. Comm'n of Tex.*, Case No. 03-18-00666-CV (Tex. App.—Austin, Mar. 28, 2019); *Joint Petition of Sw. Pub. Serv. Co. & Sw. Power Pool, Inc. for Declaratory Order*, 341 P.U.R.4th 195 (Oct. 26, 2017); *Pub. Util. Comm'n of Tex. v. Cities of Harlingen*, 311 S.W.3d 610 (Tex. App.—Austin 2010, no pet.). The Fifth Circuit also held as much, explaining that SB 1938 "was not meaningless," because before its existence "NextEra had the right to build the new transmission lines," whereas afterward it did not. *NextEra*, 48 F.4th at 326. In any event, codifying longstanding practice is not a compelling state interest if the longstanding practice violates the Constitution. *See NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring) (noting that the Supreme Court has struck down constitutional violations with long vintage); *see also Medellin v. Texas*, 552 U.S. 491, 532 (2008) ("[P]ast practice does not, by itself, create power.") (quotation omitted).

Second, cleaning up statutory language is also not a compelling state interest. That is because, "[a]dministrative convenience is no answer" to facial discrimination against commerce. *See Nat'l Revenue Corp. v. Violet*, 807 F.2d 285, 290 (1st Cir. 1986); *see also Frontiero v. Richardson*, 411 U.S.

677, 690 (1973) (plurality opinion). The changes also go beyond simply cleaning up text; they materially impact the parties and regulation of the industry and cannot be described otherwise.

Third, Texas's desire to avoid federal rates is also not a legitimate state interest. "While states . . . oversee local retail markets, only Congress . . . regulate[s] interstate wholesale transactions." *NextEra*, 48 F.4th at 310. In context then, what Texas means when it says it wants to avoid federal rate regulation is that, even though it has chosen to connect to the interstate grid, it wants to avoid the interstate wholesale market. But balkanizing a state from interstate commerce is the very problem the Commerce Clause is meant to guard against, *Dickerson v. Bailey*, 336 F.3d 388, 395 (5th Cir. 2003), and so Texas's desire to avoid the interstate market—and the federal regulation that comes with it—is not a legitimate local interest, *see Granholm v. Heald*, 544 U.S. 460, 490 (2005) (explaining that a state's desire for "greater regulatory control" does not justify a "discriminatory ban"); *La. Dairy Stabilization Bd. v. Diary Fresh Corp.*, 631 F.2d 67, 70 (5th Cir. 1980) ("The Board . . . contends that the burden on interstate commerce is justified by the legitimate local purpose of preventing local economic disruption" but "the Commerce Clause prevents a state from burdening interstate commerce for the purpose specified[.]").

The fourth, and primary, justification that Texas offers in defense of SB 1938 is that it is needed to ensure the reliability of the electricity grid in the non-ERCOT areas of Texas. Defendants argue that competitive bidding processes for new transmission construction lead to long time delays as that bidding process plays out. (*See* Dkt. 224, at 17). Defendants assert that longer lead times can "delay the ability [of the grid] to serve new loads and address congestion", particularly in a state like Texas that has a "rapidly increasing electric demand." (*Id.*). As Defendants argue: "By retaining control over the decision as to who will build needed new lines, rather than allowing that process to be controlled by federal regulators who may have different priorities, Texas advances its interests in ensuring a reliable electric system for its residents." (*Id.*). Defendants also argue that "[r]eliability can

suffer if projects to address grid problems are not timely placed in service" and that there are "reliability risks" with "adding many new transmission providers into the interconnected grid." (Dkt. 226, at 19). Defendants argue that not only is reliability a legitimate interest, but also that Texas has no reasonable, available alternative means by which to ensure the reliability of the non-ERCOT areas of the electricity grid. They assert that "the *only* way for Texas to advance its interest in avoiding the lead-time delays inherent to competitive processes over which it has no direct regulatory control is to assign responsibility for construction of all transmission in Texas to incumbents over which it has plenary regulatory authority." (Dkt. 224, at 18–19) (emphasis in original).

NextEra does not dispute that reliability of the electricity grid generally is a legitimate state interest. (*See* Dkt. 212, at 9); *see also Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States."). However, a desire to speed transmission development by avoiding federal bidding cannot justify SB 1938 because such a desire is not sufficiently related to an interest in reliability.[7] The federal-bidding process does not undermine reliability by substantially delaying projects because these projects already take years to plan. The type of transmission lines Defendants are concerned about are proposed through federal regional planning bodies to promote long term transmission development. Even without a competitive bidding process, the procedure for identifying those types of regionally planned transmission lines is time consuming. As FERC has explained, even with ROFRs, "[p]ublic utility transmission providers . . . are required to evaluate whether alternative transmission solutions proposed by other developers

---

[7] The Texas legislature did not frame its reliability justification in terms of a concern about delays inherent in the competitive bidding process when it articulated its reasons for enacting SB 1938. Therefore, it is questionable whether Texas can claim such a justification now. *See Hughes*, 441 U.S. at 338 n.20 (rejecting a justification because it had "the flavor of a post hoc rationalization"). Nonetheless, the Court considers and rejects this justification on its merits.

better meet the needs of the region." Order No. 1000, at ¶ 258. In other words, FERC has already

found that eliminating incumbent preferences does not "fundamentally alter regional transmission

planning processes" because no matter what, new proposed lines must be "analyzed to determine

whether regional solutions would be more efficient or cost-effective than the local solutions

identified by individual public utility transmission providers." *Id.* Therefore, Defendants are

incorrect to suggest that local-presence requirements are a solution to long planning horizons;

planning horizons are inevitable in this area because transmission planning takes time.

Further, it is worth noting that FERC already allows SPP to exempt a "time-sensitive"

project from the competitive bidding process when the project is "needed in three years or less to

solve reliability criteria violations." *Sw. Power Pool, Inc.*, 171 FERC ¶ 61,213, at ¶¶ 2-3 (June 18, 2020)

(discussing the "immediate need reliability project exemption"). MISO, too, excludes "baseline

reliability projects," i.e., projects "the sole purpose of which is to solve problems of reliability in

electrical transmission," from competitive bidding. *MISO Transmission Owners*, 819 at 335; *see also*

*Midcontinent Independent System Operator*, 172 FERC ¶ 61,095, ¶¶ 52, 61–64 (July 20, 2020).

Accordingly, it is unclear how the prohibition of competitive bidding processes under SB 1938

ensures reliability on the grid when the most time-sensitive, reliability-focused projects are already

excluded from competitive bidding processes. Instead, it appears that the only transmission lines at

issue here are long-term projects that already take years to plan and do not concern urgent reliability

issues. Defendants' purported interest in reliability cannot justify "a complete ban on new entrants"

in the construction of such projects. *NextEra*, 48 F.4th at 327.

Even if the Court accepts that SB 1938 ensures grid reliability or the speedy construction of

necessary transmission lines, those interests can be achieved through "reasonably nondiscriminatory

alternatives," *Or. Waste Sys.*, 511 U.S. at 101, or "available nondiscriminatory means," *Maine*, 477 U.S.

at 138. Texas already ensures reliability twice-over in its regulatory process: once when PUCT

considers a CCN, *see* 16 Tex. Admin. Code § 25.101 ("[T]he commission will grant an application and issue a certificate only if it finds that the certificate is necessary for the service, accommodation, convenience, or safety of the public[.]"), and again when the utility's facilities are in service and the utility must comply with PUCT's reliability requirements, *see* Tex. Util. Code § 38.005 ("The commission shall implement service quality and reliability standards relating to . . . transmission and distribution utilities."). If those processes are insufficient to ensure reliability, then Texas could enact new laws that add reliability mandates. The constitutional solution to Texas's issue of ensuring reliability is to evenhandedly increase reliability standards, not to treat all out-of-state entities as necessarily unreliable. *See C & A Carbone*, 511 U.S. at 393 ("Clarkstown has any number of nondiscriminatory alternatives for addressing the health and environmental problems alleged to justify the ordinance in question. The most obvious would be uniform safety regulations enacted without the object to discriminate."); *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2459 ("If the State desires to scrutinize its applicants thoroughly, as is its right, it can devise nondiscriminatory means short of saddling applicants with the burden of residing in the State." (cleaned up).

Even to Texas's specific concern about competitive bidding processes causing delays and reliability issues, Texas has reasonable and available alternatives. For example, Texas could condition CCNs for transmission projects on the competitive bidding process being completed within a certain timeframe. Or Texas could accelerate its own review of CCN applications for transmission projects that have already been evaluated by federal regulators. Those options would permit Texas to avoid "time delays attendant to the competitive bidding process," (Dkt. 224 at 17), without wholesale discrimination.

Further, the reliability of interstate transmission projects is assured by FERC and the ISOs. FERC considers reliability when it permits competitive bidding on transmission projects. And although FERC has acknowledged that incumbents "may have certain strengths," it has also

reasoned that "a nonincumbent transmission developer should [not] be categorically excluded from presenting its own strengths in support of its proposals or bids." Order No. 1000, at ¶ 260. Thus, FERC requires that ISOs consider reliability in awarding projects. *Id.* at ¶ 342. That has played out in practice. For example, MISO considered reliability and awarded NextEra a project over bids submitted by Texas' incumbents. *See* MISO, Selection Report: Hartburg-Sabine Junction 500 kV Competitive Transmission Project, 21 (2018).[8] In doing so, MISO explained that NextEra offered "top-tier plans," an "ability to leverage an affiliate with extensive 500 kV experience in hurricane-prone areas to support integration of the project into its local control center," "field crews local to the project area with extra-high voltage . . . experience, access to specialized equipment for the terrain, and hurricane preparedness and response plans developed and tested over time," and "a well-supported predictive maintenance program and documented access to a large inventory of spare parts." *Id.* at 21–22. Thus, the facts of this case further demonstrate that Defendants' concern about "the reliability risks involved with adding many new transmission providers into the interconnected grid, (Dkt. 226, at 19), is unfounded. NextEra—a new out-of-state company who would be new to the interstate transmission grid in Texas—was found to be most reliable in the Hartburg-Sabine bidding process.

The availability of reasonable, alternative means is also supported by looking to other states' practices. As the Fifth Circuit noted, "[t]he vast majority of states" do not have a ban on non-incumbents like Texas. *NextEra*, 48 F.4th at 326. Those states' experiences and chosen practices strongly suggests that Texas has other ways to secure any benefits related to reliability or timely construction of transmission lines. *See Granholm*, 544 U.S. at 491 (finding that a less discriminatory alternative was viable because it was in use in "various States"); *Nat'l Revenue Corp.*, 807 F.2d at 290

---

[8] The Hartburg-Sabine Project Report is available at https://cdn.misoenergy.org/Hartburg-Sabine%20Junction%20500%20kV%20Selection%20Report296754.pdf.

("[T]hat the other states have found it practical to [use] less-restrictive means puts a heavy burden on the state.").

Defendants contend that additional facts are needed to test these proposed reasonable alternatives. They argue that they can present expert testimony that "will explain that Texas has no control over the federal competitive process or the speed with which competitive projects are selected and built." (Dkt. 224, at 18; *see also* Dkt. 226, at 18–19; Dkt. 227, at 2–3). But the Supreme Court has not demanded this type of expert evidence, which is why courts have granted judgment on the pleadings under the commerce clause. *E.g.*, *S. Glazer's Wine & Spirits, LLC v. Harrington*, 594 F. Supp. 3d 1108, 1123 (D. Minn. 2022). Indeed, in dormant Commerce Clause cases, the Supreme Court has routinely analyzed whether a state has an adequate nondiscriminatory alternative in less demanding ways. For example, in *Granholm v. Heald*, the Court found that New York had an adequate nondiscriminatory alternative by citing one New Hampshire law adopting a nondiscriminatory approach, an FTC report, and model legislation. *See* 544 U.S. at 491–92. Likewise, in *C & A Carbone, Inc. v. Town of Clarkstown*, the Court held that Clarkstown had nondiscriminatory options by relying on common sense and logic. *See* 511 U.S. at 393; *see also Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 43 (1980) (relying on logic alone to find a less discriminatory alternative); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 629 (1978) (same); *Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 328 (5th Cir. 2022) (hypothesizing less discriminatory alternatives based on logic). Therefore, the Court finds that no further factual development is necessary to properly analyze whether Texas has reasonable, available alternatives to ensure reliability in the interstate grid. Rather, the legal issue of whether Texas can satisfy strict scrutiny can be resolved by reference to the pleadings, judicially noticed facts, and common sense. Thus, NextEra has carried its burden in demonstrating that its motion for judgment on the pleadings is an appropriate method by which to enter judgment in this case.

In sum, the Court finds that SB 1938 does not advance a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. Three of Texas's four purported justifications are not compelling state interests. Texas's fourth justification—promoting reliability by avoiding delays inherent in a competitive bidding process—also fails. It is dubious whether SB 1938 actually promotes this interest given that time delays are already inherent in the long-term planning of transmission projects, ISOs already exempt the most time-sensitive reliability projects, and FERC has found that non-incumbents can reliably provide transmission. Even if SB 1938 does advance an interest in grid reliability, reliability can be ensured through alternative means, such as PUCT's existing oversight authority, current considerations in ISO bidding processes, and new Texas laws aimed more directly at reliability. Because SB 1938 facially discriminates based on interstate commerce and does not survive strict scrutiny, the statute is unconstitutional under the Commerce Clause.[9] As such, the Court will grant NextEra's motion for judgment on the pleadings, provide Plaintiffs with the declaratory and injunctive relief that they seek, and enjoin the enforcement of SB 1938 in the non-ERCOT regions of Texas.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that SPS and Entergy's cross-motion for judgment on the pleadings, (Dkt. 225), is **DENIED**.

**IT IS FURTHER ORDERED** that NextEra's motion for judgment on the pleadings, (Dkt. 212), is **GRANTED**. Plaintiffs are entitled to judgment on their Commerce Clause claims and injunctive and declaratory relief. The Court will issue a permanent injunction enjoining the PUCT Defendants from enforcing SB 1938 in the non-ERCOT regions of Texas.

---

[9] Because the Court finds that SB 1938 is unconstitutional because it facially discriminates against interstate commerce, further adjudication of NextEra's other Commerce Clause claims—discriminatory effects, discriminatory purpose, or undue burden under *Pike*—is unnecessary.

**IT IS FINALLY ORDERED** that LSP's motion for preliminary injunction, (Dkt. 237), is **MOOT**.

The Court will enter final judgment by separate order.

**SIGNED** on October 28, 2024.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE